Bryan L. Sells (bryan@bryansellslaw.com) *(pro hac vice admission pending)*
THE LAW OFFICE OF BRYAN L. SELLS, LLC
P.O. Box 5493
Atlanta, GA 31107
Telephone: (404) 480-4212

Cheylynn Hayman (9793) (chayman@parrbrown.com)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840

Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED UTAH PARTY, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>SPENCER J. COX, in his official capacity as the Lieutenant Governor of the State of Utah,<br><br>    Defendant. | **MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>(**Expedited Consideration Requested**)<br><br>Case No. 2:17-cv-00655-DN<br><br>Judge David Nuffer |

Plaintiffs the United Utah Party, Jim Bennett, Diane Knight, Vaughn R. Cook, and Aaron Aizad (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this Motion for Temporary Restraining Order and Preliminary Injunction ("Motion").

## INTRODUCTION

This lawsuit is about access to the ballot in the special congressional election to fill an impending vacancy created by the anticipated resignation of U.S. Representative Jason E. Chaffetz.  The newly-formed United Utah Party wants to run a candidate in the special election, but Utah law—as applied here by the Lieutenant Governor—effectively shuts the party out of the special-election process.  By limiting the choices available to Utah voters in this election, the Lieutenant Governor's actions strike at the heart of representative democracy and violate the First and Fourteenth Amendments to the United States Constitution.  The United Utah Party and four individual plaintiffs therefore move the Court for a temporary restraining order and preliminary injunction prohibiting the Lieutenant Governor from failing to include the United Utah Party's nominee on the ballot in the special congressional election.

Because the campaign is already underway and the Lieutenant Governor is scheduled to certify the special election ballot on August 31, 2017, the Plaintiffs respectfully request that the Court order expedited briefing and schedule an expedited hearing on this Motion.

## STATEMENT OF RELIEF SOUGHT AND PRECISE GROUNDS FOR MOTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Plaintiffs request that the Court enjoin the Lieutenant Governor from refusing to include the United Utah Party's nominee, Jim Bennett, on the ballot in the special election to be held on November 7, 2017, in the Third Congressional District.  The basis for this Motion is that (1) the Plaintiffs are likely to succeed on the merits of their 42 U.S.C. § 1983 claim; (2) the Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in favor of issuing the injunction; and (4) the requested injunction is in the public interest.

2

Pursuant to DUCivR 7-1(f), the Plaintiffs respectfully request oral argument on this Motion.

## RELEVANT FACTS

### The Lieutenant Governor Sets a Special Election Process and Calendar for the June 30, 2017 Vacancy of the Third Congressional District of Utah

On May 18, 2017, U.S. Representative Jason Chaffetz notified Governor Gary Herbert of his intent to resign from his congressional seat at the close of business on June 30, 2017. The next day, Lieutenant Governor Spencer Cox ordered a special election to fill the expected vacancy.[1] [*See* Verified Complaint, Dkt. 2-1.] This order is hereinafter referred to as the "May 19 order." Because Utah law does not specifically provide for special elections beyond stating that "[w]hen a vacancy occurs for any reason in the office of a representative in Congress, the governor shall issue a proclamation calling an election to fill the vacancy," Utah Code § 20A-1-502, the May 19 order prescribes the process for holding the special election, and it lists a series of deadlines leading up to the special election on November 7, 2017. [Dkt. 2-1.]

Under the May 19 order, ballot access for the special election is governed by the procedures for a regular general election except for the deadlines in the order itself. [*Id.*] Utah law provides two paths for ballot access in regular general elections: one for candidates who win the nomination of a "registered political party," and one for unaffiliated candidates. *See* Utah Code § 20A-9-401 to -411; *Id.* § 20A-9-501 to -504. Registered political parties nominate their candidates for a regular general election by convention or primary election, and candidates

---

[1] Copies of Congressman Chaffetz's letter to Governor Herbert and the Lieutenant Governor's May 19 order are also available on the Utah Lieutenant Governor's Elections website at www.elections.utah.gov, under the link "3rd Congressional District Info."

3

nominated by a registered political party automatically earn a place on the general election ballot. *See id.* §§ 20A-9-407-408. An unaffiliated candidate—that is, a candidate who is not affiliated with a registered political party—nominates himself or herself for a regular general election by submitting a nominating petition with a sufficient number of signatures. *See id.* § 20A-9-501-503. All candidates seeking to appear on a general election ballot must also file a declaration of candidacy form and, unless seeking a waiver due to financial hardship, pay a filing fee. *See id.* § 20A-9-201.

Two deadlines set out in the May 19 order are relevant here. First, the order required candidates seeking a party nomination to file their declaration of candidacy form with the Lieutenant Governor by 5:00 p.m. on May 26. [Dkt. 2-1.] Second, it required parties nominating by convention to certify their nominee to the Lieutenant Governor by noon on June 19. [*Id.*]

### The Path to Becoming a Registered Political Party and Party Candidate on the Ballot

A "registered political party" is any party that: (1) participated in the last regular general election and met a certain vote threshold in at least one of the last two regular general elections; or (2) is a new political party and has complied with the petition and organizational requirements of Utah law. Utah Code § 20A-8-101(4). The Utah Code permits a would-be party to circulate a petition seeking registered-party status beginning on the date of the statewide canvass in the last regular general election. Utah Code § 20A-8-103(2)(a). The petition must be signed by at least 2,000 registered voters, and it must be submitted to the Lieutenant Governor "on or before November 30 of the year in which a regular general election will be held." Utah Code § 20A-8-103(2)(b). The would-be party must also file certain other documents about party rules and

organization, Utah Code § 20A-8-401(b), and submit a proposed name or emblem that is sufficiently distinguishable from that of other political parties. Utah Code § 20A-8-103. Once the petition is filed, the Lieutenant Governor must review the documents and certify his findings "within 30 days." Utah Code § 20A-8-103(6).

Party registration confers at least two important advantages. First, and most obviously, party registration gives the party access to the ballot. It allows a party to nominate a candidate who will appear automatically on the ballot in any partisan general election held anywhere in the State. *See* Utah Code § 20A-8-106(3). Second, party registration gives each of the party's nominees an accurate and informative party label once on the ballot. Utah law requires that general-election ballots include a party designation for each candidate nominated by a registered political party but requires all other candidates, regardless of their actual political affiliation, to be listed without a party name and with a disclaimer that "[t]his candidate is not affiliated with, or does not qualify to be listed on the ballot as affiliated with, a political party." Utah Code § 20A-6-301(1)(e). Utah law provides no way other than party registration for a party candidate to be listed on the ballot with an accurate and informative party label.

Notably, Utah law does not specifically provide for party registration in a special election, and the Lieutenant Governor's May 19 order is also silent on the issue.

### Jim Bennett's Attempt to Declare his Candidacy for the United Utah Party's Nomination

The United Utah Party is an unincorporated association of Utah citizens founded in April 2017. [Verified Complaint, Dkt. 2, ¶ 2.] The party hopes to appeal to both Republicans and Democrats who believe that their party has become too extreme and also to moderate independent voters who believe that neither the Republican nor the Democratic party adequately

5

represents their views. [*Id.* ¶ 2.] Among the party's founding members is Jim Bennett, the son of former Republican U.S. Senator Bob Bennett. [*Id.* ¶¶ 3.]

Following the Lieutenant Governor's May 19 order, party leaders announced their intention to run a party candidate in the race to succeed Congressman Chaffetz. [Dkt. 2, ¶ 42.] The party immediately began gathering signatures on a petition seeking registered-party status and submitted approximately 2,100 signatures, along with the other papers necessary to organize the party, to the Lieutenant Governor on May 25. [*See id.* ¶¶ 42-43, 46.] The party submitted an additional 600 or so signatures on May 26, and the Lieutenant Governor received all of the party's filings without incident. [*See id.* ¶ 43.]

Later on May 26, Bennett appeared in the Lieutenant Governor's office and tried to file a declaration of candidacy seeking the nomination of the United Utah Party in the special congressional election. [Dkt. 2, ¶¶ 45-46.] The Lieutenant Governor's office refused to accept the declaration because his office had not yet certified the United Utah Party as a newly registered political party. [*Id.* ¶ 46.] Bennett asked officials whether he could file his declaration provisionally, pending the Lieutenant Governor's review of the party's filings, and he was told no. [*Id.* ¶ 48.] Bennett had previously asked whether he could file provisionally as an unaffiliated candidate and then become the party's candidate upon its certification as a registered political party. He was also told no. [*Id.* ¶ 49.]

On June 17, 2017, the United Utah Party held a convention to nominate a candidate in the special election. [Dkt. 2, ¶ 53.] Bennett was unopposed and received the party's nomination. [*Id.*] Davis certified Bennett's nomination to the Lieutenant Governor's office in writing on the morning of June 19. [*Id.* ¶ 54.]

On June 20, 2017, an attorney for the Lieutenant Governor confirmed that regardless of whether the United Utah Party satisfies the requirements for registered-party status, the Lieutenant Governor will not place Bennett's name on the special election ballot as the party's nominee.  [Dkt. 2, ¶ 57.]

**ARGUMENT**

To obtain a temporary restraining order or a preliminary injunction,[2] a plaintiff must show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Plaintiffs can satisfy these elements here.

**I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT EXCLUDING NEW POLITICAL PARTIES FROM A SPECIAL ELECTION VIOLATES THE FIRST AMENDMENT.**

The concept of liberty assured by the Due Process Clause of the Fourteenth Amendment embraces those rights and freedoms which are "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937) (Cardozo, J.). Among these most fundamental rights and freedoms are those that flow from the First Amendment, including the freedom of speech, *Gitlow v. New York*, 268 U.S. 652, 666 (1925), the freedom "to engage in association for the advancement of beliefs and ideas," *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) (Harlan, J.), and "the right of citizens to create and develop new political parties." *Norman v. Reed*, 502 U.S. 279, 288 (1992).

Ordinarily, state laws that impinge upon fundamental liberties are automatically subject to strict judicial scrutiny. *See, e.g., Shapiro v. Thompson*, 394 U.S. 618 (1969). The Supreme Court has recognized, however, that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to

---

[2] The analysis for a motion for preliminary injunction and a request for temporary restraining order is the same. *See Kansas Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1551 (D. Kan. 1993).

accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). For this reason, the Court has adopted a special balancing test for evaluating constitutional claims against state election laws, all of which inevitably affect the fundamental rights of political parties, candidates, and voters:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Under this test, the level of scrutiny varies on a sliding scale with the extent of the asserted injury. When, at the low end of the scale, the law "imposes only 'reasonable, nondiscriminatory restrictions' upon First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are general sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 788, 788-89 n.9). But when the law places "severe" burdens on the rights of political parties, candidates, or voters, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* at 434 (quoting *Norman*, 502 U.S. at 289).

### A. Excluding New Political Parties from a Special Election Imposes Constitutional Burdens That Warrant Strict Scrutiny.

The Lieutenant Governor's application of Utah law in this instance to exclude the United Utah Party from the special-election ballot burdens two distinct and fundamental rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."

*Rhodes*, 393 U.S. 23, 30 (1968). "Both of these rights, of course, rank among our most precious freedoms." *Id.*

The right to associate, which includes the "right of citizens to create and develop new political parties," is obviously diminished if the party can be kept off the ballot. *Norman*, 502 U.S. at 288; *see also Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). Ballot-access restrictions also implicate the right to vote because, except for initiatives and referenda, "voters can assert their preferences only through candidates or parties or both." *Lubin v. Panish*, 415 U.S. 709, 716 (1974). "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Id.*

The magnitude of those burdens here is undoubtedly severe: the United Utah Party is effectively barred from running a party candidate in the special congressional election. There was literally no realistic way for the party to submit its petition and other documents sufficiently far in advance to ensure that it would be a registered party before the May 26 deadline for party candidates to file their declaration of candidacy form. The party would have had to predict not only Congressman Chaffetz's resignation but also the contents of the Lieutenant Governor's May 19 order. That is an impossible bar.

It also bears repeating that Utah law gives the Lieutenant Governor up to 30 days to review a prospective new party's filings. Utah Code § 20A-8-103(6). To ensure a place on the ballot, the United Utah Party would have had to file its papers in mid-April, several weeks before Congressman Chaffetz announced his intent to resign. While the Lieutenant Governor may take less than 30 days to review a party's filings if he wishes, there is no reason to believe that he would have done so here. Indeed, it has already been almost 20 days since the party submitted

10

its petition containing the required 2,000 signatures, and the Lieutenant Governor has yet to act. Simply stated, the deadlines set by the Lieutenant Governor's May 19 order, combined with his refusal to accept Bennett's declaration of candidacy form on May 26—even on a provisional basis—have shut the United Utah Party out of the special election.

Case law offers some guidance on how to weigh these burdens. Generally, a ballot-access law imposes a severe burden if it "'freeze[s] the status quo' by effectively barring all candidates other than those of the major parties" and does not "provide a realistic means of ballot access." *Libertarian Party v. Florida*, 710 F.2d 790, 793 (11th Cir. 1983) (quoting *Jenness v. Fortson*, 403 U.S. 431, 439 (1971)); *accord Arutunoff v. Oklahoma State Election Board,* 687 F.2d 1375, 1378 (10th Cir. 1982); *Blomquist v. Thomson*, 591 F. Supp. 768, 774 (D. Wyo. 1984). Thus, the Supreme Court applied strict scrutiny to several provisions of Ohio's restrictive election code which together made it "virtually impossible for any party to qualify on the ballot except the Republican and Democratic Parties." *Williams v. Rhodes*, 393 U.S. at 24.

In the context of a special election, the most closely analogous case is *Green Party of Arkansas v. Priest*, 159 F. Supp. 2d 1140 (E.D. Ark. 2001). There, the court enjoined enforcement of Arkansas' party-recognition scheme as applied to a special congressional election to fill a vacancy caused by the resignation of Representative Asa Hutchinson, who was appointed by President George W. Bush to lead the Drug Enforcement Administration. Hutchinson resigned in August, and Governor Mike Huckabee called a special election to be held in late November to fill the vacancy. The Green Party of Arkansas, which was not yet recognized as a political party by the State, wanted to run a candidate in the special election, but

Arkansas law provided no mechanism by which the party could gain recognition before December in an odd-numbered year.

The court found that the burdens imposed by Arkansas' party-recognition scheme were sufficiently severe to warrant strict scrutiny because, as in this case, state law made it virtually impossible for the Green Party to participate in the special election. *Id.* at 1144. In reaching that conclusion, the court expressly rejected the state's argument that "[e]ven though this special election was unknown and unforeseen during last year's general election, the Green Party had every opportunity to become a recognized political party last year." *Id.* at 1144 n.2.

More recently, two courts have applied strict scrutiny to ballot-access restrictions which made it very difficult, but not technically impossible, for independent and minor-party candidates to participate in a special congressional election. *See Breck v. Stapleton*, No. 1:17-CV-36, 2017 WL 1319742, Slip Op. at 14 (D. Mont. April 8, 2017) (finding that Montana's signature requirement imposed severe constitutional burdens when applied in a special congressional election); *Hall v. Merill*, 212 F. Supp. 3d 1148, 1165-68 (M.D. Ala. 2016) (finding that Alabama's signature requirement imposed severe constitutional burdens when applied in a special congressional election). Compared to those restrictions, the total exclusion the United Utah Party from the special congressional election surely imposes severe burdens.

This Court should therefore conclude that the Lieutenant Governor's May 19 order, and his subsequent implementation of it, imposes severe constitutional burdens and merits strict scrutiny.

### B. A Process That Prevents New Parties from Participating in a Special Election Is Not Narrowly Tailored to Advance a Compelling State Interest.

Because the May 19 order imposes severe constitutional burdens, it must be narrowly drawn to advance a compelling state interest. Although it remains to be seen what interests, if any, the Lieutenant Governor will identify in support of the deadline, the State has no compelling interest in preventing new political parties from participating in the special election.

While a state has a "compelling" interest in "the stability of its political system," *Storer v. Brown*, 415 U.S. at 736, the Supreme Court has made clear that this interest does not extend so far as to permit a state to protect existing parties from competition with independent or minor-party candidates. *Anderson*, 460 U.S. at 801-02. Indeed, "[c]ompetition in ideas and governmental policies is at the core of our electoral process and of the First Amendment Freedoms." *Id.* at 802 (quoting *Williams v. Rhodes*, 393 U.S. at 32). There is thus a critical difference between a legitimate stability interest in avoiding "splintered parties and unrestrained factionalism," *Storer*, 415 U.S. at 736, and an illegitimate stability interest "in protecting the two major political parties," *Anderson*, 460 U.S. at 802. The May 19 order serves the latter and not the former here.

In short, because the May 19 order is not narrowly tailored to advance a compelling state interest, it is highly likely that the Plaintiffs will succeed on the merits of their due process claims.

### II. THE PLAINTIFFS WILL CONTINUE TO SUFFER IRREPARABLE HARM UNLESS AN INJUNCTION IS ISSUED.

Harm is irreparable for purposes of a preliminary injunction when a court would be unable to compensate the plaintiffs adequately if they should prevail when the case is fully

resolved on the merits.  Free speech restrictions and harms that touch upon the constitutional and statutory rights of political parties, candidates, and voters are generally not compensable by money damages and are therefore considered irreparable.  *See, e.g., Elrod v. Burns*, 427 U.S. 347 373 (1976) (plurality opinion) ("The loss of First Amendment Freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Hobby Lobby Stores, Inc. v. Sebelius,* 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc), *aff'd* 134 S. Ct. 2751 (2014); *League of Women Voters v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).

Part of the reason for this treatment of political and voting harms is the special importance of the right to vote in the American democratic tradition:

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.  Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

*Reynolds v. Sims*, 377 U.S. 533, 561-62 (1962); *accord Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.").  Money cannot fully compensate an individual for the loss of a right so fundamental.  Part of the reason is also practical: a court simply cannot undo, by means of a special election or otherwise, all of the effects of an invalid election.  Tremendous practical advantages accrue to those who win even tainted elections, and a court simply has no way to re-level the playing field.

In this case, the irreparable nature of the threatened injuries is obvious.  Without an injunction, the Lieutenant Governor will print and distribute ballots without the United Utah

14

Party's nominee. But the injury has already begun. The special-election campaign is fully underway even today. Every day that the Lieutenant Governor refuses to place Bennett on the ballot as the nominee of the United Utah Party is a day that the Plaintiffs are deprived of the ability to campaign effectively for the United Utah Party, its candidate, and its message of inclusion, and to effectively solicit and use donations in support of that campaign. Under these circumstances, the Plaintiffs are suffering actual, imminent, and irreparable harm in the absence of the requested relief.

### III.     THE BALANCE OF EQUITIES TIP DECISIVELY IN FAVOR OF THE PLAINTIFFS.

The third *Winter* factor requires the Court to consider the potential impact that the requested injunction might have upon the Lieutenant Governor, and to balance that potential with the considerable and irreparable harms that the Plaintiffs would suffer should their request be denied. There is no question that the balance of equities tip in favor of the Plaintiffs here.

The Lieutenant Governor will suffer no harm if the injunction is granted. By contrast, both Plaintiffs and Bennett will continue to be significantly and irreparably harmed in the absence of an injunction.

Bennett is the United Utah Party's unopposed candidate, and the Lieutenant Governor is being asked to do nothing more than place Bennett's name and party affiliation on the special election ballot when the ballot is certified on August 31, 2017. Such a straight-forward and common-sense remedy tips decidedly in favor of the Plaintiffs when weighed against the irreparable constitutional harm they will suffer if the injunction is denied.

## IV. THE ISSUANCE OF AN INJUNCTION IS IN THE PUBLIC INTEREST.

The public interest in this case is clear. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby*, 723 F.3d at 1145 (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir. 2012)). Moreover, the requested injunction will ensure that Utah citizens have an opportunity to vote for candidates of their choice. Without such an injunction, voter choices will be limited. The public undoubtedly has a vital interest in a broad selection of candidates as well as the conduct of free, fair, and constitutional elections. *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (recognizing the public has a "strong interest in exercising the fundamental political right to vote" (citations omitted)). The requested injunction, if granted, would therefore favor the public interest.

## CONCLUSION

For all the foregoing reasons, the Plaintiffs respectfully request that the Court grant their Motion for Temporary Restraining Order and Preliminary Injunction, an enjoin the Lieutenant Governor from refusing to include Bennett as the United Utah Party's nominee on the ballot in the special election to be held on November 7, 2017, in the Third Congressional District.

RESPECTFULLY SUBMITTED this 21st day of June 2017.

                                        THE LAW OFFICE OF BRYAN L. SELLS, LLC

                                        /s/ Bryan L. Sells
                                        Bryan L. Sells

                                        PARR BROWN GEE & LOVELESS, P.C.

                                        /s/ Cheylynn Hayman
                                        Cheylynn Hayman

                                        *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 21st day of June 2017, a true and correct copy of the foregoing **MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** was served via email on the following:

Thomas D. Roberts
Assistant Attorney General
160 E. 300 S., Suite 500
PO Box 140857
Salt Lake City, Utah 84114-0857
thomroberts@agutah.gov

/s/ Cheylynn Hayman