DAVID N. WOLF (6688)
THOMAS D. ROBERTS (2773)
Assistant Utah Attorneys General
OFFICE OF THE UTAH ATTORNEY GENERAL
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: dnwolf@agutah.gov
E-mail: thomroberts@agutah.gov

*Counsel for Defendant*

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED UTAH PARTY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SPENCER J. COX, in his official capacity as the Lieutenant Governor of the State of Utah,<br><br>Defendants. | **DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br><br>Case No. 2:17-cv-00655-DN<br><br>Judge David Nuffer |

TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................vii

II.   STIPULATED FACTS.......................................................................................viii

III.  ADDITIONAL FACTS ........................................................................................xx

IV.   LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS ................................xxvii

V.    LEGAL STANDARD IN BALLOT ACCESS CASES ..................................xxix

VI.   ARGUMENT ...........................................................................................................1

I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR
      CLAIMS. ................................................................................................................1

      A.   The Lt. Governor Has the Authority to Establish the Timing Governing
           the Special Election: ...................................................................................1

      B.   The Special Election Process Does Not Burden Plaintiffs' Constitutional Rights...3

           1.   Plaintiffs Retain the Right to Advance Political Beliefs....................................3

           2.   UUP Voters Can Cast Their Votes Effectively...................................................7

      C.   Utah's Statutory Requirements to Become a Registered Political Party Are
           Reasonable Non-Discriminatory Regulations, Necessary for the State to Conduct
           Orderly and Fair Elections. .........................................................................8

      D.   The State Interests are Important, Compelling, and Outweigh the Claimed
           Burdens.........................................................................................................15

      E.   The Party Registration Requirements and Special Election Process Are Narrowly
           Tailored to Serve Compelling State Interests.................................................17

      F.   The Cases Upon Which Plaintiff's Rely Are Distinguishable................................19

VII.  PLAINTIFFS ARE NOT IRREPARABLY HARMED. ...............................25

VIII. THE BALANCE OF EQUITIES AND PUBLIC INTEREST IS NOT IN PLAINTIFFS'
      FAVOR. .......................................................................................................25

CONCLUSION....................................................................................................26

TABLE OF AUTHORITIES

**Cases**

*ACLU of N.M. v. Santillanes*, 546 F.3d 1313 (10th Cir.2008)....................................................20

*ACLU of Ohio v. Taft*, 385 F.3d 641 (6th Cir. 2004) ..................................................................1

*Am. Party of Tex. v. White*, 415 U.S. 767 (1974).......................................................................18

*Anderson v. Celebreeze*, 460 U.S. 780 (1983) ...........................................30, 31, 6, 14, 17, 18, 19

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012)........................................................................29

*Burdick v. Takushi*, 504 U.S. 428 (1992).................................................................31, 3, 4, 6, 16

*California Democratic Party v. Jones*, 530 U.S. 567 (2000) ......................................................11

*Coal. for Free & Open Elections, Prohibition Party v. McElderry*, 48 F.3d 493 (10th Cir. 1995)
...........................................................................................................................................25

*Curry v. Buescher*, 394 F. App'x. 438 (10th Cir. 2010)..................................................32, 14, 20

*Feldman v. Arizona Sec'y of State's Office*, 843 F.3d 366 (9th Cir. 2016) .................................25

*Fox v. Paterson*, 715 F. Supp. 2d 431 (W.D.N.Y. 2010)............................................................2

*Green Party of Arkansas v. Martin*, 649 F.3d 675 (8th Cir. 2011)............................................17

*Heideman v. South Salt Lake City*, 348 F3d 1182 (10th Cir. 2003) ......................................28, 29

*Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979)...............................17

*Jackson v. Ogilvie*, 426 F.2d 1333 (7th Cir. 1970) ....................................................................1

*Jenness v. Fortson*, 403 U.S. 431 (1971) ...............................................................10, 16, 17, 24

*Kikumura v. Hurley*, 242 F.3d 950 (10th Cir. 2001)..................................................................28

*Libertarian Party of N. Dakota v. Jaeger*, 659 F.3d 687 (8th Cir. 2011)...................................18

*Lubin v. Panish*, 415 U.S. 709 (1974).......................................................................................7

*Munro v. Socialist Workers Party*, 479 U.S. 189(1986).......................................................17, 19

*N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196 (2008) ...............................................11

*No. 1:17-CV-36*, 2017 WL 1319742.................................................................................20, 21, 22

*Norman v. Reed*, 502 U.S. 279, 112 S. Ct. 698, 116 L. Ed. 2d 711 (1992) ................................31

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) .28

*Purcell v. Gonzalez*, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) .........................................25

*Rainbow Coalition of Oklahoma*, 844 F2d 740 (10th Cir. 1988) ................................................25

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009)....................................................28

*Rossito-Canty v. Cuomo*, 86 F. Supp. 3d 175 (E.D.N.Y. 2015) .................................................15

*SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096 (10th Cir. 1991)............................................28

*Schrier v. University of Colo.*, 427 F.3d 1253 (10th Cir. 2005) ...........................................28, 29

*Smith v. Allwright*, 321 U.S. 649 (1944).....................................................................................11

*Socialist Labor Party v. Rhodes*, 290 F. Supp. 983 (S.D. Ohio) .................................................8

*Storer and Brown*, 415 U.S. 724 (1974) ................................................30, 31, 3, 5, 6, 16, 20

*Sweeney v. Bane*, 996 F.2d 1384 (2d Cir.1993)........................................................................29

*Terry v. Adams*, 345 U.S. 461 (1953) .......................................................................................11

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ..................................3, 4, 5, 16

**Statutes**

42 U.S.C. § 1973l(c)(1)...............................................................................................................6

52 U.S. Code § 20302(a)(8)................................................................................................13, 20

Article I, section 2 of the United States Constitution ..................................................................1

Mont. Code Ann. §§ 13-25-205 and 13-10-601 ........................................................................21

Mont. Code Ann. §§ 13-25-205(2) and 13-10-502....................................................................21

U.S. Const., art. 1, § 2, cl. 4.  Article I, section 4 .......................................................................1

Utah Code 20A-8-103(2)(b) .................................................................................25, 9

Utah Code 20A-8-401 ............................................................................................25

Utah Code 20A-9-201(5)(b) ..................................................................................27

Utah Code Ann. § 20A-8-102(1) ...........................................................................11

Utah Code Section 20A-1-502 ...............................................................................10

Utah Code § 20A-16-403 .................................................................................13, 20

Utah Code § 20A-6-301(1) .....................................................................................21

Utah Code § 20A-6-301(1)(e) ...........................................................................11, 10

Utah Code § 20A-8-101(4) .....................................................................................10

Utah Code § 20A-8-102(2) .....................................................................................10

Utah Code § 20A-8-103(2) .....................................................................................19

Utah Code § 20A-8-103(2)(a) ................................................................................12

Utah Code § 20A-8-103(3)(i) .................................................................................15

Utah Code § 20A-8-103(6) ................................................................................12, 9

Utah Code § 20A-8-103(7)(a) ...........................................................................12, 9

Utah Code § 20A-8-106 ..........................................................................................18

Utah Code § 20A-8-106(1) .....................................................................................10

Utah Code § 20A-8-106(2) ................................................................................12, 10

Utah Code § 20A-8-106(3) .......................................................................................3

Utah Code § 20A-8-401(2) .....................................................................................15

Utah Code § 20A-9-202(1)(a)(i) ............................................................................13

Utah Code § 20A-9-403 ............................................................................................9

Utah Code § 20A-9-502 .................................................................................22

Utah Code § 20A-9-601 .................................................................................6, 8

Utah Code § 67-1a-2(a) .................................................................................1

**Rules**

Fed. R. Civ. P. 65 .................................................................................7

Pursuant to Fed. R. Civ. P. 65 and DUCivR 7-1(b), the Lieutenant Governor of the State of Utah, Spencer J. Cox ("LG") submits this Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.[1]

## I.    INTRODUCTION

The United Utah Party ("UUP") was not a registered political party when the period to declare candidacy for the special election for the Third Congressional District of Utah expired. UUP seeks to circumvent the statutory requirements to become a newly registered political party and asks this Court to "enjoin the LG from refusing to include Bennett as the United Utah Party's nominee on the ballot in the special election to be held on November 7, 2017, in the Third Congressional District."  Thus, this case is not about whether Utah's general election laws or the special election process established by the LG unconstitutionally infringe on Bennett's right to be on the ballot.  Bennett could have accessed the ballot as an unaffiliated candidate but chose not to do so.  Instead, the issue in this case is whether the state must allow a political party's nominee a place on the ballot when that political party has not complied with the political party registration requirements.

Here, Plaintiffs claim that their First Amendment rights are unconstitutionally restricted by Utah's party-registration statutes and the special election deadlines and procedures. Plaintiffs complain that the UUP's nominee should be able to file a declaration of candidacy and access the ballot for the special election **before** the UUP satisfies the statutory requirements to be a registered political party.  Specifically, UUP contends that the statutory requirements to

---

[1] *See* doc. 5.

become a registered political party when combined with the special election procedures "burden[] two distinct rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."[2]  Contrary to UUP's contentions, however, a careful examination of the rights at issue, the burdens allegedly imposed, and the State's interest advanced by both the statutory requirements to become a registered political party and the special election process demonstrate that the regulations for the special election are well within constitutional boundaries.

## II.      STIPULATED FACTS[3]

1.      Plaintiff United Utah Party is an unincorporated voluntary political association of Utah citizens who seek to associate and express their political views.

2.      The party was founded in April 2017.

3.      Plaintiff James ("Jim") Bennett is a founding member of the United Utah Party. He is the United Utah Party candidate for United States Representative in the Third Congressional District. He was nominated at the United Utah Party convention held on June 17, 2017.

4.      Plaintiff Diane Knight is a registered Republican and qualified elector residing in the Third Congressional District for the State of Utah. She would like to have the opportunity to vote for the United Utah Party's candidate in the November 7, 2017, special election.

---

[2] Doc. 5, p. 9.
[3] *See* Stipulated Fact, attached hereto as Exhibit 1.

5.      Plaintiff Vaughn R. Cook is a registered Democrat and qualified elector residing in the Third Congressional District for the State of Utah. He would like to have the opportunity to vote for the United Utah Party's candidate in the November 7, 2017, special election.

6.      Plaintiff Aaron Aizad is an unaffiliated qualified elector residing in the Third Congressional District for the State of Utah. He would like to have the opportunity to vote for the United Utah Party's candidate in the November 7, 2017, special election.

7.      Defendant Spencer J. Cox is the Lieutenant Governor of the State of Utah and the Chief Election Officer for all statewide ballots and elections. In his capacity as Chief Election Officer, the Lieutenant Governor exercises general supervisory authority over all elections and direct authority over the conduct of elections for federal officers. The Lieutenant Governor is also responsible for reviewing information submitted by organizations seeking to become registered political parties in the State of Utah, and for certifying qualified organizations as newly registered political parties under the Utah Election Code. The Lieutenant Governor is sued in his official capacity only.

8.      On or about May 18, 2017, United States Representative Jason Chaffetz notified Governor Gary R. Herbert of his intent to resign from his congressional seat on June 30, 2017.

9.      On April 20, 2017, the Associated Press reported Representative Chaffetz had announced "he wouldn't seek re-election next year," and "may not even finish the two-year term that started fourth months ago."  According to the same Associated Press article, Representative Chaffetz said in a text message: "My future plans are not yet finalized but I haven't ruled out the possibility of leaving early.  In the meantime I still have a job to do and I have no plans to take my foot off the gas."

10.     On May 19, 2017, after receiving Representative Chaffetz's letter, Governor Herbert issued a writ of election and proclamation which established the special election date as November 7, 2017. A true and accurate copy of the Governor's writ of election and proclamation is attached hereto as Exhibit 1.

11.     On May 19, 2017, the Lieutenant Governor issued an order setting forth a special election process and calendar for the vacancy of the Third Congressional District of Utah. A true and accurate copy of the Lieutenant Governor's order is attached hereto as Exhibit 2.

12.     The May 19 order also provides that the special election will be conducted using the procedures for a regular general election except as provided in the special election process and calendar attached to the order.

13.     Utah Code Section 20A-1-502 provides that "[w]hen a vacancy occurs for any reason in the office of a representative in Congress, the governor shall issue a proclamation calling an election to fill the vacancy."  Utah law provides the Lieutenant Governor with the authority to establish the special election process.

14.     A "registered political party" is any party that: (1) participated in the last regular general election and met a certain vote threshold in at least one of the last two regular general elections; or (2) is a new political party and has complied with the petition and organizational requirements of Utah law. Utah Code § 20A-8-101(4).

15.     Registered political parties nominate their candidates for a regular general election by either convention or primary election. Candidates nominated by a registered political party are placed on the general election ballot.

16.     Unaffiliated candidates receive a place on the ballot for a regular general election by submitting a nominating petition with a sufficient number of signatures.

x

17.     All candidates seeking to appear on a general election ballot must also file a declaration of candidacy form and, unless seeking a waiver due to financial hardship, pay a filing fee.

18.     The May 19 order required candidates seeking nomination as a candidate for a registered political party to file their declaration of candidacy form with the Lieutenant Governor by 5:00 p.m. on May 26, 2017.

19.     The May 19 order required parties nominating by convention to certify their nominee to the Lieutenant Governor by noon on June 19, 2017.

20.     The May 19 order allows a special primary election to be held, if necessary, on August 15, 2017.

21.     The May 19 order sets a deadline of August 31, 2017, for the Lieutenant Governor to certify the names of the candidates who will appear on the special general election ballot.

22.     Utah law requires that general election ballots include a party designation for each candidate nominated by a registered political party but requires all other candidates, regardless of their actual political affiliation, to be listed without a party name and with a disclaimer that "[t]his candidate is not affiliated with, or does not qualify to be listed on the ballot as affiliated with, a political party." Utah Code § 20A-6-301(1)(e). Utah law provides no other way for a party candidate to be listed on the ballot with a party label.

23.     The Utah Election Code provides one process for an organization of registered voters to become a registered political party.  The Utah Election Code does not provide a special process for an organization of registered voters to become a registered political party for a special election.

24.     To become a registered political party, an organization of registered voters must file a petition seeking registered political party status and other documents with the Lieutenant Governor.

25.     The voters may circulate their petition to become a registered political party "beginning no earlier than the date of the statewide canvass held after the last regular general election" and "ending no later than November 30 of the year before the year in which the next regular general election will be held." Utah Code § 20A-8-103(2)(a).

26.     The petition must be signed by at least 2,000 registered voters. Once the petition is filed with the Lieutenant Governor, the Lieutenant Governor is required to determine whether the required number of voters appears on the petition and review the proposed name and emblem of the new political party to determine if they are distinguishable, and certify his findings "within 30 days." Utah Code § 20A-8-103(6).

27.      If the Lieutenant Governor determines that the petition meets these requirements, the Lieutenant Governor authorizes the filing officer to organize the prospective registered political party. Utah Code § 20A-8-103(7)(a).

28.      Party organizers are required to file various items with the Lieutenant Governor on or before March 1st of regular general election year.  Once the Lieutenant Governor has reviewed that filing and determined that all proper procedures have been completed, the Lieutenant Governor is required to issue a certificate naming the organization as a registered political party in Utah and inform each county clerk that the organization is a registered political party in Utah. Utah Code § 20A-8-106(2).

29.     Utah voters who want to form a newly registered political party ordinarily have months to organize, prepare party constitutions and bylaws, gather petition signatures, submit

required documentation, and wait for the Lieutenant Governor to certify his findings and issue a certification of new party status in advance of a general election.

30.     The Governor set the special election date of November 7, 2017 to coincide with the previously scheduled municipal general election date.  The Lieutenant Governor adopted this date in the May 19 order, stating that "[t]he special general election shall be held on the same day as the municipal general election, November 7, 2017.  If a special primary election is needed, it shall be held on the same day as the municipal primary election, August 15, 2017."

31.     To "piggyback" the special election on the municipal primary and general elections, the Lieutenant Governor determined the special election process needed to begin immediately after Representative Chaffetz announced his resignation date.

32.     Pursuant to Utah Code § 20A-16-403, and 52 U.S. Code § 20302(a)(8), the Lieutenant Governor and county and municipal clerks are required to deliver to military personnel and overseas citizens the primary election ballot 45 days prior to any federal election. For the August 15, 2017, special primary election, that day was June 30, 2017, under state law, and July 1, 2017, under federal law.

33.     The Lieutenant Governor determined that he had from May 19 to June 30, 2017, to provide a declaration of candidacy period, signature collection period, signature review period, political party conventions period, unaffiliated declaration of candidacy period and provide sufficient time for election officials to develop, test, and qualify the special primary ballots prior to June 30, 2017.  These steps in a regular general election take place over the course of four months.  The special election involves seven counties and fifty-four municipalities.

34.     Because Representative Chaffetz did not announce his resignation until May 18, 2017, and because the Lieutenant Governor set the deadline for party candidates to submit their declarations of candidacy on May 26, 2017, the United Utah Party had less time to complete the steps necessary for registered political party status for the upcoming special election compared to the 2018 general election.

35.     The United Utah Party's initial filing provided to the Lieutenant Governor on May 25, 2017, expressly stated that: "The party will hold a convention in June to adopt a constitution and bylaws and elect officers for the party."

36.     The United Utah Party submitted approximately 2,100 signatures to the Lieutenant Governor on May 25, 2017.  The party submitted an additional approximately 600 signatures prior to 5:00 p.m. on May 26, 2017.

37.     When Jim Bennett and other representatives of the United Utah Party submitted their signatures to the Lieutenant Governor's office on May 25, an election official said that the election office would do the best they can to quickly review their documents and petition signatures.

38.     On May 26, 2017, the UUP sent its proposed bylaws and constitution to the LG's office and chose to be designated as a qualified political party.

39.     On the afternoon of May 26, 2017, Jim Bennett returned to the Lieutenant Governor's office to submit his declaration of candidacy.

40.      Although the United Utah Party had submitted its petition signatures to the Lieutenant Governor's office, along with the party's proposed constitution and bylaws, prior to the 5:00 p.m. deadline, the Lieutenant Governor's office did not accept Jim Bennett's

declaration of candidacy for the United Utah Party's nomination because the United Utah Party was not yet a registered political party in the State of Utah.

41.     The United Utah Party, and all prospective registered political parties, are required to set forth the process they would follow to organize and adopt a constitution and bylaws in their initial petition. Utah Code § 20A-8-103(3)(i).  United Utah Party said in their initial filing that they would "hold a convention in June to adopt a constitution and bylaws and elect officers for the party."  United Utah Party also stated that "[c]ertification is requested promptly and certification for candidates to file for the special election is requested pending certification of the party."

42.     Utah Code § 20A-8-401(2) provides that "each new political party seeking registration, and each unregistered party seeking registration shall ensure that its constitution or bylaws contain:

…

(b) a procedure for selecting party officers that allows active participation by party members; [and]

(c)  a procedure for selecting party candidates at the federal, state, and county levels that allows active participation by party members."

43.     On June 17, 2017, the United Utah Party held an organizing convention at which the party adopted its constitution and bylaws, elected officers, and nominated Jim Bennett in accordance with its bylaws as the United Utah Party's unopposed candidate in the special election for the Third Congressional District seat.

44.     Prior to 12:00 p.m. on June 19, 2017, the United Utah Party submitted a certification to the Lieutenant Governor's office certifying Jim Bennett as the United Utah

Party's nominee in the special election for Representative Chaffetz's seat. The Lieutenant Governor did not accept the United Utah Party's certification because the United Utah Party was not yet a registered political party and because its nominee, Jim Bennett, did not file an accepted declaration of candidacy prior to the May 26 candidate-filing deadline.

45.     On June 26, 2017, the Lieutenant Governor certified that the United Utah Party had submitted enough signatures to become a registered political party and that the party's name and emblem are distinguishable from other parties.

46.     On June 27, 2017, the Lieutenant Governor determined that the United Utah Party need not hold another organizing convention in order to become a registered political party.

47.     On June 28, 2017, the United Utah Party submitted to the Lieutenant Governor the names of party officers elected at the party's organizing convention and provided additional documentation requested by the Lieutenant Governor to complete the process of becoming a registered political party.

48.     On May 19, 2017, Utah had five registered political parties: the Constitution Party, the Democratic Party, the Independent American Party, the Libertarian Party, and the Republican Party. At that point in time, the Green Party had submitted some signatures to become a registered political party in Utah but, as of June 28, 2017, had not submitted the full 2000 signatures or the other required documents necessary to be certified as a registered political party. No person other than Jim Bennett has attempted to file a declaration of candidacy seeking to participate in the special congressional election as the nominee of a political party that had not yet been certified as a registered political party.

49.     Utah law requires registered political parties to allow for a primary election to determine a political party's nominee for the general election.  However, an unopposed candidate within a registered political party is allowed to go directly on the general election ballot without a primary.

50.     A registered political party may choose the process by which their candidates gain access to the primary election ballot.  By default, a registered political party must allow their candidates to collect signatures of 2% of the registered political party's members within the political district.  A registered political party may choose to become a Qualified Political Party, which means that the party will allow candidates ballot access through the collection of signatures, the political party convention or both.

51.     Each of Utah's five registered political parties have submitted official paperwork with the Lieutenant Governor's Office designating themselves as a Qualified Political Party. Each registered political party must designate whether it chooses to be a Qualified Political Party or a Registered Political Party. The party's designation governs the method through which the party's candidates can access the primary and general election ballots.

53.     On May 25, 2017, United Utah Party held a press conference announcing their candidate for the special election.  Following that press conference, media outlets reported that Jim Bennett said he would run as an unaffiliated candidate if the state was not able to complete the signature verification process by the 5 p.m. Friday filing deadline for candidates seeking to fill the remainder of Representative Chaffetz's two-year term.  In an article dated May 25, 2017, the Deseret News also reported that Richard Davis said the party would "have a candidate for the 3rd District race regardless of whether it's registered."

54.     Under the May 19 order, the last day to file as an unaffiliated candidate was June 12, 2017 at noon.  Mr. Bennett did not file as an unaffiliated candidate.  The last day to file as a write-in candidate for the special election is September 8, 2017. The Lieutenant Governor issued a preliminary certification of the primary ballots on June 19 to the county clerks in order to allow time to prepare, print, and distribute the primary ballots by June 30, 2017.

55.     On June 26, 2017, the Lieutenant Governor determined and certified that the required number of voters had signed the United Utah Party's petition and the party name and emblem are distinguishable from the name and emblems of other registered political parties in this State. A true and accurate copy of the Lieutenant Governor's certification letter is attached hereto as Exhibit 3.

56.     After that certification, United Utah Party was then authorized to organize the prospective registered political party.  In order to have its candidates appear on the ballot in the 2018 election cycle, on or before March 1, 2018, the United Utah Party must file the names of the party officers or governing board with the Lieutenant Governor, Utah Code § 20A-8-106. This filing should also demonstrate that United Utah Party followed the procedures pursuant to their processes, including adopting their constitution and by-laws, as outlined in their previous filings. If the Lieutenant Governor determines all proper procedures and requirements have been followed and completed, he will then issue a certificate naming the United Utah Party as a registered political party in Utah and designate its official name. The Lieutenant Governor will also then inform each county clerk that the United Utah Party is a registered political party.

57.     When a new registered political party is certified in Utah, the Lieutenant Governor is required to change, print and provide new voter registration forms throughout the state including to: the county clerks, each public assistance agency, armed forces recruitment

offices, and each state driver license division.  Software changes are made to the Election

Management System in order to ensure a new voter or a current voter can registered for the new

registered political party.  The online voter registration system must be changed to allow a voter

to register with the new registered political party. Absentee ballot request forms and Political

Party Affiliation forms are adjusted and appropriately distributed to the county clerks.  The state

tax commission is officially contacted to ensure they make the appropriate program and form

changes to the "check a buck" program which allows a citizen to have taxpayer's funds go to

registered political parties.

58.     The Lieutenant Governor's Office completes these tasks prior to officially

certifying the registered political party to ensure election officials are fully prepared for voters

who may affiliated or switch political parties. The Lieutenant Governor's Office has received

complaints in the past from a newly registered political party because the voter registration form

had not been updated prior to the certification and been accused of certifying a new registered

political party but not providing a way for voters to affiliate with the new registered political

party.

60.     On June 30, 2017, the Lieutenant Governor issued the final primary ballot

certification and the county clerks delivered primary ballots to voters that same day.

61.     After the special primary election results are canvassed, the Lieutenant Governor

will certify the candidates for the special general election ballots on or before August 31. The

Lieutenant Governor will not include the nominee of the United Utah Party on the special

general election ballot even if the party becomes a registered political party before that date. See

June 20 letter from T. Roberts to C. Hayman attached hereto as Exhibit 4.

62.     Pursuant to Utah Code § 20A-16-403, and 52 U.S. Code § 20302(a)(8), the Lieutenant Governor, county and municipal clerks are required to deliver to military personnel and overseas citizens the special general election ballot, 45 days prior to any federal election. For the November 7, 2017 election, that day is September 22, 2017, under state law, and September 23, 2017, under federal law.

## III.     ADDITIONAL FACTS

Defendant sets forth the following additional facts based on the Declaration of Mark Thomas.[4]

1.      On April 19, 2017, Congressman Chaffetz announced his intent not to seek reelection in the 2018 election. The following day, Congressman Chaffetz publicly discussed the possibility of resigning before the end of his current term.  (Thomas Decl., ¶ 4)

2.      Following this announcement, the Lieutenant Governor's Office developed scenarios for special elections depending on possible resignation dates.  (*Id*., ¶ 5)

3.      As the Lieutenant Governor's Office reviewed the different scenarios, several important and compelling state interests were identified:

    a.  **Financial Impact.** Because counties are primarily responsible for the costs of conducting an election, a special election is financially challenging to counties. The counties are not prepared to pay the approximately $1.6 to $2 million required to conduct a special primary election and special general election. If the special elections were to coincide with already scheduled elections, it would result in a significant savings to taxpayers.

---

[4] *See* Declaration of Mark Thomas, attached here to as Exhibit 2.

b. **Voter Confusion.** Holding a special election on any date other than an already scheduled election, results in a high risk of voter confusion. Voters may not understand there is a separate election being conducted, particularly if the voter casts a ballot at a polling location or submits a by-mail ballot for the municipal election and shortly before or after the voter is required to go to the polls again or cast another mail ballot for a special election.

c. **Election Administration**. The administration of an election does not take place on just one day. Administrative tasks include voter registration deadlines, ballot development, machine logic and accuracy testing, certifications, ballot delivery beginning 45 days before the election, auditing, and the canvass period following the actual date of the election stretch an election to over 60 days. The statewide election management system (EMS), which the state and counties use to conduct the election, is not designed to conduct two separate elections at the same time, unless the election is conducted following the exact same deadlines for voter registration, ballot delivery, ballot returns and canvass dates. This would directly impact the accuracy and integrity of the election. If two separate elections are held on different days but are within 30 days of each other, the EMS cannot appropriately manage the two separate elections. It is particularly difficult when voter registration deadlines overlap for separate elections. The EMS is not programed to send ballots for separate elections and appropriately track, hold, count, reject, or notify voters of issues for two separate elections at the same time.

    d. **Lack of Representation.** The need for a promptly conducted special election to ensure the people of the Third Congressional District are without representation for the least amount of time.

    e. **Voter Participation**. Provide a process that allows for full voter participation. This includes following Utah's statutory election process, which allow for a primary election and provides candidates with the ability to gain ballot access through the political party convention and signature gathering process.

(*Id*., ¶ 6)

4.    The special election dates coincide with the already scheduled municipal general election dates. Providing a special election process and timeframe that coincides with the already scheduled municipal elections is critical to addressing administrative burdens, while minimizing voter confusion by combining ballots, increasing voter turnout and participation, and saving taxpayers approximately $1.6 to $2 million.  (*Id*., ¶ 9)

5.    The Lieutenant Governor had the time from May 19 to June 30, 2017, to provide a declaration of candidacy period, a signature collection period, a signature review period, a political party conventions period, an unaffiliated declaration of candidacy period and provide sufficient time for election officials to develop, test, and qualify the ballots prior to June 30. These steps normally take place over the course of four months during a normal regular general election cycle. This special election will require extra coordination and ballot testing.  In the seven counties in the Third Congressional District, the 54 municipalities will combine their municipal candidates and ballot propositions with their respective county's special election ballot generating hundreds of different ballots types.  (*Id*., ¶ 13)

6.      On May 19, 2017, Utah had 5 registered political parties: the Constitution Party, the Democratic Party, the Independent American Party, the Libertarian Party, and the Republican Party. At that point in time the Green Party had submitted some signatures to become a registered political party in Utah. As of July 5, 2017, the Green Party has submitted 2100 signatures for review and are currently being reviewed.  (*Id.*, ¶ 15)

7.      A registered political party may choose the process by which their candidates gain access to the primary election ballot. A registered political party must allow their candidates to collect signatures of 2% of the registered political party's members within the political district of the office sought. A registered political party may also choose to become a Qualified Political Party, which means the political party will allow candidates to become its nominee through the collection of signatures, the political party convention, or both.  (*Id.*, ¶ 17)

8.      Each of Utah's five registered political parties has submitted official paperwork with the Lieutenant Governor's Office designating themselves as a Qualified Political Party. This is an important step to ensure any candidate understands the process which he or she must follow in order to gain ballot access and the method by which he or she will campaign against potential intra-party opponents.  (*Id.*, ¶ 18)

9.      On May 25, 2017, United Utah Party held a press conference announcing their selected candidate for the special election. Following that press conference, media reporters from Fox 13 News and KSL/Deseret News indicated to me that the United Utah Party preferred to have their candidate file under their political party name but understood that was unlikely since they were filing their initial application on the second to last day of the candidate filing period. The media reporters also told me the United Utah Party stated they would have their

candidate gain ballot access as an unaffiliated candidate if they were not able to become a political party before the end of the candidate filing period. (*Id.*, ¶ 20)

10.     Following the United Utah Party's press conference on May 25, 2017, Richard Davis, United Utah Party Chair, submitted the initial application to the Lieutenant Governor's Office. I indicated to him that our office would do the best we could to process it quickly. Mr. Davis asked whether our office would allow their candidate to file a declaration of candidacy in anticipation of the United Utah Party becoming a party in the weeks to come.   Mark Thomas, the Chief Deputy and Director of Elections in the Office of the Lieutenant Governor, told Mr. Davis that our office is not able accept a declaration of candidacy for a political party that is not a certified registered political party in Utah. (*Id.*, ¶¶ 1, 21)

11.     Accepting a declaration of candidacy or allowing a candidate on the ballot for a registered political party that does not exist and is not certified would create problems throughout the election process. A certified registered political party is required to set forth their constitution and bylaws so political party members and potential political party members can know how the political party will operate internally and the processes by which candidates will gain ballot access. In particular, potential candidates would need to know whether or not the registered political party is a Registered Political Party or a Qualified Political Party. If the registered political party chose to allow candidates to seek the nomination through their political party convention, the statute requires the convention to have certain procedures to ensure party officers and candidates are selected in a way that allows for active participation by party members (Utah Code 20A-8-401).  (*Id.*, ¶ 22)

12.     May 26, 2017, was the last day for candidates to file a declaration of candidacy for the special election. That morning, Mr. Davis emailed our office proposed bylaws and

constitution for their prospective party. Later that same morning our office received notice that United Utah Party intended to be a Qualified Political Party. Subsequently, Mr. Davis came into the Lieutenant Governor's Office and inquired as to the status of their application.  Mr. Thomas indicated that we had begun the review process.  Mr. Thomas also indicated our office had already received inquiries whether the political party could participate in the election even if they could be officially certified by the close of the candidate filing period because of the deadline set forth in Utah Code 20A-8-103(2)(b). Additional inquiries were made questioning the nomination process if more than one candidate declared candidacy for United Utah Party since it does not exist, and what would be the process for these candidates to gain access on the special primary election ballot.  Mr. Thomas indicated that because our office had just a few hours until the 5pm candidate filing deadline, it would likely not be possible to complete the review of the signatures and documentation that day.  (*Id.*, ¶ 23)

13.     Shortly after, Jim Bennett came into the Lieutenant Governor's Office asking for a status update.  Mr. Thomas provided him with the same update that Mr. Thomas provided to Mr. Davis. Mr. Bennett asked if Mr. Thomas knew how many signatures had been reviewed. Mr. Thomas told him that he did not know.  Mr. Bennett asked if he could find volunteers to help review the signatures. Mr. Thomas indicated to Mr. Bennett that he could not provide volunteers to review the petition signatures. Mr. Thomas indicated there were additional legal issues besides just the labor intensive process of reviewing signatures.  (*Id.*, ¶ 24)

14.     At approximately 4:45pm on May 26, Mr. Bennett came into the Lieutenant Governor's Office and read a letter recognizing that the statutory process of becoming a political party may take a few more weeks, but requested to be placed on the ballot as a

candidate for the United Utah Party. Mr. Thomas told Mr. Bennett that our office could not

accept a declaration of candidacy for a political party that is not a registered political party in

Utah. In order to obtain a blank declaration of candidacy form, Mr. Bennett requested a

declaration of candidacy form to be a candidate for the Republican Party. Mr. Thomas provided

him the form and he completed parts of the form, but left blank the areas to be completed by an

election official and the area which required him to indicate which registered political party he

intended to file under. Mr. Bennett left the partially completed declaration of candidacy and a

check for the filing fee with our office.  (*Id*., ¶ 26)

15.     Utah Code 20A-9-201(5)(b) requires the filing officer to refund the filing fee to

any candidate who is disqualified or who the filing officer determines has filed improperly. On

Monday May 29, 2017, Mr. Thomas mailed the filing fee and the partially completed

declaration of candidacy form to Mr. Bennett's home address.  (*Id*., ¶ 27)

16.     The last day to file as an unaffiliated candidate was June 12, 2017. Despite Mr.

Bennett's earlier statement that he would file as an unaffiliated candidate, he did not file as an

unaffiliated candidate. The last day to file as a write-in candidate for the special election is

September 8, 2017.  (*Id*., ¶ 28)

17.     When a new registered political party is certified in Utah, the Lieutenant

Governor is required to change, print and provide new voter registration forms throughout the

state, including to: the county clerks, each public assistance agency, armed forces recruitment

offices, and each state drivers license division. Software changes are made to the EMS in order

to ensure a voter can register for the new registered political party. The online voter registration

system must be changed to allow a voter to register with the new registered political party.

Absentee ballot request forms and Political Party Affiliation forms are adjusted and

appropriately distributed to the county clerks. Our office works with the state tax commission to ensure the appropriate changes to the "check a buck" program which allows a taxpayer to have a small amount of funds go to a registered political party.  (*Id*., ¶ 33)

17.     The Lieutenant Governor's Office completes these tasks prior to officially certifying the registered political party to ensure that election officials are fully prepared for voters who may affiliate or switch political parties. The Lieutenant Governor's Office has received complaints in the past from a newly registered political party because the voter registration form had not been updated prior to the certification. The complaints accused the Lieutenant Governor's Office of certifying a new registered political party but not providing a way for voters to affiliate with the new registered political party. The Lieutenant Governor's Office follows a careful process to ensure election officials are fully prepared for voters to affiliate with the new registered political party prior to issuing the certification to a prospective political party.  (*Id*., ¶ 34)

## IV.     LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS

The Court must deny motions for preliminary injunctions unless the movant clearly and unequivocally establishes: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest."[5] Because a preliminary injunction is an extraordinary remedy, the "right to relief must be clear and unequivocal."[6]

---

[5] *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1208 (10th Cir. 2009).
[6] *Heideman v. South Salt Lake City*, 348 F3d 1182, 1188 (10th Cir. 2003) (quoting *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001)); *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir. 1991).

In the Tenth Circuit, three types of injunctions are disfavored: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant to all the relief that it could recover at the conclusion of a full trial on the merits."[7]  "Such disfavored injunctions 'must be more closely scrutinized to assure that the exigencies of that case support the granting of a remedy that is extraordinary even in the normal course.'" *Id.* "Movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard."[8]  "[W]here . . . a preliminary injunction '*seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme,*'" lesser standards for the issuance of a preliminary injunction are not applicable.[9]  Instead, the movant must make "a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."[10]

The status quo for purposes of a preliminary injunction is "the 'last peaceable uncontested status existing between the parties before the dispute developed.'"[11]  In this case, the last uncontested status between the parties was when the LG's office, acting pursuant to its constitutionally and legislatively delegated statutory authority, denied Bennett's request to be placed on the ballot for the special election as the UUP's nominee because the UUP was not an existing registered political party at the time Bennet sought to file his declaration of candidacy. Plaintiffs ask this Court to require the LG "to include Mr. Bennett as the United Utah party's nominee on the ballot in the special election to be held on November 7, 2017, in the Third

---

[7] *Schrier v. University of Colo.,* 427 F.3d 1253, 1259 (10th Cir. 2005) (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 389 F.3d 973, 977 (10th Cir. 2004)).
[8] *O Centro,* 389 F.3d at 976.
[9] *Heideman,* 348 F.3d. at 1189 (*quoting Sweeney v. Bane,* 996 F.2d 1384, 1388 (2d Cir.1993)) (further quotations omitted) (citations omitted).
[10] *Awad v. Ziriax,* 670 F.3d 1111, 1125 (10th Cir. 2012).
[11] *Schrier,* 427 F.3d at 1260.

Congressional District."[12]  Absent the issuance of the requested injunction, Bennett's name will

not be on the ballot.  Accordingly, issuing an injunction will alter the status quo, and thus the

requested injunction is disfavored.

The requested injunction is also disfavored because granting the injunction would

provide Plaintiffs with substantially all the relief they could obtain from a trial on the merits.

Plaintiffs asks this Court to declare that Utah's party-registration statutes and the special

election process, as applied to the United Utah Party ("UUP") and its nominee, are

unconstitutional.[13]  On that basis, Plaintiffs seek an injunction enjoining the Defendant from

implementing those laws and requiring that Bennett's name be placed on the ballot as UUP

nominee. Plaintiffs' Complaint seeks the same relief.[14]

## V.    LEGAL STANDARD IN BALLOT ACCESS CASES

As the Supreme Court stated in *Clements v. Fashing*: "Far from recognizing candidacy

as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to

the ballot 'does not of itself compel close scrutiny."[15]  States must enact regulations regarding

elections, ballots, and voting in order for elections to occur:

> [A]s a practical matter, there must be a substantial regulation of
> elections if they are to be fair and honest and if some sort of order,
> rather than chaos, is to accompany the democratic process.[16]

The State's regulation of elections will, of necessity, burden and impact the

participants in the process.  Every election law:

> whether it governs the registration and qualification of voters,
> the selection and eligibility of candidates, or the voting process

---

[12] Doc. 5, p.16.

[13] Doc. 5,  p. 12, 13.

[14] *See* Doc. 2, Pl.s' Compl. p. 12.

[15] 457 U.S. 957, 963 (1982).

[16] *Storer and Brown*, 415 U.S. 724, 730 (1974).

> itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.[17]

Therefore, the Supreme Court recognized that even though First Amendment rights may be affected by voting or ballot regulations, it would be improper to subject every regulation to strict scrutiny, requiring it to be narrowly tailored to advance a compelling state interest. This is because the states must adopt regulations to conduct elections and applying strict scrutiny would "tie the hands of States seeking to assure that elections are operated equitably and efficiently."[18]

> Instead, the Supreme Court applies a flexible standard:
> A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.[19]

The extent of the burden on Plaintiff's asserted constitutional rights determines the level of scrutiny to be applied:

> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens the First and Fourteenth Amendment rights. Thus, as we have recognized when those were subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a State interest of compelling importance.' *Norman v. Reed*, 502 U.S. 279, 289, 112 S. Ct. 698, 705, 116 L. Ed. 2d 711 (1992). But when a state election law provision imposes only 'reasonable, non-discriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to

---

[17] *Anderson v. Celebreeze*, 460 U.S. 780, 788 (1983).

[18] *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

[19] *Burdick*, 504 U.S. at 434 (internal quotations omitted).

justify' the restrictions. *Anderson [v. Celebreeze]*, 460 U.S. at 788, 103 Sup. Ct. at 1569-1570.[20]

The same analysis applies to ballot access issues:

> [N]ot all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates. *Anderson, 460* U.S. at 788, 103 S.Ct. 1564. [A]s a practical matter there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. *Id.* (quoting *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 174 (1974)). Thus, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions on election procedures.[21]

Therefore, the Court must first identify the magnitude and character of the claimed restrictions on Plaintiff's First Amendment rights and weigh those interests against the interests of the State in conducting the special election to fill the vacancy created by Rep. Chaffetz's resignation from office.

## VI.    ARGUMENT

I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A. *The Lt. Governor Has the Authority to Establish the Timing Governing the Special Election:*

Article I, section 2 of the United States Constitution requires the Governor to issue a Writ of Election to fill a vacancy to the United States House of Representatives. U.S. Const., art. 1, § 2, cl. 4. Article I, section 4, in turn, provides "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the

---

[20] *Burdick*, 504 U.S. at 434.
[21] *See, e.g.*, *Curry v. Buescher,* 394 F. App'x. 438, 443 (10th Cir. 2010).

Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . .”

The duty of the Governor to call a special election to fill a vacancy in the House of Representatives is mandatory; the *timing* of such elections has been left to the individual states. Pertinent here, as its Chief Election Officer, the Utah Legislature has vested the LG with the authority to “exercise general supervisory authority over all elections,” and to “exercise direct authority over the conduct of elections for federal, state, and multicounty officer.”[22]  The Legislature also authorized the LG to “render all interpretations and make initial decisions about controversies or other matters” arising from the election code.[23]  Considering similar terms, courts in the Sixth and Seventh Circuits recognize that states enjoy broad discretion over special election special matters.[24]

The Utah Legislature has not defined a specific process for filing the seat vacated by Representative Chaffetz, but has granted that authority to the LG instead. Thus, the LG has the authority to establish the timing and process governing this special election, consistent with the date of the special election (Nov. 7, 2017) identified in the Governor’s Writ of Election. While the Legislature has vested the LG with the authority to set the process for federal elections, he is not free to disregard the robust political party registrations requirements established by the Legislature.  His discretion is limited by the

---

[22] Utah Code § 67-1a-2(a).

[23] *Id*. at § 20A-1-402.

[24] *See ACLU of Ohio v. Taft,* 385 F.3d 641, 648, 650 (6th Cir. 2004) (noting “considerable discretion given to state government officials to determine election procedures, particularly the discretion to set a time for a special election to replace a Representative,” and stating “legislative balancing between [various factors bearing upon the timing of a special election] is entitled to considerable deference”); *Jackson v. Ogilvie,* 426 F.2d 1333,1337–38 (7th Cir. 1970) (stating that while governor “does not have discretion to decide against filling the vacancy,” he does have some discretion over the date on which to hold a special election to fill the vacancy); *see also Fox v. Paterson,* 715 F. Supp. 2d 431, 437 (W.D.N.Y. 2010).

Governor's decision to set November 7, 2017 as the date for the special election and by the statutory requirements to certify a new registered political party.

**B.** *The Special Election Process Does Not Burden Plaintiffs' Constitutional Rights.*

UUP contends the special election procedures burdens two constitutional rights: "[T]he right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."[25]  Contrary to UUP's contentions, a careful examination of the rights at issue and the burdens allegedly imposed demonstrates that the rules and deadlines governing the special election are constitutional.

**1. Plaintiffs Retain the Right to Advance Political Beliefs.**

Regardless of whether Bennett is on the special election ballot, Plaintiffs are free to advocate for political issues.  The special election process does not restrict Plaintiffs' speec.

Plaintiffs complain they are disadvantaged because the special election process provided no process for a newly formed association of voters to become a registered political party under the special election timeframes.[26]  Plaintiffs correctly state that registered political parties may nominate a candidate who will appear on the ballot in any partisan election held in the state.[27]  However, Plaintiffs do not have any right "to be identified on a ballot nor any right to use the ballot itself to send a particularized message."[28] Plaintiffs remain free to advocate, campaign, and engage in all protected forms of speech.  These rights are not diminished by UPP's nominee's absence from the ballot.

---

[25] Doc. 5, p. 9.
[26] Doc. 5, p. 5.
[27] Doc. 5, p. 5 (citing Utah Code § 20A-8-106(3).
[28] *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997).

The lack of a right to political speech in connection with the actual ballot is highlighted in *Burdick v. Takushi.* [29] There, the Supreme Court upheld Hawaii's denying the ability to cast a write-in vote that would be counted.  The plaintiff claimed a right to cast a "protest vote" and that limiting his voting to candidates on the ballot made him promote positions (candidates) he did not support.  Rejecting plaintiff's claim, the Court held that the ballot is not a forum for political speech but rather a mechanism to elect candidates:

> [T]he function of the election process is "to winnow out and finally reject all but the chosen candidates," not to provide a means of giving vent to "short-range political goals, pique, or personal quarrel[s]." Attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently.[30]

UPP's claim that it possesses a First Amendment right to have its party's designation appear on the ballot next to the name of its nominee fares no better.[31]  Plaintiffs suggests its party designation is necessary for voters to connect its candidate to UPP's ideology or platform.  Plaintiffs specifically claim that not including Bennett on the ballot as the UPP nominee deprives Plaintiffs "of the ability to campaign effectively for the United Utah Party, its candidate and its message of inclusion, and to effectively solicit and use donations in support of that campaign."[32]

Plaintiffs err and its' position is contrary to the long line of cases holding that First Amendment rights do not apply to the State's creation of a ballot.  For instance, *Nevada Comm'n on Ethics v. Carrigan*,[33] where the Court upheld a state law requirement that disallowed votes by a legislator who possessed a personal conflict of interest:

---

[29] 504 U.S. 428 (1992).
[30] *Id.* at 438, (quoting *Storer*, 415 U.S. at 735.
[31] *See* doc. 5, p. 5.
[32] Doc. 5, p. 15.
[33] 564 U.S. 117 (2011).

4

Even if it were true that the vote itself could "express deeply held and highly unpopular views," the argument would still miss the mark. This Court has rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message. For example, in *Timmons v. Twin Cities Area New Party*, we upheld a State's prohibition on multiple-party or "fusion" candidates for elected office against a First Amendment challenge. We admitted that a State's ban on a person's appearing on the ballot as the candidate of more than one party might prevent a party from "using the ballot to communicate to the public it supports a particular candidate who is already another party's candidate," but we nonetheless were "unpersuaded ... by the party's contention that it has a right to use the ballot itself to send a particularized message."[34]

Relying on this authority in *Utah Republican Party et al. v. Herbert*, Case No. 2:14-cv-00876-DN-DBP, this very Court held that:

[T]here is no protected free speech right to communicate the Party's endorsement on the general election ballot. Ballots serve primarily to elect candidates, not as forums for political expression. The Supreme Court has rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message.[35]

Thus, political parties possess no constitutional right to be on a ballot or to have a candidate placed on the ballot "as a candidate of that party," along with a party emblem. First Amendment rights with respect to making a statement on the ballot are extremely limited— neither a candidate, a voter, nor a party possesses the right to use the ballot for political speech. Utah's political party registration statutes and special election process do not prevent UPP from exercising its rights to free speech. UPP "can hold its convention, campaign for candidates, fundraise, and endorse any candidate the Party choses to support. Simply put, the 'Party remains

---

[34] *Id.* at 127 (citing and quoting *Timmons*, 520 U.S. 351, 362–63; *Burdick*, 504 U.S. at 438).
[35] *Id.* at 17 (citing *Burdick*, 594 U.S. at 438; *Storer*, 415 U.S. at 730; *Nevada Com'n on Ethics*, 564 U.S. at ? (2011) (quoting *Timmons*, 520 U.S. at 362-63.

free to endorse whom it likes, to ally itself with others, to nominate candidates for office and to spread its message to all who will listen.'"[36]  Its First Amendment rights are therefore not burdened.

Plaintiffs' assertion UPP or its chosen candidate has a Constitutional right to "campaign effectively" is also not correct.  The Constitution does not guarantee success for those engaging in activities protected by the First Amendment. *Republican Party of North Carolina v. Martin*,[37]  demonstrates this point. There, the Republican Party of North Carolina ("RPNC") appealed an order of the district court dismissing its suit against the North Carolina State Board of Elections (NCSBE). RPNC alleged that the method of electing superior court judges in North Carolina deprived members of the Republican Party and others aligned with that political party rights guaranteed by the First Amendment. The court held that RPNC had failed to state a claim under the First Amendment:

> Although the North Carolina method of election of superior court judges does prevent the realization of Republican political goals, Republicans are not prevented from participating, as individuals or as a group, in the elections of superior court judges. The First Amendment guarantees the right to participate in the political process. It does not guarantee political success.[38]

The same rationale applies here.  Bennett or any other UUP member can participate, as individuals or as a group, in the election of the Representative for the Third Congressional District of Utah. Bennett could have run as an unaffiliated candidate with UUP's support and endorsement, but chose not to. Bennett can continue to advocate for his chosen political ideology and to campaign for election to the Third Congressional District as a write-in candidate.[39]  Even assuming Bennett had a better opportunity to "campaign effectively" and

---

[36] *Id.* (quoting *Timmons*, 560, U.S. at 361.)
[37] 980 F.2d 943, 946-947 (4th Cir. 1992).
[38] *Martin*, 980 F.2d at 960 (emphasis added).
[39] *See* Utah Code § 20A-9-601.

win the election if he were included on the ballot as the UUP nominee, that does not state a claim under the First Amendment.

### 2. UUP Voters Can Cast Their Votes Effectively.

The Supreme court has defined "the right to vote [as] the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system."[40]  The Voting Rights Act contains a similarly broad definition of the right to vote:

> The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.[41]

Here, Plaintiffs do not contend that they are denied the right to vote or that their votes will not be properly counted.  Instead, Plaintiffs assert their votes are not "effective" because the LG will not include UUP's name on the ballot next to Bennett's name.  But there is no constitutional right to have the party's name on the ballot, especially here, where UUP is a newly formed party with no track record with the electorate.

Contrary to Plaintiffs' assertions, the rights of voters are not burdened in any way by Utah law or the special election process. Plaintiffs contend that:

> Ballot-access restrictions also implicate the right to vote because, except for initiatives and referenda, "voters can assert their preferences only through candidates or parties or both." "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues."[42]

---

[40] *Burdick,* 504 U.S. at 441 *(citing Anderson,* 460 U.S. at 788; *Storer,* 415 U.S. at 730).
[41] 42 U.S.C. § 1973l(c)(1).
[42] Doc. 5 at 10 *(quoting Lubin v. Panish,* 415 U.S. 709, 716 (1974)).

But Bennett could have run as an unaffiliated candidate with his name placed on the ballot. Bennett seriously considered running as an unaffiliated candidate, with UUP's support, but chose not to. If Bennett had run as an unaffiliated candidate, voters would have found his name on the ballot and could have voted for him. Thus, if Bennett is the "candidate who comes near to reflecting [UPP's] policy preferences on contemporary issues,"[43] the reason voters won't find him on the ballot is because Bennett chose not to be there.

Plaintiffs' contention that voters cannot effectively vote for Bennett because he will not be listed on the ballot UUP's nominee is also not correct. Bennett does not have to be on the ballot for voters to vote for him.  Voters will be able to vote for Bennett for election to Utah's Third Congressional District as a write-in candidate.[44] Accordingly, no provision of Utah law prohibits UUP voters from voting for their preferred candidate and effectively exercising their constitutionally protected franchise.

C.  *Utah's Statutory Requirements to Become a Registered Political Party Are Reasonable Non-Discriminatory Regulations, Necessary for the State to Conduct Orderly and Fair Elections.*

Requiring a prospective registered political party to comply with statutory requirements before the declaration of candidacy period expires is a reasonable, non-discriminatory regulation, necessary for the State to conduct orderly and fair elections.

The regulation is "non-discriminatory" because it applies to all prospective parties equally. Bennett asked the LG to accept his declaration of candidacy as the UUP's nominee "provisionally . . . pending certification of the UUP as a newly

---

[43] *Lubin*, 415 U.S. at 716.
[44] *See* Utah Code Ann § 20A-9-601.  See also Socialist Labor Party v. Rhodes, 290 F. Supp. 983, 987 (S.D. Ohio) ("A write-in ballot permits a voter to effectively exercise his individual constitutionally protected franchise."), aff'd in part, modified in part, sub nom. *Williams v. Rhodes*, 393 U.S. 23 (1968).

8

registered political party."[45] "Bennett . . . also . . . asked the election official if he could provisionally file as an unaffiliated candidate and later switch his affiliation to the United Utah Party, once the United Utah Party was certified as a newly registered political party."[46] The LG denied Bennett's requests because exempting UUP from the statutory requirements would violate the LG's duty to treat all prospective parties equally.

The regulation is "necessary" for the State to conduct orderly and fair elections because candidates need to know what registered political parties exist before deciding for which party the candidate chooses to declare candidacy. Allowing Bennett to declare his candidacy as the UUP nominee before the party formally exists stifles intra-party competition. For example, if UUP was a registered political party during the declaration of candidacy period, other candidates in addition to Bennett could have filed a declaration of candidacy and sought to become UUP's nominee. If more than one person sought to become UUP's nominee, a primary election would be necessary.[47] As applied to the special election, extending the declaration of candidacy period to allow UUP more time to complete the statutory requirements necessary to become a registered political party would have pushed back the date of the primary and general election, which, in turn, would have prevented the State from selecting special election dates to coincide with the previously scheduled municipal primary and municipal general elections.[48]

In addition to being non-discriminatory and necessary, the regulation is also "reasonable." Utah law requires that, to become a registered political party, an organization of registered voters seeking registered political party status must file a petition signed by at least

---

[45] Doc. 2, p. 10, ¶ 48.
[46] Id. at ¶ 49.
[47] See Utah Code § 20A-9-403.
[48] See Thomas' Declaration, ¶¶ 9. 10. 38, 39.

9

2000 registered voters with the LG's office "on or before February 15 of the year in which the regular general election will be held."[49] Once the petition is filed with the LG, the LG must determine whether the required number of registered voters appears on the petition, review the proposed name and emblem of the new political party to determine if they are distinguishable, and certify his findings "within 30 days."[50] If the LG determines the petition meets these requirements, the LG must authorize the filing officer to organize the prospective political party.[51] After receiving authorization from the LG to organize the prospective political party, the prospective political party's officers or governing board must file the names of the party officers or governing board with the LG office.[52]  After the LG has reviewed names of the party officers or governing board, and if he determines that all proper procedures have been completed, the LG then issues a certificate naming the organization as a registered political party and informs each county clerk that the organization is a registered political party in Utah.[53]  Thus, Utah law requires that a proposed party demonstrate sufficient support in the electorate, that it is sufficiently established and has adopted appropriate procedures, justifying the party to have state authority to place its candidates on the ballot.

Utah's requirements for initial qualification as a political party support the state's interest in requiring candidates and political parties to demonstrate some degree of support before granting them access to the ballot:

> There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot the interest, if no

---

[49] Utah Code § 20A-8-103(2)(b).
[50] Utah Code § 20A-8-103(6).
[51] Utah Code § 20A-8-103(7)(a).
[52] Utah Code § 20A-8-106(1).
[53] Utah Code § 20A-8-106(2).

other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.[54]

Moreover, recognition as a registered political party is a significant event that carries with it privileges and responsibilities. Only a registered political party may place the names of its nominee on the primary and regular general election ballots under the party's name.[55] Utah law also requires that general election ballots include a party designation for each candidate nominated by a registered political party but requires all other candidates, regardless of their actual political affiliation, to be listed without a party name.[56] And, recognition as a political party has a lasting effect.  As applied to this case, if UUP is certified as a registered political party it will retain that status at least until November 2020.[57]

Along with the privileges associated with registered political party status come certain responsibilities.  For example, a registered political party becomes a state actor and, thus, must act within the boundaries of the Constitution.  "[W]hen the State gives the party a role in the election process . . . by giving certain parties the right to have their candidates appear with party endorsement on the general-election ballot. Then . . . the party's racially discriminatory action may become state action that violates the Fifteenth Amendment."[58] Thus, Utah should be allowed to carefully review the petition, 2,000 signatures, and organizing documents submitted by UUP along with the party's emblem, officers and governing board to ensure full compliance

---

[54] *Jenness v. Fortson*, 403 U.S. 431, 442 (1971).

[55] Utah Code § 20A-8-102(2)

[56] *See* Utah Code § 20A-6-301(1)(e).

[57] Utah Code Ann. § 20A-8-102(1) ("Any organization of voters whose organization did not participate in the last regular general election, or whose organization polled a total vote equivalent to less than 2% of the total vote cast for all candidates for the United States House of Representatives for any of its candidates in both of the last two regular general elections shall comply with the requirements of this chapter to become a registered political party.)

[58] *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 203 (2008); see *Smith v. Allwright*, 321 U.S. 649 (1944); *Terry v. Adams*, 345 U.S. 461 (1953); *California Democratic Party v. Jones*, 530 U.S. 567, 594 (2000) (Justice Stevens' dissenting) (stating that "primary elections, unlike most 'party affairs,' are state action.").

with the statutory requirements to become a registered political party <u>before</u> the State

grants UUP the privileges associated with registered political party status and delegates

its sovereign authority to the party to determine who shall appear on the State's general

election ballot.

Plaintiffs do not challenge these statutory requirements as they apply to a general

election, nor could they do so successfully because Utah's statutory requirements to become a

registered political party are reasonable non-discriminatory regulations, necessary for the State

to conduct orderly and fair elections.  Instead, Plaintiffs challenge the application of those

requirements to the special election, claiming that it was impossible for UUP to become a

registered political party before the May 26 deadline for filing declarations of candidacy.[59]

First, it was not impossible for UPP to become a registered political party in time to

comply with the special election process.  The UUP party was founded in April 2017, *before*

Rep. Chaffetz announced his intent to resign from office and around the same time that Rep.

Chaffetz indicated he might not serve his full term.  A reasonably prudent party would have

acted promptly to register upon receiving these reports of Chaffetz's potential early

resignation.  Therefore, UUP contention that it would have had to anticipate Mr. Chaffetz's

resignation to comply with the deadlines[60] is not correct.  UUP could have begun the process

of becoming a registered political party earlier.

Moreover, it was UUP's decision to wait until June to organize the party that prevented

UUP from completing the party registration requirements before the period for filing

declarations of candidacy expired.  On May 25, 2017, UUP informed the LG that "[t]he party

---

[59] *See* doc. 5, p. 10.
[60] Doc. 5, p. 10.

will hold a convention in June to adopt a constitution and bylaws and elect officers for the party."[61]   UUP held its convention on June 17.  Adopting a constitution and bylaws and electing officers is not the end of the party registration process. Therefore, it did not matter how quickly the LG's office reviewed the signatures provided by UUP and authorized it to organize as a party.  Unless the LG extended the deadline for filing candidacy beyond June 17, UUP could not have complied with the party registration requirements before the period for filing declarations of candidacy expired.

While Rep. Chaffetz's resignation from office came as a surprise to Plaintiffs, this is also true with respect to other prospective political parties, other candidates who may have wanted to run for the vacant seat, and the LG as well.  Special elections, by their very nature, require different procedures and accelerated timelines than do general elections.  Moreover, Bennett was not the only person who filed a lawsuit claiming the accelerated special election process is unconstitutional. In fact, the minimal barriers to Bennett's ability to access the ballot in this special election are not as "severe" as the barriers to ballot access that a Utah court has already determined are constitutional.

The recent case entitled *Teng v. Cox*,[62] is instructive.  Chia-Chi Teng (Teng"), a prospective candidate for the office for the office vacated by Rep. Chaffetz, also challenged the statutory requirements for filing a declaration of candidacy in the special election.  Utah Code § 20A-9-202(1)(a)(i) requires candidates to file their decalration of candidacy "in person." Teng, a BYU professor, was in China teaching students when the LG announced the special election procedures.  Teng was unable to return to Utah to personally file the

---

[61] *See* R. Davis Letter to LG (May 25, 2017), attached hereto as Exhibit 3.
[62] *Teng v. Cox*, Case No. 1709033450 Third Judicial District Court, State of Utah.

declaration of candidacy during the one-week period set by the LG without abandoning the students he was charged with supervising.  In effort to timely file his declaration of candidacy, Teng executed a power of attorney in favor of his son and communciated directly with the LG's office via video conference while his son tried to file in his stead. The LG's office read plainly the elections code, chose not to deviate from the statutory "in-person" filing requirement and rejected Teng's declaration of candidacy.

Teng sued, seeking an order excusing him from personally filing a declaration of candidicy and asking the court to place him on the special election ballot. Just as here, Teng argued the LG's refusal to accept his declaration of candidacy violated his right to access the ballot under the Constitution. The Third District Court for the State of Utah disagreed:

> [T]he in-person filing requirement, even in the special election context where there is little or no notice, is a reasonable and non-discriminatory requirement.   It is therefore subject to only rational basis review pursuant to *Anderson v. Celebrezze*, 460 U.S. 780 (1983).[63]

The court further determined "the in-person requirement in the context of this special election passes constitutional muster . . ." because it furthers the state's interests in making elections "fair and free from fraud" and "in administering the oath of candidacy and allowing communication between the putative candidate and the election officer."[64]

In addition to requiring candidates to file declarations of candidacy "in-person," Utah law also prohibits a candidate from filing a declaration of candidacy for a party that does not exist. Requiring a prospective registered political party to comply with the statutory requirements necessary to become a registered political party before the declaration of candidacy period expires for a particular election is a reasonable non-

---

[63] *See* Proposed Final Order, *Teng v. Cox*, Case No. 1709033450, attached hereto as Exhibit 4.
[64] *Id.*

discriminatory regulation, necessary for the State to conduct orderly and fair elections. Therefore, the State's important regulatory interests are sufficient to justify the reasonable, nondiscriminatory restrictions on the special election.[65]

> **D.** *The State Interests are Important, Compelling, and Outweigh the Claimed Burdens.*

Here, there are sound policies and fiscal reasons supporting the special election process. Rep. Chaffetz's resignation leaves the citizens within Utah's Third Congressional District without representation. Thus, the Governor sought to hold the special election promptly, and to do so in a way that results in little additional costs to the county governments that finance these elections.

Utah's statutes governing general elections represent the will of the people as expressed through their elected representatives. Adopting the statutory process for general elections, that allow candidates to gain ballot access through party convention and signature gathering, respects the legislative process and allows for full voter participation, including a primary election. Here, the LG preserved the general election procedures, while adjusting the timelines to allow the special election to occur on the same dates as the municipal primary and general elections.[66]

Holding the special election on the same days as the municipal elections advances additional state interests. First, it will save Utah taxpayers between $1.6 and $2 million. Second, it reduces the risk of voter confusion by combining ballots and increases voter turnout.

---

[65] *See,* e.g., *Curry,* 394 F.App'x. at 443.
[66] *See Rossito-Canty v. Cuomo,* 86 F. Supp. 3d 175, 193 (E.D.N.Y. 2015) ("[s]ubstantial state interests [we]re furthered by the decisions of the New York Legislature that Senate vacancy elections be held only in conjunction with regular congressional elections.")

Holding the elections at the same time reduces administrative burdens as well.  The statewide election management system (EMS), which the state and counties use to conduct the election, is not designed to conduct two separate elections at the same time, unless the elections are conducted following the exact same deadlines for voter registration, ballot delivery, ballot returns and canvass dates. The EMS is not able to send ballots out for separate elections and appropriately track, hold, count, reject, or notify voters of issues for two separate elections at the same time.

Moreover, if UUP and its nominee are exempt from party registration requirements and special election deadlines, then other prospective candidates and unregistered political parties may seek the same relief.  For example, the Green Party has collected signatures to become a registered political party but did not submit the requisite 2,000 signatures by May 26 and, thus, could not advance a candidate for the special election.

All elections need deadlines to provide certainty for the parties, candidates, voters and election officials.[67]  The need for hard and fast deadlines is heightened in this special election where the process allows only 43 days to file declarations of candidacy, collect signatures, review signatures, hold party conventions, declare candidacy for unaffiliated candidates, and also provide sufficient time for election officials to develop, test, and qualify the ballots prior to the deadline to certify the ballot.  These steps in a general election typically take four months.  This special election will require extra coordination, review and testing because it involves seven counties and fifty-four

---

[67] *Burdick*, 504 U.S. at 434 (stating "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.")

municipalities.  Interjecting another process – an expedited political party registration process – would frustrate, not improve these already compressed timeframes.

   E.   *The Party Registration Requirements and Special Election Process Are Narrowly Tailored to Serve Compelling State Interests.*

Even if the Court determines the burden on Plaintiffs' constitutional rights is severe (a conclusion with which Defendant disagrees), the Court must still uphold the State's regulation of this special election because it is "narrowly tailored and advance[s] a compelling state interest."[68]  The interests advanced by the party registration requirements and special election process are set forth above.  Plaintiffs concede, as they must, that ensuring "the stability of its political system" and "avoiding splintered parties and unrestrained factionalism" are compelling state interests.[69]  Those registration requirements and the special election process also serve the State's compelling interest "in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot the interest . . .  [and] avoiding confusion, deception, and even frustration of the democratic process at the general election."[70]  States clearly have an "interest in 'avoiding overloaded ballots and frivolous candidacies, which diminish victory margins, contribute to the cost of conducting elections, confuse and frustrate voters, increase the need for burdensome runoffs, and may ultimately discourage voter participation in the electoral process.'"[71]

Moreover, "the Supreme Court [has] "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous

---

[68] *Timmons*, 520 U.S. at 358.
[69] Doc. 5 at 13 (quoting *Storer*, 415 U.S. at 736.); *see also Jenness*, 403 U.S. at 442.
[70] *Jenness*, 403 U.S. at 442.
[71] *Ill. State Bd. of **Elections** v. Socialist Workers Party*, 440 U.S. 173, 185 (1979).

candidacies prior to the imposition of reasonable restrictions on ballot access."[72]  Thus, Utah "need not allow itself to be harmed by such ills before enacting appropriate measures to prevent harm."[73]

Citing *Anderson*, Plaintiffs' erroneously assert the interest advanced by the party registration requirements and special election process is "in protecting the two major Plaintiffs' reliance on *Anderson* is misplaced.  The constitutional infirmity at issue in *Anderson* was that "[a] burden that falls unequally on independent candidates or on new or small political parties impinges, by its very nature, on associational choices protected by the First Amendment, and discriminates against those candidates and voters whose political preferences lie outside the existing political parties."[75]  "[T]the crux of this analysis is to determine whether the challenged statute 'freezes the status quo' of a two-party system, or whether "[i]t affords minority political parties a real and essentially equal opportunity for ballot qualification."[76]  Thus, the inquiry is whether "the challenged laws freeze the status quo by effectively barring all candidates other than those of the major parties."[77]

Utah's party registration requirements and special election process do not disfavor minor political parties. All political parties must satisfy the initial registration requirements to obtain registered political party status. And, all registered political parties must comply with the deadlines and procedures set forth in the special election

---

[72] *Green Party of Arkansas v. Martin*, 649 F.3d 675, 686 (8th Cir. 2011)(quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95(1986).
[73] *Id* at 195-96.
[74] *Id.* (quoting *Anderson*, 460 U.S. at 802.)
[75] *Anderson*, 460 U.S. at 781.
[76] *Libertarian Party of N. Dakota v. Jaeger*, 659 F.3d 687, 694 (8th Cir. 2011)(quoting *Am. Party of Tex. v. White*, 415 U.S. 767, 787–88 (1974).
[77] *Id.*

process. That several minor political parties' nominees will be on the ballot for the special election disproves Plaintiffs' assertion that the purpose of the regulations is to protect the two major parties.

Having misidentified the State's interests, Plaintiffs' argument that the regulations are not "narrowly tailored" becomes unavailing.  The party registration requirements are narrowly tailored and necessary to advance the State's interests. The LG cannot exempt the UPP from the statutory process for initial party registration while still ensuring the UPP is a legitimate political party with the requisite amount of support. Similarly, if the LG extends the time for the UPP to become a registered political party beyond the special election deadline for candidates to file declarations of candidacy, he must also extend the time for other parties' candidates.  If the LG extends the time for filing declarations of candidacy, he cannot schedule the special election to coincide with the dates already set for the municipal primary and general elections because of federal requirements governing the mailing of overseas and military ballots.[78]  Accordingly, the interests advanced by the party registration requirements and special election process "make it necessary to burden the plaintiff's rights."[79]

### F. *The Cases Upon Which Plaintiff's Rely Are Distinguishable.*

Plaintiffs cite *Green Party of Arkansas v. Priest*,[80] in support of their position.  *Priest* is distinguishable. Arkansas's statutory restrictions on recognizing new political parties are far more severe than Utah's.  In fact, before being struck as unconstitutional, the restrictions on new party registration at issue in *Priest* were the most restrictive laws in the country:

> Arkansas, North Dakota and Texas are the only states in which it is
> virtually impossible for a new political party or emerging political party

---

[78] Thomas' Declaration, ¶¶ 9, 10, 37, 38.
[79] *Anderson*, 460 U.S. at 789; *see also Munro*, 479 U.S. at 194–96.
[80] 159 F. Supp. 2d 1140, 1142 (E.D. Ark. 2001).

to have its nominee appear on the ballot with an accurate and informative party label in an odd-year election.[81]

Unlike Arkansas, Utah allows prospective political parties to become registered political parties in odd-numbered years—they can be certified at any time.[82] Accordingly, while in *Priest* it was "impossible for new and emerging political parties to gain recognition in odd-numbered years in time to participate in any special elections that might occur,"[83] this is not true in Utah.

The constitutional deficiency in Arkansas was that emerging political parties had a path to the ballot in even numbered years, but not in odd-numbered years.  Accordingly, the court held that "[t]he State has no compelling interest in allowing unrecognized parties to participate in some elections but not others. Such arbitrary restrictions on political participation fail even the test of rationality."[84] Utah does not deny emerging political parties the ability to participate in special elections in odd-numbered years. Instead, Utah law sets forth reasonable, non-discriminatory regulations governing party registration and requires emerging political parties to comply with those laws. *Priest*, is not applicable here.[85]

Plaintiffs' reliance on *Breck v. Stapleton*[86] is also misplaced.  *Breck* does not address the seminal issue in this case, i.e., whether a newly emerging political party can place its nominee on the ballot for a special election without first complying with the State's party registration requirements. No prospective political party was a plaintiff in *Breck*. Instead, the "[p]laintiffs

---

[81] *Id*. at 1143.

[82] *See* Utah Code § 20A-8-103(2).

[83] *Priest*, 159 F. Supp. 2d at 1142.

[84] *Id*. at 1144.

[85] Priest also ignores the Supreme Court's holding in *Storer* that "the one-year disaffiliation provision furthers the State's [compelling] interest in the stability of its political system" *Storer*, 415 U.S. at 736.  *See also Curry*, 394 F. App'x at 446 (10th Cir. 2010) (concluding "the twelve-month disaffiliation requirement . . . does not violate the Plaintiffs' First–Amendment rights.") *(citing ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1322 (10th Cir.2008) ("Restrictions that are generally applicable, even-handed, politically neutral, and which protect the reliability and integrity of the election process are generally not considered severe restrictions and are upheld.")

[86] No. 1:17-CV-36, 2017 WL 1319742, Slip Op. (D. Mont. April 8, 2017)

consist of three people who seek to run in the special election as a minor party candidate or as independent candidates and a voter who wishes to cast her vote for one of these candidates."[87] In this case, Plaintiffs are not asking the Court to place Bennett on the ballot in the special election. Instead, Plaintiffs are asking the Court "to include Bennett as the United Utah Party's nominee on the ballot in the special election . . . ."[88] Thus, *Breck* offers no support for UUP's claim that it should be recognized as a registered political party for the special election.

The issue in *Breck* was not whether the state's registration requirements for a prospective political party were unconstitutionally burdensome.  The problem in *Breck* was that the signature gathering requirements for minor party candidates to access the ballot were too restrictive when applied to the special election:

> Montana law requires minor parties to submit a nominating petition containing 5,000 signatures in order for their chosen candidate to appear on the ballot. Mont. Code Ann. §§ 13-25-205 and 13-10-601. An independent candidate, or a candidate of a minor party who failed to collect 5,000 signatures, must file a nominating petition containing signatures totaling at least five percent of the votes cast for the last successful candidate for the office at issue. Mont. Code Ann. §§ 13-25-205(2) and 13-10-502. The five percent signature requirement for the May 25, 2017, special election would require 14,268 signatures, according to this formula.[89]

Unlike Montana, Utah does not require a minor party to submit signatures to access the ballot in the special election. Minor parties are treated the same as major parties.  If certified as a registered political party, the party's nominee is placed on the ballot.[90]  As of June 19, which was the deadline for registered political parties to certify the party's nominee to the LG's, Utah recognized five registered political parties: Constitution Party, Democratic Party, Independent

---

[87] *Id*. at *1.
[88] Doc. 5 at 16 (emphasis added).
[89] *Id.*
[90] Utah Code § 20A-6-301(1); § 20A-9-403(1)(b).  If the registered political party elects to be a qualified political party the candidate may gather signatures to access the ballot for the primary election. § 20A-9-406.

American Party, Libertarian Party, and Republican Party.  The Constitution Party, Independent American Party and Libertarian Party are all considered minor parties. Utah allows each registered political party, regardless of size or prominence, to place a candidate on the special election ballots.

*Breck* supports the LG's decision to abide by Utah's statutory requirements. In *Breck*, "the Court agree[d] that the State possesses a compelling interest in the stability of the electoral system, especially when the special election proves imminent."[91] Relying on *Jones v. McGuffage*,[92] the court further concluded "that states possess a compelling interest in requiring putative candidates to demonstrate a modicum of support before gaining ballot access."[93] Because the three prospective candidates "failed to pursue any meaningful signature gathering effort[,] [and] have failed to present other evidence that would help establish a modicum of support for the appearance on the ballot, the . . . Court [declined] to take the unusual step of ordering the State to place their names on the ballot."[94]

Plaintiffs also cite *Hall v. Merrill*,[95] in support of their position that Utah's special election process imposes severe burdens on unaffiliated and minor party candidates.  *Hall* too is inapposite. Unlike the plaintiffs in *Hall*, Bennett chose not to run as an unaffiliated candidate. Thus, the constitutionality of Utah's signature petition requirements for unaffiliated candidates to access the ballot[96] is not at issue here.

---

[91] *Breck*, 2017 WL 1319742, at *6.
[92] 921 F. Supp. 2d 888, 902 (N.D. Ill. 2013).
[93] *Breck*, 2017 WL 1319742, at *8.
[94] *Id.* at *9.
[95] 212 F. Supp. 3d 1148, 1152 (M.D. Ala. 2016).
[96] *See* Utah Code § 20A-9-502.

Plaintiffs' arguments miss the mark. The ability of unaffiliated or minor party candidates to access the ballot is not what is at issue in this case. Here, Plaintiffs are not asking the Court to place Bennett on the ballot in the special election, nor is an existing minor political party's nominee seeking access to the ballot. Instead, Plaintiffs complain Utah's requirement that a political organization submit 2,000 signatures and additional documentation for initial qualification as a political party is unconstitutional, as applied to the special election. That issue was addressed in *Mathers v. Morris*.[97]

In *Mathers*, a political party, its candidate for a special congressional election, and a registered voter brought an action challenging the constitutionality of Maryland's laws preventing a candidate from being placed on the special election ballot.[98] Like the instant case:

> The plaintiffs assert that the number of signatures required for nomination by petition, together with the early deadline imposed for filing the total required number of signatures and the relatively short time period available in which to gather the signatures, impose an unconstitutional burden on the freedoms of speech and association, protected by the First and Fourteenth Amendments to the Constitution, and the fundamental right to vote, protected by the Fourteenth Amendment to the Constitution.[99]

Like the instant case, "[t]he plaintiffs also contend[ed] that, if Mathers is allowed on the ballot, he should be allowed to designate his political affiliation and that [Maryland law] prohibiting such designation on the ballot unless the candidate is affiliated with a "political party" or "party" . . . is unconstitutional as applied to the candidate and the Libertarian Party of Maryland.

The court concluded "that the timing of the deadlines for submitting the total number of required signatures represents an unconstitutional restriction under the circumstances of this special election and that the State Election Officials must accept the signatures tendered by the

---

[97] 515 F. Supp. 931 (D. Md.), aff'd, 649 F.2d 280 (4th Cir. 1981), aff'd, 454 U.S. 934 (1981).
[98] *Id*. at 932.
[99] *Id*. at 933.

plaintiff" on or before [the date of the special primary election.]"[100] On the issue of whether the candidate had the right to access the ballot, the court held that "[i]f a sufficient number of those signatures prove valid, and the candidate is found otherwise qualified, he must be placed on the ballot for the special general election."[101]

Significant, however,  to the case at bar, the court denied the Libertarian Party's request to set aside the general organizational requirements to become a new political party,[102] The court found the statutory requirement that a political organization gather 10,000 signatures for initial qualification as a political party is not unconstitutional,[103] and concluded "the State Election Officials are NOT required to designate the political affiliation of the plaintiff Mathers on the ballot in the upcoming special general election."[104]

The court distinguished:

the signature requirement for nomination of a candidate by petition and the signature requirement for qualification as a political party. The former is by its nature confined to the context of a particular election and is therefore subject to deadlines necessitated by the timing of the election, an especially acute problem in the case of a special election. However, the signature requirement for qualification of a political party is part of an ongoing effort by the state to limit political party status and its attendant ballot rights to those organizations which are able to demonstrate "a significant modicum of support" on a continuing basis. Thus, the burden of the requirements for political party status must be considered in a broader context than that of the signature requirements for nomination by petition in a specific election.[105]

As noted in *Mathers*,

---

[100] *Id.* at 635.
[101] *Id.*
[102] *Id.* at 636.
[103] *Id.* at 935-938.
[104] *Id.* at 938 (emphasis in original).
[105] *Id.* at 936-37.

The Supreme Court has clearly recognized the state interest in requiring candidates and political parties to demonstrate some degree of support before granting them access to the ballot:

"There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."[106]

Just as in *Mathers*, Utah's requirements for initial qualification as a political party prevent frivolous political organizations from gaining access to the ballot and, thereby, serves to preserve the order and integrity of the electoral process.

## VII.   PLAINTIFFS ARE NOT IRREPARABLY HARMED.

Plaintiffs contend they are harmed by the loss of their First Amendment rights to vote and "have a voice in the election"[107]  As set forth above, Plaintiffs' constitutional rights are not affected by the party registration statutes or the special election process.  Accordingly, plaintiffs have not clearly and unequivocally demonstrated that they have been irreparably harmed.

## VIII.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST IS NOT IN PLAINTIFFS' FAVOR.

When faced with a request to interfere with a state's election laws and enjoin an ongoing election, federal courts are "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases."[108]  "These considerations often counsel restraint."[109] Restraint is clearly needed here.  The interests

---

[106] *Id.* at 936 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). Similarly, the 10th Circuit concluded that "a State does have a 'greater interest' in imposing restrictions on the organization of new political parties than on ballot access for minority candidates because of the additional need 'to provide assurance that the particular party designation has some meaning . . . .'" *Coal. for Free & Open Elections, Prohibition Party v. McElderry*, 48 F.3d 493, 498 (10th Cir. 1995)(quoting *Rainbow Coalition of Oklahoma*, 844 F2d 740, 749 n.9 (10th Cir. 1988).
[107] Doc. 5 at 14.
[108] *Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam).
[109] *Feldman v. Arizona Sec'y of State's Office*, 843 F.3d 366, 375 (9th Cir. 2016).

advanced by the special election schedule include saving the taxpayers 1.6 to 2 million dollars, decreasing voter confusion, increasing voter participation, ensuring the vacancy is filled in a timely manner and minimizing administrative burdens.  Moreover, the Court should evaluate the party registration requirements in a broader context than this special election because those regulations protect against overloaded ballots and frivolous candidacies, which diminish victory margins, contribute to the cost of conducting elections, confuse and frustrate voters, increase the need for burdensome runoffs, and ultimately discourage voter participation in the electoral process.  And, allowing prospective political parties to circumvent these requirements has effects well beyond a particular election. The State should be allowed to ensure full compliance with the statutory requirements to become a registered political party <u>before</u> the State grants the UUP the privileges associated with registered political party status and delegates its sovereign authority to the party to determine who shall appear on the State's general election ballot.

## CONCLUSION

For the reasons stated above, this Court should deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

DATED:  July 7, 2017.

OFFICE OF THE UTAH ATTORNEY GENERAL

/s/ David N. Wolf
DAVID N. WOLF
THOMAS D. ROBERTS
Assistant Utah Attorney General
*Counsel for Defendant*