Bryan L. Sells (bryan@bryansellslaw.com) *(admitted pro hac vice)*
THE LAW OFFICE OF BRYAN L. SELLS, LLC
P.O. Box 5493
Atlanta, GA 31107
Telephone: (404) 480-4212

Cheylynn Hayman (9793) (chayman@parrbrown.com)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah  84111
Telephone: (801) 532-7840

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED UTAH PARTY, et al.,<br><br>     Plaintiffs,<br><br>vs.<br><br>SPENCER J. COX, in his official capacity as the Lieutenant Governor of the State of Utah,<br><br>     Defendant. | **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Case No. 2:17-cv-00655-DN<br><br>Judge David Nuffer |

Plaintiffs the United Utah Party, Jim Bennett, Diane Knight, Vaughn R. Cook, and Aaron Aizad (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this reply to the Defendant's Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. [Dkt. 17.]

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................ii

ADDITIONAL FACTS ..........................................................................................iii

    The United Utah Party Solicited Candidates to Run in the Special Election .................iii

    Rule 30(b)(6) Deposition of the Lieutenant Governor's Office ......................................iv

    The 1930 Special Election for Historical Context…………………………………viii

ARGUMENT .........................................................................................................1

   I.  The Lieutenant Governor Understates the Constitutional Burdens of His May 19 Order .........................................................................................................1

      A.    Nothing in the Lieutenant Governor's Brief Establishes that the United Utah Party Had a Reasonable Opportunity to Participate in the Special Election ...............................................................................1

      B.    The Availability of an Unaffiliated or Write-in Candidacy Does Not Diminish the Burdens of the May 19 Order ........................................................4

   II.  The Lieutenant Governor Has Failed to Establish Any Need to Exclude the United Utah Party for the Special Election ....................................................8

   III. The Lieutenant Governor's Analysis of the Caselaw Misses the Point .........................11

INDEX OF EXHIBITS .........................................................................................15

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) .......................................................................................... 5, 7, 8

*Arutunoff v. Oklahoma State Election Board,*
  687 F.2d 1375 (10th Cir. 1982) ................................................................................. 5

*Blomquist v. Thomson,*
  591 F. Supp. 768 (D. Wyo. 1984) .............................................................................. 5

*Breck v. Stapleton,*
  2017 Wl 1319742, Slip Op. At 10-11 (D. Mont. April 8, 2017) ................................. 2

*Bullock v. Carter,*
  405 U.S. 134 (1972) ................................................................................................... 5

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ........................................................................................... 6, 7, 8

*Cook v. Gralike,*
  531 U.S. 510 (2001) ................................................................................................... 6

*Green Party of Arkansas v. Priest,*
  159 F. Supp. 2d 1140 (E.D. Ark. 2001) .................................................................... 2

*Illinois Elections Bd. v. Socialist Workers Party,*
  440 U.S. 173 (1979) ................................................................................................... 5

*Lubin v. Panish,*
  415 U.S. 709 (1974) ................................................................................................... 7

*Mclain v. Meier,*
  637 F.2d 1159 (8th Cir. 1980) ............................................................................... 5, 7

*Norman v. Reed,*
  502 U.S. 279 (1992) ............................................................................................... 4, 5

*Storer v. Brown,*
  415 U.S. 724 (1974) ................................................................................................... 5

*U.S. Term Limits v. Thornton,*
 514 U.S. 779 (1995) ................................................................................................ 7

*United States v. Classic,*
 313 U.S. 299 (1941) ................................................................................................ 7

*Williams v. Rhodes,*
 393 U.S. 23 (1968) .................................................................................................. 5

Statutes

Utah Code § 20a-6-301 ............................................................................................. 6

Utah Code § 20a-8-102 ........................................................................................ 6, 10

Utah Code § 20a-8-103 ........................................................................................ 2, 10

Utah Code § 20a-8-106 .......................................................................................... 3, 9

Rules

Fed.R.Evid. 803 ...................................................................................................... vii

Fed.R.Evid. 902 ...................................................................................................... vii

Other Authorities

Senate Bill No. 4 ........................................................................................................ 9

Senate Bill No. 7 ........................................................................................................ 9

## **INTRODUCTION**

In his brief, the Lieutenant Governor observes that "[s]pecial elections, by their very nature, require different procedures and accelerated timelines than do general elections." [Dkt. 17 at 13.]  Plaintiffs agree.  The Lieutenant Governor's May 19 order prescribes deadlines and procedures for the upcoming special congressional election that differ from those set by Utah law because the Utah statutes are virtually silent on special congressional elections.  But the Lieutenant Governor has steadfastly refused to adopt different procedures and timelines that would permit a new political party to run a candidate in the special election.  Instead, he has insisted on rigid adherence to the procedures and timelines set out in Utah law that permit a new party to participate in a regular election.  The result, which is not seriously in dispute, is that the newly formed United Utah Party[1] is effectively barred from running a party candidate in the upcoming special election.

At the scheduling hearing on this motion, the Court invited the Lieutenant Governor to explain in his brief why he found it necessary to exclude new parties from the special election process.  What practical obstacles, if any, would have prevented a more inclusive process?  [Dkt. 25 at 24-25.] The answer is none.  Given the Lieutenant Governor's broad authority over the special election, the May 19 order could have proscribed additional procedures and timelines that would have included new-party candidates while at the same time preserving the other interests

---

[1] The Lieutenant Governor certified the United Utah Party as a registered political party on July 13, 2017.  Plaintiffs are working with counsel for the Lieutenant Governor to prepare stipulated facts regarding this certification.

he sought to protect.  Nothing in the Lieutenant Governor's brief or supporting materials indicates otherwise.

## ADDITIONAL FACTS

Plaintiffs set forth the following additional facts:

### The United Utah Party Solicited Candidates to Run in the Special Election

1.      On Monday, May 22, 2017, one business day after Governor Herbert announced the special election to fill Representative Chaffetz's seat in the Third Congressional District, the United Utah Party held a press conference at the Utah State Capitol.  [Declaration of Richard Davis, Exhibit 1 hereto, ¶ 3.]

2.      During that press conference, Richard Davis announced the formation of the United Utah Party and informed the public that the Party would be seeking a candidate for the Third Congressional District special election.  [Davis. Decl. ¶ 4.]

3.      In interviews with members of the media, Mr. Davis encouraged people who were interested in filing with the United Utah Party to come forward and run under the United Utah Party banner.  [*See* Davis Decl. ¶ 6; Declaration of Jim Bennett, Exhibit 2 hereto, ¶ 4.]

4.      At no time prior to May 26, 2017, did the Lieutenant Governor or anyone from his office mention to Mr. Davis or Jim Bennett that if the United Utah Party did not hold its organizing convention prior to May 26, 2017, the Party would not be allowed to run a candidate for the special election to replace Representative Chaffetz.  [Davis Decl. ¶ 3; Bennett Decl. ¶ 3.]

5.      The United Utah Party held its organizing and nominating convention on June 17, 2017, in order to meet the June 19 deadline set out in the Lieutenant Governor's May 19 order

for political parties to certify their nominees to the Lieutenant Governor.  [Davis Decl. ¶ 8;

Bennett Decl. ¶ 10.]

### Rule 30(b)(6) Deposition of the Lieutenant Governor's Office

6.      The Lieutenant Governor's Office, which includes the Election Office, is

currently staffed by approximately eight employees.  [Deposition Transcript of Mark Thomas,

dated July 12, 2013 ("Thomas Dep."), Exhibit 3 hereto, at 11-13.][2]

7.      In addition to Mark Thomas, the Director of Elections, the Election Office is

staffed by three employees: a deputy election director and two assistants.  [*Id.*]  The Election

Office may draw on other employees within the Lieutenant Governor's Office for help if the need

arises.  [*Id.* at 12-13.]

8.      When the Election Office reviews petition signatures for political parties or

candidate petitions, it begins by verifying that the person who circulated the petition meets the

statutory requirements necessary to be a circulator—i.e., that the circulator is a Utah resident over

18 years of age.  [*Id.* at 16-17, 20.]

9.      The Election Office then reviews the individual petition signatures and the

accompanying address, birthdate, and signature to ensure that information matches the

information the State of Utah has on file.  [*See id.* 16-19.]  For candidate petitions, the Election

---

[2] Due to the expedited nature of these proceedings, the parties have not yet received a certified
deposition transcript from the court reporter, and Mr. Thomas has not had the opportunity to read
and make corrections to this deposition transcript.  Due to the filing deadline for this Reply
Memorandum, Plaintiffs are submitting a rough uncertified deposition transcript.  Plaintiffs will
supplement this filing with a certified deposition transcript when it is available.

Office also reviews the petition signatures to ensure that the voter did not sign another petition for the same candidate.  [*See id.* at 16.]  Utah's voter registration database (VISTA) usually contains all of the information necessary for the Election Office to review petition signatures.  [*Id.* at 19-21.]

10.     If a signature has been collected by a careful circulator, and the name, address, and birth date included on the petition is the same as the information contained in VISTA, it takes approximately 60-90 seconds for the Election Office to review a signature.  [*Id.* at 27-29.]

11.     During this special election, two party candidates submitted candidate petition signatures: Tanner Ainge and John Curtis.  [*Id.* at 29.]

12.     Mr. Ainge submitted his candidate petition signatures on Tuesday, June 6, 2017, or Wednesday, June 7, 2017.  The Election Office reviewed those petitions and certified 7,000 signatures within approximately one week.  [*Id.* at 31.]

13.     Mr. Curtis submitted his candidate petition signatures on June 12, 2017.  The Election Office reviewed those petitions and certified 7,000 within 3-4 days.  [*Id.* at 32.]

14.     The United Utah Party submitted its party petition signatures to the Utah Election Office on May 25 and 26, 2017.  [Dkt. 19, ¶ 36.]

15.     The Lieutenant Governor's Office has no information that the signatures the United Utah Party submitted were in bad form or took an unusually long amount of time to verify. [Thomas Dep. at 46-47.]

16.     In preparation for reviewing the candidate petitions of Mr. Ainge and Mr. Curtis, the Election Office hired temporary employees and procured rental space and computer screens for those workers.  [*See id.* at 30.]

17.     Although the Election Office had temporary workers available to review petition signatures as early as May 30, 2017, the Election Office did not use any of those workers to review the United Utah Party's petitions.  [*See id.* 39-40.]  Instead, the Election Office determined that additional resources were not necessary based upon the 30-day statutory review deadline and opted to complete its review using existing internal resources.  [*Id.* at 39-40, 43.]

18.     The Election Office did not complete its review and certification of the United Utah Party's 2,000 party petition signatures until June 26, 2017.  [Dkt. 19, ¶ 45.]

19.     The Lieutenant Governor he was aware on May 22, 2017, that the United Utah Party intended to become a political party and run a candidate in the special election.  [Thomas Dep. at 47-49, 97.]

20.     The Lieutenant Governor has identified no defects in the United Utah Party's process of organizing the party and, barring any technical computer issues with the state system and the public-based voter registration websites, intends to issue a certification to the United Utah Party on July 13, 2017, confirming that it is a registered political party in the State of Utah.  [*Id.* at 57-59.]

21.     From start to finish, the process for the Lieutenant Governor to review the United Utah Party's party petitions and organizational documents spanned from May 25, 2017 to July 13, 2017—i.e., seven weeks.  [*Id.* at 64-65.]

22.     The United Utah Party's registration application could have been completed in less than seven weeks if the Lieutenant Governor had taken different steps, such as using the temporary workers the Lieutenant Governor's office had hired to verify the United Utah Party's 2,000 signatures.  [*Id.* at 65-67.]

23.     The Lieutenant Governor admits that every single deadline in the May 19 order is one that would not exist but for the May 19 order.  [*Id.* at 74-75.]  Although the May 19 order compresses the statutory election calendar as compared to the regular election calendar, the May 19 order makes no adjustments to the political party statutory process for becoming a registered political party. [*See* at 68, 76-78.]

24.     At the time the Lieutenant Governor issued the May 19 order, "there just wasn't any real discussion related to any potential because I – we just weren't – it wasn't an issue that had come up, other than in talking about scenarios that – and timeliness and other issues."  [*Id.* at 80-81.]

25.     The Lieutenant Governor's Office admits it never made a determination that the Lieutenant Governor couldn't make adjustments in the May 19 order to the political party statutory process for becoming a registered political party.  [*Id.* at 78.]

26.     Adding additional candidates to an already existing election likely would not result in any cost increase to the State, and the Lieutenant Governor's Office is not aware of any voter confusion that has arisen from any of the other special congressional elections around the country this year.  [*Id.* at 85-87.]

27.     The Lieutenant Governor's Office has not received any indication from the Green Party that it intends to try to run a candidate in this special election.  [*Id.* at 93-94.]

28.     No one other than Jim Bennett attempted to file a declaration of candidacy for a political party that is not registered seeking to be on the ballot in the special election. [*Id.*]

29.     The Lieutenant Governor's Office has no reason to believe that anyone other than Jim Bennett wanted to run for the United Utah Party nomination for the Third Congressional District.  [*Id.* at 96-97.]

30.     The Lieutenant Governor's Office admits that the State of Utah has an interest in complying with the First Amendment to the United States Constitution.  [*Id.* at 91.]

31.     The Lieutenant Governor's Office admits that the State of Utah has an interest in protecting the First Amendment rights of Utah voters.  [*Id.*]

32.     The Lieutenant Governor's Office admits that the State of Utah has an interest in protecting the First Amendment rights of prospective party candidates and prospective new parties.  [*Id.* at 91-92.]

### The 1930 Special Election for Historical Context[3]

33.     On December 17, 1929, Utah Governor George H. Dern called for the convention of a special session of the Utah Legislature to consider and propose amendments to the Utah Constitution and conduct other legislative business.  *See* Governor's Proclamation, Laws of the State of Utah, Eighteenth Legislature, Special Session (1930), Exhibit 4 hereto.

34.     On December 24, 1929, Utah Representative Elmer O. Leatherwood died, leaving a vacancy in Utah's Second Congressional District.  *See* J. O. Eldredge, Jr., *Ogden Admired E. O. Leatherwood*, The Ogden Standard Examiner, Dec. 25, 1929, at 8, Exhibit 5 hereto.

_____

[3] The following historical facts are submitted pursuant to Rules 803(16) and 902(6) of the Federal Rules of Evidence.

35.     On January 27, 1930, the Legislature convened for the special session.  *See* Utah House Journal, First Special Session of the Eighteenth Legislature (1930), at 139–142, Exhibit 6 hereto.

36.     At that time, Section 2104 of the Compiled Laws of Utah 1917 provided as follows with regard to congressional vacancies:

> 2104.  When a vacancy or a failure to elect by reason of a tie vote or for any reason whatever occurs in the office of representative in congress or member of the legislature, the governor must at once issue a proclamation calling an election to fill such vacancy; provided, that if there be no session of the legislature or congress, as the case may be, between the happening of such vacancy and the next general election occurring forty-five or more days thereafter, such vacancy shall be filled at the general election.

*Id.* at 140.

37.     During the special session, the Governor reported that no steps had been taken to fill the vacancy because the Governor did not construe the U.S. Constitution as commanding him to call a special election immediately.  The Governor invited the Legislature to amend Section 2104 to allow vacancies to be filled at the next general election, and to authorize the governor to call an emergency special election if necessary.  *See id.*

38.     On February 19, 1930, the Legislature complied with the Governor's request and passed Senate Bill No. 7, which amended Section 2104 to read as follows:

> 2104. Vacancies—Governor to issue proclamation calling election—when—special election.  When a vacancy or a failure to elect by reason of a tie vote or for any reason whatever occurs in the office of representative in Congress or member of the legislature, the governor shall issue a proclamation calling an election to fill such vacancy at the next general election; provided, that if in the judgment of the governor an emergency exists requiring that such vacancy shall be filled before the next general election he may issue a proclamation calling a special election to fill such vacancy.

*See* Senate Bill No. 4, Laws of the State of Utah, Eighteenth Legislature, Special Session (1930), at 1, Exhibit 7 hereto.

39.     On September 4, 1930, the Governor issued a proclamation declaring that a general election would be held on Tuesday, November 4, 1930, for the purpose of electing various officers, including a representative to fill the vacancy left by Representative Leatherwood.  *See* Governor's Proclamation, Office of the Secretary of State, State of Utah, Sept. 4, 1930, at 1, Exhibit 8 hereto.

40.     At that time, Utah did not require primary elections for any political parties. Instead, new parties received access to the ballot by collecting and submitting 500 signatures at least 30 days before the general election.  *See* Ballot Access Law, Utah Session Laws State of 1896, § 6, at 184-85, Exhibit 9 hereto.

41.     On September 23, 1930, a new political party called the Liberty Party of Utah (the "Liberty Party") announced plans for nominating a candidate for the Second Congressional District.  *See Liberty Party Born as Leaders Denounce Present Liquor Laws*, Salt Lake Telegram, Sept. 24, 1930, at 1, 8, Exhibit 10 hereto; *New Liberty Party Opens Dry War*, Salt Lake Tribune, Sept. 24, 1930, Exhibit 18 hereto; *Mass Meeting Advertisement*, Salt Lake Telegram, Sept. 22, 1930, Exhibit 19 hereto.[4]

42.     One week later, on September 30, 1930, George N. Lawrence ("Lawrence"), a former Republican state senator and prominent Salt Lake City attorney, was nominated as the Liberty Party's candidate for the Second Congressional District.  Before Lawrence could

---

[4] The Liberty Party supported repealing prohibition laws and adopting a government control system for selling alcohol.  *See* Ex. 10.

officially be entered into the congressional race, he had to circulate and file with the Secretary of State and county clerks of the four counties in the Second Congressional District a petition signed by 100 citizens.  *See Liberty Party Names Lawyer for Congress*, Salt Lake Telegram, Sept. 30, 1930, at 1, Exhibit 11 hereto.

43.     The Liberty Party circulated petitions to place Lawrence on the ballot for the upcoming November 4, 1930 election.  *See Ticket Filled by New Party*, The Ogden Standard-Examiner, Oct. 4, 1930, at 6, Exhibit 12 hereto.  On October 3, 1930, Lawrence filed his nominating petition as a candidate of the Liberty Party with the Secretary of State.  *See Parties File Two Petitions*, The Salt Lake Tribune, Oct. 4, 1930, at 1, Exhibit 13 hereto.

44.     On October 4, 1930, the Liberty Party filed a blanket nominating petition for its state and county candidates with the Salt Lake County Clerk before the 5:00 p.m. filing deadline. Although the clerk initially questioning the legal form of the petition, the clerk ultimately determined "it was all right" and that "he personally had no authority to refuse to accept the list as it was filed within the statutory time."  *See Place Liberty Party on File for Balloting*, Salt Lake Telegram, Oct. 5, 1930, at 1, Exhibit 14 hereto.

45.     On October 26, 1930, the Utah County Clerk certified the list of Second Congressional District candidate names for the general election to be held on Tuesday, November 4, 1930.  The ballot included candidates from the Republican, Democratic, Socialist, and Liberty Parties.  Lawrence represented the Liberty Party.  The special election was listed first on the ballot, followed by the regular two-year term beginning on Tuesday, March 4, 1931. A customary blank column for write-in votes was included on the ballot.  *See List of Nominations*, The Sunday Herald, Oct. 26, 1930, at 7, Exhibit 15 hereto.

46.     Republican Frederick C. Loofbourow was ultimately elected to fill the vacancy

caused by Representative Leatherwood, and also to serve an additional two year term.  *See* Frank

Francis, *Utahns Adopt Amendments; Colton Wins By Big Vote*, The Ogden Standard Examiner,

Nov. 6, 1930, at 1, Exhibit 16 hereto.

**ARGUMENT**

**I.      The Lieutenant Governor Understates the Constitutional Burdens of his May 19 Order.**

The Lieutenant Governor contends in his brief that the special election process imposes no burden whatsoever on the Plaintiffs' constitutional rights.  [Dkt. 17 at 3-15.]  He argues, as a factual matter, that his May 19 order did not make it impossible for the United Utah Party to participate in the special election process but that the timing of the Party's organizing convention did.  [*Id.* at 12-13.]  He also claims that, even if the United Utah Party is unable to run a party candidate in the special election, all of the Plaintiffs remain free to exercise their First Amendment rights in other ways.  [*Id.* at 3-8.]  These arguments miss their mark.

**A.      Nothing in the Lieutenant Governor's Brief Establishes that the United Utah Party Had a Reasonable Opportunity to Participate in the Special Election.**

First, as a factual matter, the Lieutenant Governor suggests that the Party could have participated in the special election as a registered political party if it had started the registration process sooner. [Dkt. 17 at 12.]  This suggestion finds no support in the record.  Although there was speculation beginning on April 20, 2017, that Representative Chaffetz might not serve out his full term [*id.* at ix, 12], there is no reason to believe that the United Utah Party could have completed the party registration process before the May 26 candidate filing deadline set by the Lieutenant Governor's May 19 order, even had the United Utah Party began gathering signatures

1

that very same day.[5]  Utah law gives the Lieutenant Governor 30 days to review signatures on a

party registration petition, Utah Code § 20A-8-103(6), and he took every day of that time to

process the Party's signatures.  [Dkt. 17 at xvi.]  And, as the Lieutenant Governor also points out,

the party registration process includes many other steps. [*Id.* at xvi-xvii.]  Without different

procedures and timelines tailored to the special election, it would have been impossible for the

Party to become certified between April 20, when the speculation about Representative

Chaffetz's resignation began, and the candidate-filing deadline on May 26.

      Moreover, prescience is itself a burden.  If, as the Lieutenant Governor suggests, the only

way the Party could have participated in the special election was to predict not only

Representative Chaffetz's resignation and the timing thereof, but also the contents of the May 19

order, then the burden on the Plaintiffs was high indeed.  In other special-election cases, courts

have rejected foreknowledge arguments out of hand.  *See, e.g., Breck v. Stapleton,* No. 1:17-CV-

36, 2017 WL 1319742, Slip Op. at 10-11 (D. Mont. April 8, 2017) (rejecting Montana's

argument that "putative candidates should start collecting signatures based on the mere

possibility of an election"); *Green Party of Arkansas v. Priest*, 159 F. Supp. 2d 1140, 1144 n.2

(E.D. Ark. 2001) (rejecting Arkansas' argument that the Green Party could have become a

recognized political party in the prior year even though the special election at issue was

"unknown and unforeseen" at that time).  This Court should do the same.

---

[5] It bears emphasis that while it was reported on April 20, 2017 that Representative Chaffetz
might not finish his two year terms, he also assured the public that "[i]n the meantime I still have
a job to do and I have no plans to take my foot off the gas."  [Stiplulated Fact, Dkt. 17-1, ¶ 9.]

The Lieutenant Governor also claims that it was the Party's own decision to hold its organizing convention in June that shut the Party out of the special election.  [Dkt. 17 at 12-13.] This is an odd claim, because nothing in Utah law requires a newly formed political party to hold an organizing convention before March 1 of a general election year, *see* Utah Code § 20A-8-106(1), and the May 19 order does not set a different deadline.  The Lieutenant Governor did not mention any other convention deadline when the Party submitted its signatures on May 25 and expressed its intention to run a candidate in the special election; or on May 26, when the Party submitted additional signatures; or later on May 26, when Jim Bennett attempted to file his declaration of candidacy.  [Davis Decl. ¶ 3; Bennett Decl. ¶ 3.]  Indeed, at no point before he filed his brief did the Lieutenant Governor identify the timing of the Party's organizing convention as an issue.

The claim is also puzzling because Utah law suggests that a party is not authorized to hold an organizing convention until after the Lieutenant Governor certifies that the party's petition has enough signatures, and certifies that the prospective party's name and emblem is distinguishable from those of other registered political parties.  *See* Utah Code § 20A-8-106(7)(a).  In fact, the Lieutenant Governor's June 26 letter making those determinations states that the "United Utah Party is therefore now authorized to organize the prospective registered political party." [Dkt. 19-3.]

Here, the Party held its convention before certification in order to meet the June 19 deadline set out in the May 19 order for political parties to certify their nominees to the Lieutenant Governor.  [Davis Decl. ¶ 8; Bennett Decl. ¶ 10.]  And the Lieutenant Governor has determined that the Party need not redo its organizing convention unnecessarily.  [*See* Stipulated

Facts, Dkt. 19, ¶ 46.]  But the sequence of events suggested both by the Election Code and by the

Lieutenant Governor's June 26 certification letter led to substantial discussion at the scheduling

hearing on the Plaintiffs' motion about whether the Party would actually have to redo its

convention.  [Transcript of June 26, 2017 Status Report and Scheduling Conference, Ex. 17

hereto, Tr. 5:11-9:19.]  That matter was not finally resolved until the Lieutenant Governor made

a concession on the following day.  [Stipulated Facts, Dkt. 19, ¶ 46.]  It therefore seems

unreasonable to suggest, as the Lieutenant Governor apparently does, that the United Utah Party

could have, and should have, complied with a made-up convention deadline that did not even

exist before this litigation began.

What the record actually shows in this case is that the United Utah Party has acted

diligently and in good faith in its effort to secure a place on the special election ballot.  The Party

acted swiftly after the special election became more than a mere possibility, and the Party

complied, or attempted to comply, with all of the deadlines set out in the May 19 order.  Despite

those efforts, the Lieutenant Governor's May 19 order and his subsequent implementation of it

have made it impossible for the Party to participate in the special election.

B.     **The Availability of an Unaffiliated or Write-in Candidacy Does Not Diminish the Burdens of the May 19 Order.**

The Lieutenant Governor also argues that, as a legal matter, the May 19 order does not

burden constitutional rights here because Plaintiffs could have participated in the special election

process through an unaffiliated or write-in candidacy.  This claim is easily addressed because the

overwhelming weight of precedent is against it.

First, it is axiomatic that ballot-access restrictions that shut new parties out of the political

process burden the First Amendment rights of parties, candidates, and voters.  *See, e.g., Norman*

4

*v. Reed,* 502 U.S. 279, 288-89 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 793-94 (1983);

*Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *Williams v. Rhodes,*

393 U.S. 23, 30-31 (1968).  The Lieutenant Governor makes almost no mention of the many

cases establishing that proposition, and he has certainly failed to distinguish them.

Second, it is also well established that "the political party and the independent candidate

approaches to political activity are entirely different and neither is a satisfactory substitute for the

other."  *Storer v. Brown*, 415 U.S. 724, 745 (1974); *accord Arutunoff v. Oklahoma State Election*

*Board,* 687 F.2d 1375, 1380 (10th Cir. 1982)*; Blomquist v. Thomson,* 591 F. Supp. 768, 776 (D.

Wyo. 1984); *see also Bullock v. Carter*, 405 U.S. 134 (1972); *McLain v. Meier*, 637 F.2d 1159,

1165 (8th Cir. 1980) (a "candidate who wishes to be a party candidate should not be compelled

to adopt independent status in order to participate in the electoral process").  The Supreme Court

rejected this very argument in *Bullock,* where the issue was the constitutionality of a Texas filing

fee that applied only to party candidates. Texas did not defend the reasonableness of its filing fee

but relied instead on the fact that a candidate could avoid the fee altogether by filing as an

independent.  The Supreme Court was not persuaded: "[W]e can hardly accept as reasonable an

alternative that requires candidates and voters to abandon their party affiliations in order to avoid

the burdens of the filing fees imposed by state law." *Bullock*, 405 U.S. at 146-47.   The

Constitution requires that ballot-access requirements for both new parties and independent

candidates be reasonable.  Not just one or the other.

The facts of this case illustrate one of the reasons why an independent, or "unaffiliated,"

candidacy is no substitute: Jim Bennett is not an independent candidate.  He is affiliated with,

nominated by, and endorsed by, the United Utah Party.  Utah law requires that general-election

ballots include a party designation for each candidate nominated by a registered political party but requires all other candidates, regardless of their actual political affiliation, to be listed without a party name and with a disclaimer that "[t]his candidate is not affiliated with, or does not qualify to be listed on the ballot as affiliated with, a political party." Utah Code § 20A-6-301(1)(e). Although Utah law does not make any provision for ballot labels in a special election, the Lieutenant Governor made clear that his May 19 order would require Bennett to appear with the "unaffiliated" label if Bennett filed his candidacy under the procedure for unaffiliated candidates.[6] [Complaint, Dkt. 2, ¶ 49.] That label would have been inaccurate and misleading, because it would have appeared in a place on the ballot where the voters would reasonably expect to find accurate information about each candidate's party affiliation, and nothing about the content or the context would have given any indication that the "unaffiliated" party label might not be accurate.

An inaccurate and misleading ballot label is itself a heavy burden, particularly when other candidates are not so disadvantaged. *See Cook v. Gralike*, 531 U.S. 510, 525 (2001) ("[I]t seems clear that the adverse labels handicap candidates 'at the most crucial stage in the election process—the instant before the vote is cast.' . . . [T]he labels surely place their targets at a

---

[6] One way that the Lieutenant Governor might have avoided shutting the United Utah Party out of the special election is to have prescribed a different procedure for ballot labels in the context of the special election. In the 2008 general election, for example, Utah allowed unaffiliated candidates to choose a party label on the ballot. https://elections.utah.gov/Media/Default/Historical%20VIPs/2008%20VIP.compressed.pdf. Utah law no longer permits that practice in a general election, but there is no explicit prohibition in a special election. *See* Utah Code § 20A-6-301(1)(a); *id.* § 20A-8-102(2)(a). Only the Lieutenant Governor's May 19 order prohibits this solution in this special election.

6

political disadvantage….”); *McLain*, 637 F.2d at 1165 n.12 (observing that a minor political party's rights are heavily burdened where the state "is willing to encourage minority political voices, but only if they are partially stripped of a legitimizing party label").

Third, the Supreme Court has repeatedly rejected the argument that a write-in candidacy is an adequate substitute for ballot access. *See U.S. Term Limits v. Thornton*, 514 U.S. 779, 831 (1995) ("But even if petitioners are correct that incumbents may occasionally win reelection as write-in candidates, there is no denying that the ballot restrictions will make it significantly more difficult for the barred candidate to win the election."); *Burdick v. Takushi*, 504 U.S. 428, 437, n. 7 (1992) ("If the dissent were correct in suggesting that requiring primary voters to select a specific ballot impermissibly burdened the right to vote, it is clear under our decisions that the availability of a write-in option would not provide an adequate remedy"); *Anderson*, 460 U.S. at 799, n. 26 ("We have previously noted that [a write-in] opportunity is not an adequate substitute for having the candidates name appear on the printed ballot"); *Lubin*, 415 U.S. at 719 n.5 ("The realities of the electoral process . . . strongly suggest that 'access' via write-in votes falls far short of access in terms of having the name of the candidate on the ballot."); *United States v. Classic*, 313 U.S. 299, 313 (1941) ("Even if . . . voters may lawfully write into their ballots, cast at the general election, the name of a candidate rejected at the primary and have their ballots counted, the practical operation of the primary law . . . is such as to impose serious restrictions upon the choice of candidates by the voters"). There can be no serious claim that any of the Plaintiffs' rights at issue here are adequately protected by the availability of running a write-in candidacy.

Finally, it is also worth noting that the Lieutenant Governor's claim lacks evidentiary support in the record.  There are no election returns in the record to demonstrate how well

unaffiliated and write-in candidates fare in Utah compared to party candidates because those records simply do not exist.  The political and practical reality is that shutting the United Utah Party out of the special election puts Plaintiffs at a great disadvantage, and the availability of an unaffiliated or write-in candidacy does nothing to lessen that burden.

## II.   The Lieutenant Governor Has Failed to Establish Any Need to Exclude the United Utah Party from the Special Election.

The only things standing in the way of allowing a newly formed political party to participate in the upcoming special election are the Lieutenant Governor's May 19 order and a lack of imagination.  The Lieutenant Governor's brief identifies no public need or statutory constraint that would make it impossible, or even impractical, to accommodate First Amendment values in this case.  That is not enough to pass constitutional muster under any level of scrutiny.

The *Anderson/Burdick* test requires this Court to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789.  "[T]he Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*  The Lieutenant Governor's brief and supporting materials identify five interests to justify excluding new parties from the special election: financial impact; voter confusion; election administration; lack of representation; and voter participation.  [Dkt. 17 at xx-xxii, 15-19.]  In the abstract, these are undoubtedly legitimate and important state interests. But the Lieutenant Governor has failed to connect any of them to the burdens at issue here.

For example, the Lieutenant Governor claims that holding the special election on the same days as the regularly-scheduled municipal election will save the state money, reduce voter confusion, increase voter turnout, and reduce administrative burdens. [Dkt. 17 at 15-16.]  That

8

may be so.  But why must the Lieutenant Governor exclude new parties from the special election in order to synchronize it with the municipal election?  The Plaintiffs are not challenging the date of the special election or asking the Court to decouple it from the municipal election.

The answer appears to be related to the Lieutenant Governor's repeated suggestion that it would be necessary to extend the May 26 candidate-filing deadline set out in his May 19 order—thereby delaying the special primary and general elections—unless new parties are required to complete the statutory process of becoming a registered political party before the candidate-filing deadline. [Dkt. 17 at 9, 13, 19.]  This answer is at least consistent with the suggestion elsewhere in his brief that the Party was also required to hold its organizing convention before the May 26 deadline.  [Dkt. 17 at 12-13.]  But the Lieutenant Governor's brief fails to explain why that rigid sequence of events is necessary or required in the context of a special election.

In fact, it is neither.  Utah law sets no deadline for party registration.  Under Utah Code Section 20A-8-106(1), a prospective party must hold an organizing convention to elect officers by March 1 of a general election year, but there is no statutory deadline for completing the subsequent steps set out in Utah Code Section 20A-8-106(2).  There is an ordinary sequence of events for party registration in a general election, but the only thing requiring that sequence here is the Lieutenant Governor's May 19 order.

The Lieutenant Governor also claims that the sequence is necessary, as a practical matter, "because candidates need to know what registered political parties exist before deciding for which party the candidate chooses to declare candidacy."  [Dkt. 17 at 9.]  Candidates certainly need to know their options, but party registration is not the only way to make them known.  The

9

United Utah Party's intention to run a candidate in the special election was well known and widely reported in the press.  Party leaders publicly invited prospective candidates to seek the Party's nomination, and anyone could have tried to file a provisional declaration of candidacy seeking the party's nomination, as Jim Bennett did, before May 26.  [*See* Davis Decl. ¶¶ 4-6; Bennet Decl. ¶ 4.]  Given the Lieutenant Governor's discretionary authority over the special election, he could have even built this into the process.

The Lieutenant Governor could have, for instance, set a special deadline for new parties seeking ballot access in the special election to submit their signatures in advance of the candidate filing deadline, then published the list of prospective parties on his website.  *See* Utah Code § 20A-8-103(2)(b).  He could have announced a special signature review period.  *See* Utah Code § 20A-8-103(6)(c).  He could have announced a special deadline for a party to hold its organizing convention.  *See* Utah Code § 20A-8-106(1).  He could have set out a complete set of procedures and timelines for the special election, all within the Lieutenant Governor's authority, that would have included new parties, preserved the State's articulated interests, and allowed the special election to proceed in conjunction with the municipal elections.  The Lieutenant Governor's May 19 order abbreviated other aspects of the regular election process, and he clearly could have done something similar to accommodate new parties. With a little imagination, he could have taken whatever reasonable steps were necessary to strike a more appropriate balance between fundamental First Amendment rights and the other values and interests that he sought to protect.

Nothing in the Lieutenant Governor's brief or in the record establishes otherwise.

III.     **The Lieutenant Governor's Analysis of the Caselaw Misses the Point.**

The Lieutenant Governor devotes almost a quarter of his brief to a discussion of four special-election cases. [Dkt. 17 at 19-25.] He attempts to distinguish three cases upon which the Plaintiffs rely, *Green Party of Arkansas v. Priest*, 159 F. Supp. 2d 1140 (E.D. Ark. 2001), *Breck v. Stapleton,* No. 1:17-CV-36, 2017 WL 1319742, (D. Mont. April 8, 2017), and *Hall v. Merill*, 212 F. Supp. 3d 1148 (M.D. Ala. 2016), and offers a fourth case, Mathers v. Morris, as support for his position.

The Lieutenant Governor's attempt to distinguish *Green Party* is unavailing.  He claims that the ballot-access restrictions in that case were more severe than those here and that "the constitutional deficiency" was the fact that the party registration statute did not permit the Green Party to become recognized in an odd year.  [Dkt. 17 at 19-20.]  Not so.  The constitutional deficiency there was the same as it is here: the special-election process did not allow new parties to participate.  159 F. Supp. 2d at 1142.  The United Utah Party had no more realistic opportunity to run a party candidate in the upcoming special election than the Green Party did in 2001.  The only significant difference is that it was Arkansas law that shut the Green Party out of the special election and here it is the Lieutenant Governor's May 19 order.  Election officials in Arkansas did not have the statutory discretion to provide a special process to allow the Green Party to participate, but Utah's Lieutenant Governor clearly does.  While neither Arkansas law nor Utah law could stand in the way of fundamental First Amendment rights, the fact that the burden here arises from the discretionary act of an executive official tips the constitutional balance even further in Plaintiffs' favor.

The Lieutenant Governor's analysis of *Breck* and *Hall* also misses its mark.  He points out, correctly, that both of those cases involved independent candidates rather than party candidates.  Although the Constitution requires that ballot access requirements for both independent and new-party candidates be reasonable, *see, e.g., Blomquist v. Thomson,* 591 F. Supp. 768, 776 (D. Wyo. 1984), the right of new parties to run a party candidate in a special election was not at issue.  What is most important about the cases, though, does not depend on the nature of the plaintiffs.  Both courts found severe burdens where the ballot-access restrictions at issue only made it difficult, but not impossible, for the plaintiffs to participate in the special election.  In other words, *Breck* and *Hall* provide an important yardstick by which to measure the burdens at issue in this case.  The plaintiffs in those cases could have participated in the special elections if they had been able to gather a very large number of signatures in a very short time.  Not so here.  The Lieutenant Governor's rigid insistence on regular-election procedures and timelines made it impossible for the United Utah Party to participate in the special election despite gathering a large number of signatures in a very short time.  If the burdens in *Breck* and *Hall* were severe, then so is the burden here.

Lastly, the Lieutenant Governor's reliance on *Mathers* is misplaced.  The plaintiffs in that case, who were affiliated with the Libertarian Party, did not challenge "the constitutionality of the general organizational requirements for a new political party" in the context of Maryland's special congressional election in 1981.  515 F. Supp. at 936.  Rather, the plaintiffs challenged the Maryland statute that resulted in the revocation of the Libertarian Party's status as a political party after its presidential candidate received less than 3% of the vote in the 1980 presidential election.  *Id.*  The plaintiffs also challenged Maryland's statute that required minor-party

candidates to submit both a party petition and a candidate petition in order to appear on any ballot as the party's nominee.  *Id.*  Finally, the plaintiffs challenged the number of signatures required on a candidate's nominating petition, along with the early deadline and short time for gathering them in the context of the special election.  *Id.* at 933. The court struck down the signature deadline but upheld the disestablishment threshold and dual-petition system.

Utah does not have a dual-petition system.  The State's disestablishment threshold could not be an issue here because the United Utah Party is a completely new party.  And the plaintiffs in *Mathers* did not raise any challenge to the organizational requirements for a new political party or their implementation in the context of a special election.  It is also worth noting that, unlike the Libertarian Party in Maryland, the United Utah Party has demonstrated that it can comply with Utah's party-registration requirements.  *Mathers* thus provides no precise measure of the burdens at issue here or how the Court should weigh the State's asserted interests for excluding the United Utah Party from the special election.  If anything, the case provides further support for the basic proposition that the ballot-access requirements in a special election may not be unduly burdensome.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Temporary Restraining Order and Preliminary Injunction.

RESPECTFULLY SUBMITTED this 13th day of July 2017.

THE LAW OFFICE OF BRYAN L. SELLS, LLC

/s/ Bryan L. Sells
Bryan L. Sells
*Attorneys for Plaintiffs*

PARR BROWN GEE & LOVELESS, P.C.

/s/ Cheylynn Hayman
Cheylynn Hayman
*Attorneys for Plaintiffs*

14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 13th day of July 2017, a true and correct copy of the

foregoing **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR**

**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

was served via the Court's EM/ECF filing system on the following:

     Thomas D. Roberts
     David N. Wolf
     Assistant Attorney General
     160 E. 300 S., Suite 500
     PO Box 140857
     Salt Lake City, Utah 84114-0857
     thomroberts@agutah.gov
     dnwolf@agutah.gov

                    /s/ Cheylynn Hayman

**INDEX OF EXHIBITS**

Exhibit 1 – Richard Davis Declaration

Exhibit 2 -UUP - Jim Bennett Declaration

Exhibit 3 - Mark Thomas Deposition Transcript (Draft)

Exhibit 4 - Special Session Proclamation by Governor with Cover

Exhibit 5 - Leatherwood Death Announced

Exhibit 6 - Governor's Message No. 2 (Special Session)

Exhibit 7 - Laws Passed at Special Session

Exhibit 8 - Governor's Election Proclamation

Exhibit 9 - State Session Laws of 1869, Chapter 69

Exhibit 10 - Liberty Party Born

Exhibit 11 - Lawrence Nominated

Exhibit 12- Ticket Filled by New Party

Exhibit 13 - Parties File Two Petitions

Exhibit 14 - Place Liberty Party on File

Exhibit 15 - Second Congressional District General Election Ballot

Exhibit 16 - Loofbourow Elected

Exhibit 17 - Status Report and Scheduling Conference Transcript

Exhibit 18 - Mass Meeting Advertisement

Exhibit 19 - New Liberty Party, Salt Lake Tribune, Sep. 24, 1930