DAVID N. WOLF (6688)
THOMAS D. ROBERTS (2773)
ANDREW DYMEK (9277)
Assistant Utah Attorneys General
OFFICE OF THE UTAH ATTORNEY GENERAL
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: dnwolf@agutah.gov
E-mail: thomroberts@agutah.gov
E-mail: adymek@agutah.gov

*Counsel for Defendant*

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED UTAH PARTY, et al., <br><br> Plaintiff, <br><br> v. <br><br> SPENCER J. COX, in his official capacity as the Lieutenant Governor of the State of Utah, <br><br> Defendant. | **DEFENDANT'S RESPONSE TO PLAINTIFF'S ALTERNATIVE ELECTION CALENDAR (OPTIONS A, B AND C)** <br><br><br> Case No. 2:17-cv-00655-DN <br><br> Judge David Nuffer |

Pursuant to the Court's instructions provided at the hearing held on July 14, 2017, Defendant submits his Response to Plaintiff's Alternative Election Calendar (Options A, B, and C).[1]

---

[1] For the Court's convenience, Defendant has attached Plaintiff's Alternative Election Calendar (Options A, B, and C) as Exhibit 1.

## I.   INTRODUCTION

The United Utah Party ("UUP") has provided three proposed alternatives to the Special Election process, each of which would require the Lt. Governor to deviate from Utah law. While the proposed alternatives, if implemented, may have provided a pathway for Mr. Bennett to appear on the ballot with the UUP's designation, the Lt. Governor respectfully asks the Court to consider that any regulations the Lt. Governor makes (or would have made) to the Special Election process would not apply just to UUP but must apply to all prospective political parties. Thus, the Court should evaluate the proposed alternatives in a broader context than just Mr. Bennett's desire to access the ballot as the UUP's candidate.

The problems caused by UUP's proposed alternatives fall into three general categories. First, there are problems with allowing a person to declare candidacy before a registered political party exists. Before there is an established registered political party, with established rules, bylaws, membership requirements, platform, etc., how is a candidate to know if she wants to join the registered political party, participate in the registered political party, or run as a candidate for the registered political party? Further, before a registered political party is established and declared a qualified political party or registered political party, how is the candidate to know which process to follow (signature gathering or convention process) and who can vote for her or support her in the process?

Second, the process for this special election process is not as "special" as UUP suggests-- the Lt. Governor can convene a special election that otherwise comports with Utah law, but he cannot create a special process that applies specifically to UUP. UUP has advanced three scenarios to get its preferred candidate on the ballot. But none of these proposed alternatives

would have accommodated other emerging political parties' desire to participate in the special election. UUP had been in discussions for months, even before the last general election, about the possibility of forming a new party. UUP finally decided to form a party in April 2017. When Rep. Chaffetz announced his resignation and the Lt. Governor issued his special election order, UUP was able to hit the ground running. By April 2017, UUP had an organization, money, volunteers, and potential members all in existence. Options B and C, while expedient, are also self-serving. For each would have permitted an organization of voters merely a weekend (May 19 to May 22) to decide if it could or should form a party, gather like-minded people willing to volunteer their time and money, and file the necessary information to petition to become a registered political party. That group would then have an extremely short period of time to gather signatures, otherwise organize a party and choose candidates. These are clearly not timelines that could have worked for any group other than the UUP.

The third types of problems created by UUP's alternative options for the special election stem from deviating from the normal election processes. Implementing any of UUP's options would 1) limit participation of citizens, voters, and candidates; and 2) create confusion for the candidates, parties, voters, and election officials.

Having generally identified the problems presented by the UUP's proposed special election process, the Lt. Governor responds to each of the proposed options.

## II.  ANALYSIS

**Option A:**

Option A proposes to utilize the existing unaffiliated candidate procedures to allow a candidate to gain ballot access through a new category called a "political group." Option A is

very similar to what is set forth in the Lt. Governor's May 19th Order. Pursuant to the election code and the special election process, the Lt. Governor's Office would place the name of any unaffiliated candidate who collected 300 signatures and met the qualifications for the desired political office on the ballot and the candidate is then allowed to specifically list her "political group" under Utah Code § 20A-9-502(1)(a) on the declaration of candidacy form.

UUP's proposal creates new law, not found in the Election Code, by requiring the Lt. Governor to place the name of the candidate's "political group" on the ballot next to the candidate's name. This invites confusion by allowing an unregulated and unregistered "political group" to have its name on the ballot. Utah Code § 20A-8-103 requires the Lt. Governor to determine whether the name and emblem of a potential new registered political party is distinguishable from other registered political parties. UUP's revision to Utah law removes the Lt. Governor's ability to protect against purposeful misidentification or accidental confusion between registered political parties. The need for such protection is not merely theoretical: In this very case, an issue arose concerning whether the emblem chosen by UUP was distinguishable from the emblem submitted by the Green Party of Utah, and the Lt. Governor was required to determine which political group had the right to use its chosen emblem.

Allowing the political party's name on the ballot next to the candidate's name carries an endorsement by that "political group." However, under the UUP's proposal, the political groups are unregulated. Thus, it would be impossible for the Lt. Governor to determine whether the "political group" permits the candidate to use the political group's name on the ballot.

4

Moreover, Utah Code § 20A-9-202(1)(c) and (2)(iii) requires a candidate be a member of the political party if the candidate is seeking to be a candidate for that party unless the party permits otherwise. And, Utah Code § 20A-6-301 states:

> (1) Each election officer shall ensure that:
> (a) all paper ballots furnished for use at the regular general election contain:
> (i) no captions or other endorsements except as provided in this section;
> (ii) no symbols, markings, or other descriptions of a political party or group, except for a registered political party that has chosen to nominate its candidates in accordance with Section 20A-9-403; and
> (iii) no indication that a candidate for elective office has been nominated by, or has been endorsed by, or is in any way affiliated with a political party or group, unless the candidate has been nominated by a registered political party in accordance with Subsection 20A-9-202(4) or Subsection 20A-9-403(5).

Without requiring compliance with the statutory registered political party filings, the election official would be unable to determine whether the candidate is authorized to file under the "political group" name.

And if the Lt. Governor adopted "Option A," why would any candidate for a registered political party not choose to gain ballot access through the proposed unaffiliated candidate process if the candidate is still allowed to place any "political group" name on the ballot next to their name? Candidates could bypass the convention process and requirement to gather 7,000 signatures and still enjoy all the benefits of being a registered political party, including having the political group's name on the ballot, by just listing the political group on the certificate of nomination form for unaffiliated candidates. UUP's proposed amendment to Utah law is particularly concerning because any voter would be allowed to sign the unaffiliated candidate

petition. An unaffiliated candidate with a "political group" name on the ballot could be place on the ballot without any voter from the "political group" signing the petition.

Allowing a candidate to place the name of an unregistered "political group" name on the ballot does not allow for an orderly election and greatly increases the likelihood of voter and candidate confusion. UUP's proposal is likely to raise additional legal challenges from registered political parties or other organizations whose unauthorized name might be used by a candidate on the ballot.  Existing registered political parties would likely complain as well, arguing "Option A" detracts from their rights and status as certified registered political parties.

**Option B:**

Option B would allow a candidate to file a declaration of candidacy, collect signatures and gain ballot access through the convention <u>prior</u> to the organization becoming a registered political party.

Allowing a candidate to file a declaration of candidacy for a prospective registered political party would be impossible to administer because the election officer would not know if the candidate met the membership requirements to be a candidate for the prospective registered political party. The election official would not have the necessary information to decide any challenges to a candidate's declaration of candidacy for a party that doesn't exist.

Allowing a candidate to file a declaration of candidacy for a prospective political party creates great uncertainty in the election process for both the candidate and the election official. The candidate would not know whether the prospective political party will nominate its candidates only through the signature path or allow both a signature path and a convention. A signature candidate would know by the end of the day on May 22 who the prospective political

party would allow to participate in the prospective political party's primary. However, if the prospective political party only allowed its members to participate, the election official would not know whether a voter who signed a signature petition met the prospective party's membership requirements since no voter would be able to affiliate with the prospective political party until after it becomes a registered political party. The schedule proposed by UUP confirms this fatal deficiency because the deadline to submit signatures is the same date (June 12) that the prospective political party is required to submit its constitution and bylaws. Thus, the rules regulating the party and its members would not be known to the candidates or the voters until after the signature gathering process was over.

Similarly, under the UUP's proposed schedule, the first date a prospective political party could hold its convention is May 27, 2017, thus allowing the nominating convention to occur prior to the organizing convention. But on May 27, a convention candidate would not know the rules of the convention process since the bylaws and constitution would not be ratified until after the prospective political party held its organizing convention.

Option B also assumes the organization or prospective registered political party will meet all the statutory requirements and will become a registered political party. This is a dangerous assumption for all involved.  If the prospective political party does not meet the signatures requirements, have a distinguishable name and emblem, or does not submit a constitution or bylaws that meet the statutory requirements, the candidate, who expended large amount of time and resources to collect 7,000 signatures, or campaign at the convention, or both would be denied ballot access, even when she could have been on the ballot if she had utilized the unaffiliated route.

Clear requirements must be met before a candidate is allowed to gain ballot access and those requirements need to be established at the beginning of the process. To provide a structure based on the assumption that, sometime in the future, a prospective registered political party will satisfy the statutory requirements necessary to become a registered political party, gives candidates little to no clarity on how to gain access to the ballot. The candidates would be trying to gain ballot access using a moving target. Election officials would be determining ballot access without the information necessary to properly apply the law.

**Option C:**

Option C suffers from all the same infirmities as Option B, with the previously identified problems compounded by moving the deadlines to June 26 for the Lt. Governor to determine whether a prospective political party meets the signature requirements and has a distinguishable name and emblem. The deadline for the prospective political party to file its constitution, bylaws, and the names of party officers or governing board is also moved back to June 29. The Lt. Governor would certify the prospective political party as a registered political party on July 14, if it met all the statutory requirements.

To hold the primary election on August 15, 2017, the last date to mail ballots to military and overseas voters is June 30, 2017. Option C sets forth a process where prospective candidates are placed on the ballot and mailed to voters before the Lt. Governor determines whether they meet the statutory requirements and certifies the prospective registered political party as a registered political party.

There must be certainty in the process. To allow a candidate to gain ballot access and have voters cast ballots before a prospective political party is certified does not provide for an

orderly election. The potential for candidate and voter confusion and frustration is extremely high if the candidate failed to meet the requirements to gain access to the ballot and was therefore disqualified.

### III. CONCLUSION

Certifying an emerging political party after the declaration of candidacy deadline (May 26), while adhering to the statutory requirements, would have added months to the election process established by the Lt. Governor in his May 19 order. The election process could not have utilized the existing municipal primary and election dates and, thus, would have resulted in significantly greater expenses to the State and extended the time the Third Congressional District would not have had a representative in Congress. Alternatively, if the Lt. Governor exempted the UUP from the statutory requirements for certifying registered political parties or adopted any of the suggested "Options," he could not have administered a fair and orderly election.

DATED: July 17, 2017.

OFFICE OF THE UTAH ATTORNEY GENERAL

/s/ David N. Wolf
DAVID N. WOLF
THOMAS D. ROBERTS
ANDREW DYMEK
Assistant Utah Attorneys General
*Counsel for Defendant*