IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED UTAH PARTY, an unincorporated political association of Utah citizens; JIM BENNETT, an individual; DIANE KNIGHT, an individual; VAUGHN R. COOK, an individual, and AARON AIZAD, an individual,<br><br>　　　　　　　　　Plaintiffs,<br>v.<br><br>SPENCER J. COX, in his official capacity as the Lieutenant Governor of the State of Utah,<br><br>　　　　　　　　　Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING [5] PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 2:17-cv-00655-DN-PMW<br><br>District Judge David Nuffer |

This case arises because former Congressman Jason Chaffetz resigned partway through his term in office for Utah's Third Congressional District in the United States House of Representatives. Plaintiffs seek to have a new political party and its candidate included on the ballot of the special election set November 7, 2017 to fill the currently vacant seat (the "Special Election").

The United Utah Party ("UUP") is newly founded. Jim Bennett is a potential UUP candidate for the vacant congressional seat. The other three plaintiffs are Utah voters (one registered Democrat, one registered Republican, and one unaffiliated) with an interest in voting for a UUP candidate for office. [1]

Plaintiffs United Utah Party, Jim Bennett, Diane Knight, Vaughn Cook, and Aaron Aizad ("Plaintiffs") filed a Motion for Temporary Restraining Order and Preliminary Injunction (the

---

[1] Verified Complaint ¶¶ 3–6, docket no. 2, filed June 21, 2017.

"Motion")[2] on June 21, 2017. Plaintiffs seek to enjoin the Lieutenant Governor (the "Lt. Governor") of the State of Utah (the "State") from "failing to include the nominee of the United Utah Party on the ballot in the special election to be held on November 7, 2017, in the Third Congressional District."[3] Plaintiffs contend that the Lt. Governor's Special Election deadlines and procedures (the "Special Election Procedures") effectively barred UUP or any other new political party formed in response to the vacancy in the congressional office from participating in the Special Election, which violates Plaintiffs' First and Fourteenth Amendment rights.

No temporary restraining order was issued[4] because the Lt. Governor received notice of the Motion, and the parties briefed the Motion on an expedited briefing schedule.[5] The parties presented oral argument at a hearing on the Motion.[6]

Based on the current record, a preliminary injunction is GRANTED. Under the standard for constitutional challenges to state election laws articulated by the United States Supreme Court, the Special Election Procedures violate the First and Fourteenth Amendments. The Constitution guarantees the freedom to associate in political parties for the advancement of beliefs and ideas. The State's interests do not require or justify effectively barring UUP and its candidate, Mr. Bennett, from participating in the Special Election as a new political party.

Therefore, the Lt. Governor is ordered to include Mr. Bennett as the UUP candidate in the Special Election.

---

[2] Docket no. 5, filed June 21, 2017.

[3] Verified Complaint. Prayer for Relief, ¶ 3 at 12. The Motion seeks to "enjoin the Lieutenant Governor from refusing to include the United Utah Party's nominee, Jim Bennett, on the ballot in the special election to be held on November 7, 2017, in the Third Congressional District." Motion at 2.

[4] Fed. R. Civ. P. 65(b) (requiring a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" for a temporary restraining order to issue).

[5] Minute Entry for Proceedings Held Before Judge David Nuffer, docket no. 12, filed June 26, 2017.

[6] Minute Entry for Proceedings Held Before Judge David Nuffer, docket no. 38, filed July 14, 2017; Transcript of Motion Hearing Held Before Judge David Nuffer on July 14, 2017 ("Transcript"), docket no. 43, filed July 26, 2017.

**Table of Contents**

Background ................................................................................................................ 4
    The Law of Congressional Special Elections .................................................. 4
    The Lt. Governor Oversees Elections and Party Registration. ....................... 5
    Utah's Election Code Provides a Process for New Political Parties to Register. .............. 6
        The Lt. Governor Takes Many Actions Related to Primary Elections When a New
        Party is Certified. ................................................................................. 9
    Utah's Election Code Provides Processes for Candidate Access to the Regular Primary
    Election Ballot. .................................................................................. 10
    Utah's Election Code Provides Processes for Candidate Access to the Regular General
    Election Ballot. .................................................................................. 11
    Representative Chaffetz's Resignation Necessitated a Special Election. ......................... 12
    The Lt. Governor Established Procedures for a Congressional Special Election. ............ 12
        Rationale for Lt. Governor's May 19 Order .......................................... 15
    The UUP Seeks to Organize and Participate in the Special Election. ............................. 17
        Actions Taken Furthering Jim Bennett's Candidacy ............................. 20
        Summary of UUP and Bennett Actions ............................................... 21
    Lt. Governor Procedures – Special Primary Election to Special General Election .......... 22
    Only the Lt. Governor's Procedures Exclude New Parties from the Special Election..... 23
    The Election Office Review of UUP's Petition Was Unnecessarily Delayed. ................. 24
    Elimination of Election Office Delays Would Have Allowed Full Registration  of the
    UUP Before the Special Primary Election ............................................ 26
    The Lt. Governor Did Not Consider Participation of New Parties in the Special Election
    .................................................................................................... 28
    The State Faces No Significant Burdens in Including the UUP and Its Candidate  in the
    Special General Election. .................................................................... 28
Procedural Standard ................................................................................................ 29
Discussion ............................................................................................................... 30
    A Flexible Legal Standard Applies to Constitutional Challenges to Election Laws. ....... 30
    The Special Election Procedures Severely Burden Plaintiffs' Constitutional Rights....... 32
        The Character of the Asserted Injury: The Special Election Procedures Violate
        Plaintiffs' First and Fourteenth Amendments Rights. ........................... 32
        The Magnitude of the Asserted Injury: The Special Election Procedures Severely
        Burden Plaintiffs' Rights. ................................................................ 36
    The Interests Asserted by the Lt. Governor Do Not Justify or Necessitate a Complete Bar
    to New Political Party Participation in the Special Election................................... 37
        The State Interests Identified by the Lt. Governor Are Insufficient. .................... 37
        The Lt. Governor Could Have Accommodated Formation of a New Political Party
        Before the Special Primary Election....................................................... 41
        The Facts Demonstrate the UUP and its Candidate Are Ready to Participate in the
        Special Election .............................................................................. 45
        State Interests Do Not Justify Exclusion of the UUP from the Special Election.  46
    Plaintiffs Will Suffer Irreparable Harm in the Absence of Preliminary Relief. .............. 47
    The Balance of Equities Is Strongly in Plaintiffs' Favor. ................................................ 47
    The Injunction Is in the Public Interest. ......................................................................... 48
    No Bond Is Required. ...................................................................................................... 48

Order and Preliminary Injunction ................................................................................. 49

## BACKGROUND

The following factual record is preliminary, based on information as of the date of this Memorandum Decision and Order and is subject to revision based on evidence presented in any later proceedings, including trial. The record is drawn largely from undisputed facts stipulated by the parties,[7] together with the Verified Complaint[8] and the statements and exhibits presented in the briefs submitted in support of[9] and in opposition to[10] the Motion. This Order finds some facts which the parties identified as disputed.[11] The disputes are resolved after considering the record and argument at the hearing.[12] The parties' cooperation in developing a record in a short period of time is greatly appreciated and has greatly served the public interest.

This background section begins with an explanation of the legal framework of the Special Election, to enable the facts specific to Plaintiffs' claims to be understood in that context. There is no dispute as to the legal framework.

### The Law of Congressional Special Elections

Utah Code § 20A-1-502 provides that "[w]hen a vacancy occurs for any reason in the office of a representative in Congress, the governor shall issue a proclamation calling an election

---

[7] Stipulated Facts, docket no. 19, filed July 7, 2017.

[8] Verified Complaint.

[9] Motion; Plaintiffs' Corrected Reply Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction ("Plaintiffs' Reply"), docket no. 40, filed July 7, 2017 (correcting, supplementing, and replacing Reply Memorandum submitted on July 13, 2017, docket no. 31).

[10] Defendant's Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (the "Opposition"), docket no. 17, filed July 7, 2017; Defendant's Responses to Plaintiffs' Additional Facts and Supplemental Facts, docket no. 35, filed July 13, 2017.

[11] Disputed Facts and Issues that May Require Evidence, ("Disputed Facts and Issues"), docket no. 20, filed July 13, 2017.

[12] Transcript of Motion Hearing Held before Judge David Nuffer on July 14, 2017 ("Transcript"), docket no. 43, filed July 26, 2017.

to fill the vacancy." Under Utah law, the Governor proclaims a special election, and the Lt. Governor has authority to establish the Special Election Procedures.[13] While Utah has an extensive election code (with procedures for general elections, special statewide elections, and local elections), there are no statutory provisions other than Utah Code § 20A-1-502 applicable to a congressional special election.[14]

Unlike a seat in the United States Senate, which can be filled by appointment by the Governor until the seat is filled at the general election, a vacancy in the House of Representatives can be filled only by special election.[15] This odd difference between the methods of filling vacancies arises because vacancies in the office of Representative are filled by an election mandated by the U.S. Constitution, Article I, section 2, clause 4, while vacancies in the office of Senator may be filled by appointment of the "executive" of a state, or a special election, under a process outlined in Amendment XVII, U.S. Constitution, passed in 1913. The ability of a governor to appoint a Senator, who serves a six-year term, contrasts with the requirement of an election to fill a vacancy in the office of Representative, who serves for only a two-year term. This disparity in process explains the prevalence of reported cases involving special elections for the office of Representative. These disputes arise and must be resolved in compressed timeframes.

### The Lt. Governor Oversees Elections and Party Registration.

The Lt. Governor, who has been sued in his official capacity only, is the Chief Election Officer for all statewide ballots and elections.[16] In his capacity as Chief Election Officer, the Lt.

---

[13] Utah Code § 20A-1-203; Stipulated Facts ¶ 13.

[14] Found by the court; suggested by Disputed Facts and Issues ¶ 1.

[15] Utah Code § 20A-1-502.

[16] Utah Code § 20A-1-102(28); Stipulated Facts ¶ 7.

Governor exercises general supervisory authority over all elections and direct authority over the conduct of elections for federal officers.[17] The Lt. Governor is also responsible for reviewing information submitted by organizations seeking to become political parties in the State of Utah, and for certifying qualified organizations as newly Registered Political Parties under the Utah Election Code.[18]

The Lt. Governor's Office includes an Election Office, which is headed by Mark Thomas, the Director of Elections.[19] In addition to Mr. Thomas, the Election Office is staffed by three employees: a deputy election director and two assistants.[20] The Election Office may draw on other employees within the Lt. Governor's Office for help if the need arises.[21] The Election Office operates under the Utah Election Code.[22]

Due to Utah's lack of statutory procedures for a congressional special election, the process for such an election, except for the date of the election which is set by the Governor, is established entirely by the Lt. Governor.

**Utah's Election Code Provides a Process for New Political Parties to Register.**

In Utah, Registered Political Parties may participate in regular primary elections which select the parties' candidates for regular general elections.[23] Only candidates nominated by a Registered Political Party are placed on the general election ballot with a party designation.[24] A

---

[17] *Id.*

[18] Utah Code § 20A-8-103(6); Stipulated Facts ¶ 7.

[19] Transcript of Rule 30(b)(6) Deposition of the Office of the Lieutenant Governor: Witness Mark Thomas, dated July 12, 2017 ("Thomas Dep."), Exhibit 3 to Plaintiffs' Reply, docket no. 40-3, at 16–18.

[20] *Id.*

[21] *Id.* at 17–18.

[22] Utah Code §§ § 20A-1-101 *et seq.*

[23] Stipulated Facts ¶ 49; Utah Code §§ 20A-9-403(1)(a); 409(2)(b); and 409(2)(c).

[24] Stipulated Facts ¶ 15.

"Registered Political Party" is any party that: (1) participated in the last regular general election and met a certain vote threshold in at least one of the last two regular general elections; or (2) is a new political party and has complied with the petition and organizational requirements of the Election Code.[25]

The Utah Election Code defines the process for an organization of registered voters to become a Registered Political Party. To become a Registered Political Party, an organization of registered voters must file with the Lt. Governor a petition seeking Registered Political Party status and other documents.[26] The voters may circulate their petition to become a Registered Political Party "beginning no earlier than the date of the statewide canvass held after the last regular general election," which is usually around the end of November of an election year,[27] and "ending no later than November 30 of the year before the year in which the next regular general election will be held."[28] Thus, political party formation must occur principally in a year in which there is no general election. The petition must be signed by at least 2,000 registered voters. After the petition is filed with the Lt. Governor, the Lt. Governor is required to determine whether the required number of voters appears on the petition and review the proposed name and emblem of the new political party, which appear on the petition, to determine if they are distinguishable from other parties' names and emblems, and certify findings "within 30 days."[29]

If the Lt. Governor determines that the petition meets these requirements, the Lt. Governor then authorizes the filing officer to organize the prospective Registered Political

---

[25] *Id.* ¶ 14; Utah Code § 20A-8-101(4).

[26] Stipulated Facts ¶ 24.

[27] Transcript at 15:19-24; 68:23 69:4.

[28] Stipulated Facts ¶ 25; Utah Code § 20A-8-103(2)(a).

[29] Stipulated Facts ¶ 26; Utah Code § 20A-8-103(6).

Party.[30] Party organizers are next required to file various items, including the names of the party officers or governing board with the Lt. Governor. This must be done on or before March 1st of regular general election year.[31] After the Lt. Governor has reviewed that filing and determined that all proper procedures have been completed, the Lt. Governor issues a certificate naming the organization as a Registered Political Party in Utah and informs each county clerk that the organization is a Registered Political Party in Utah.[32] A Registered Political Party may qualify as a Qualified Political Party by filings which commit to allow candidates access to the ballot by convention or by gathering signatures.[33]

Utah voters who want to form a newly Registered Political Party ordinarily have months in advance of a regular general election to organize, prepare party constitutions and bylaws, gather petition signatures, submit required documentation, and wait for the Lt. Governor to certify findings and issue a certification of new party status.[34]

The Lt. Governor's Office follows a careful process to ensure election officials are fully prepared prior to issuing the certification to a political party.[35] This is because "recognition as a registered political party is a significant event that carries with it privileges and responsibilities" such as recognition for at least two years, the right to "place the names of its nominee on the primary and regular general election ballots under the party's name," and becoming "a state actor [that] must act within the boundaries of the Constitution."[36]

---

[30] Stipulated Facts ¶ 27; Utah Code § 20A-8-103(7)(a).

[31] Utah Code § 20A-8-106(1).

[32] Stipulated Facts ¶ 28; Utah Code § 20A-8-106(2).

[33] Utah Code §§ 20A-9-101(12) and 406(1).

[34] Stipulated Facts ¶ 29.

[35] Found by the court; suggested by Disputed Facts and Issues ¶ 15.

[36] Opposition at 11.

***The Lt. Governor Takes Many Actions Related to Primary Elections When a New Party is Certified.***

When a new Registered Political Party is certified in Utah, the Lt. Governor is required to change, print, and provide new voter registration forms throughout the state including to the county clerks, each public assistance agency, armed forces recruitment offices, and each state driver license division. Software changes are made to the Election Management System to ensure a new voter or a current voter can register for the new Registered Political Party. The online voter registration system must be changed to allow a voter to register with the new Registered Political Party. Absentee ballot request forms and Political Party Affiliation forms are adjusted and appropriately distributed to the county clerks. These changes are principally relevant to primary elections for parties who have chosen to have a primary open only to party members. Party affiliation of a voter is not relevant in a general election in Utah, though voter affiliation may be designated in the voter registration form.

The Lt. Governor's Office usually completes these tasks prior to officially certifying the Registered Political Party to ensure election officials are fully prepared for primary election voters who may affiliate or switch political parties. The Lt. Governor's Office has received complaints in the past from a newly Registered Political Party because the voter registration form had not been updated prior to the certification and has been accused of certifying a new Registered Political Party but not providing a way for voters to affiliate with the new Registered Political Party.[37] Again, these issues are only relevant in primary elections.

The Lt. Governor also contacts the State Tax Commission to ensure they make the appropriate program and form changes to the "check a buck" program which allows a citizen to

---

[37] Stipulated Facts ¶ 58.

have taxpayer's funds go to Registered Political Parties.[38] This step is unrelated to any election and is more important in the tax-paying season.

### Utah's Election Code Provides Processes for Candidate Access to the Regular Primary Election Ballot.

Utah Code § 20A-8-401(2) provides that "each new political party seeking registration, and each unregistered party seeking registration shall ensure that its constitution or bylaws contain:

> (b) a procedure for selecting party officers that allows active participation by party members; [and]

> (c) a procedure for selecting party candidates at the federal, state, and county levels that allows active participation by party members.[39]

To fulfill the requirements of Utah Code § 20A-8-401(2)(c), Registered Political Parties select general election candidates in a primary election. However, a political party's unopposed candidate will go directly on the general election ballot without a primary.[40]

A candidate for a Registered Political Party becomes eligible to access the primary election ballot if the candidate collects signatures of 2% of the Registered Political Party's members within the political district.[41] And if a candidate is a member of a Registered Political Party which is qualified as Qualified Political Party, the candidate may seek the party's designation for the primary election ballot through a party convention.

---

[38] *Id.* ¶ 57.

[39] *Id.* ¶ 42.

[40] *Id.* ¶ 49; Utah Code §§ 20A-9-403(1)(a); 409(2)(b); and 409(2)(c).

[41] Utah Code § 20A-9-403(3)(a)(ii).

The parties to this action agree that each of Utah's five Registered Political Parties[42] have submitted official paperwork with the Lt. Governor's Office designating themselves as a Qualified Political Party.[43]

### Utah's Election Code Provides Processes for Candidate Access to the Regular General Election Ballot.

Candidates who want to appear on a general election ballot may do so as candidates who win the nomination of a Registered Political Party or as unaffiliated candidates.[44]

Unaffiliated candidates receive a place on the ballot for a regular general election by submitting a nominating petition with a sufficient number of signatures.[45]

"All candidates . . . must also file a declaration of candidacy form and, unless seeking a waiver due to financial hardship, pay a filing fee."[46]

Utah law requires that regular general election ballots include a party designation for each candidate nominated by a Registered Political Party but requires all other candidates, regardless of their actual political affiliation, to be listed without a party name and with a disclaimer that "[t]his candidate is not affiliated with, or does not qualify to be listed on the ballot as affiliated with, a political party."[47] Utah law provides no other way for a party candidate to be listed on the general election ballot with a party label.[48] Section 20A-8-102(2) of the Utah Election Code provides that "[u]nless an organization of registered voters is a

---

[42] Constitution Party, Democratic Party, Independent American Party, Libertarian Party, and Republican Party. Opposition at 21-22.

[43] Found by the court; suggested by Disputed Facts and Issues ¶ 14.

[44] Found by the court; suggested by Disputed Facts and Issues ¶ 2.

[45] Stipulated Facts ¶ 16.

[46] *Id.* ¶ 17.

[47] Utah Code § 20A-6-301(a).

[48] Stipulated Facts ¶ 22; Utah Code § 20A-6-301(1)(e).

Registered Political Party under this chapter, it may not place the names of candidates representing that organization upon the primary and regular general election ballots under the common organization name."[49]

The Utah Election Code contains no provision governing placement of the names of candidates representing an organization upon a congressional special election ballot under a common organization name.

### Representative Chaffetz's Resignation Necessitated a Special Election.

The Associated Press reported on April 20, 2017, that Representative Jason Chaffetz of Utah's Third Congressional District "wouldn't seek re-election next year," and "may not even finish the two-year term that started four months ago."[50] According to the same Associated Press article, Chaffetz said in a text message: "My future plans are not yet finalized but I haven't ruled out the possibility of leaving early. In the meantime I still have a job to do and I have no plans to take my foot off the gas."[51] On May 18, 2017, Chaffetz's resignation was announced when he notified Utah Governor Gary Herbert of his intent to resign effective June 30, 2017.[52] Chaffetz's resignation came only a few months into his two-year term and left an 18-month vacancy to fill in his Third Congressional District seat.

### The Lt. Governor Established Procedures for a Congressional Special Election.

On May 19, 2017, after receiving Representative Chaffetz's resignation letter, Governor Herbert issued a writ of election and proclamation, which set the special election date as

---

[49] Found by the court; suggested by Disputed Facts and Issues ¶ 4.

[50] Stipulated Facts ¶ 9.

[51] *Id*.

[52] *Id.* ¶ 8.

November 7, 2017.[53] Later that same day, "[p]ursuant to Utah Code 20A-l-502," the Lt.

Governor issued an order setting forth a Special Election process and calendar for the vacancy of

the Third Congressional District of Utah (the "May 19 Order").[54] The May 19 Order also

provides that the Special Election will be conducted using the procedures for a regular general

election except as provided in the Special Election Procedures and calendar attached to the

order.[55]

     The May 19 Order:

- required candidates seeking nomination as a candidate for a Registered Political
  Party to file their declaration of candidacy form with the Lt. Governor by 5:00
  p.m. on May 26, 2017;[56]
- set a deadline of June 12, 2017, at noon, for unaffiliated candidates to file a
  declaration of candidacy;
- required parties nominating by convention to certify their nominee to the Lt.
  Governor by noon on June 19, 2017;[57]
- allows a special primary election to be held, if necessary, on August 15, 2017;[58]
  and
- sets a deadline of August 31, 2017, for the Lt. Governor to certify the names of
  the candidates who will appear on the special general election ballot.[59]

     The Governor set the Special Election date of November 7, 2017, to coincide with the

previously scheduled municipal general election date. The Lt. Governor adopted this date in the

May 19 Order, stating that "[t]he special general election shall be held on the same day as the

municipal general election, November 7, 2017. If a special primary election is needed, it shall be

---

[53] *Id.* ¶ 10; Governor Herbert Writ of Election, Utah Executive Order/Proclamation No. 2017-3, dated May 19, 2017,
docket no. 19-1, filed July 7, 2017.

[54] Stipulated Facts ¶ 11; Lieutenant Governor Order Setting Forth a Special Election Process and Calendar for the
Vacancy of the Third Congressional District of Utah, dated May 19, 2017, docket no. 19-2, filed July 7, 2017.

[55] Stipulated Facts ¶ 12.

[56] *Id.* ¶ 18.

[57] *Id.* ¶ 19.

[58] *Id.* ¶ 20.

[59] *Id.* ¶ 21.

held on the same day as the municipal primary election, August 15, 2017."[60] To "piggyback" the Special Election on the municipal primary and general elections, the Lt. Governor determined the Special Election process needed to begin immediately after Representative Chaffetz announced his resignation date.[61]

The portion of the Lt. Governor's schedule[62] through certification of the general election ballot is:

---

[60] *Id.* ¶ 30.

[61] *Id.* ¶ 31.

[62] Exhibit 1 to Verified Complaint, docket no. 2-1, filed June 21, 2017.

**The Lt. Governor's Schedule
through Certification of Special General Election Ballot**

| Date | Event |
|---|---|
| May 19, 2017 (1:00 p.m.) | Declaration of candidacy and intent to gather signature period begins for all candidates |
| May 26, 2017 (5:00 p.m.) | Declaration of candidacy and intent to gather signature period ends for partisan candidates |
| May 27, 2017 | First day a party may hold a nominating convention |
| June 12, 2017 (12:00 p.m.) | Deadline for partisan signature gathering candidates to submit petition signatures |
| June 12, 2017 (12:00 p.m.) | Declaration of candidacy and signature submission period ends for unaffiliated candidates |
| June 16, 2017 | Lt. Governor certifies qualified signature gathering candidates |
| June 19, 2017 (12:00 p.m.) | Last day for political parties to certify candidates nominated at convention to the Lt. Governor |
| June 19, 2017 (12:00 p.m.) | Lt. Governor issues a preliminary Special Primary Election ballot certification and delivers it to county clerks |
| June 30, 2017 | Vacancy in Office of Representative for Utah's Third Congressional District. |
| June 30, 2017 | Lt. Governor issues the Special Primary Election ballot certification and delivers it to county clerks |
| June 30, 2017 | Ballots are sent to military & overseas voters |
| July 3, 2017 | Last day for candidates to submit Primary Election profile to vote.utah.gov |
| July 17, 2017 | Voter registration deadline (via mail) |
| July 25, 2017 | Mail ballots are sent to voters |
| August 1, 2017 | In-person early voting begins |
| August 8, 2017 | Voter registration deadline (via online & in-person) |
| August 10, 2017 | Absentee ballot request deadline |
| August 11, 2017 | In-person early voting ends |
| August 15, 2017 | Special & Municipal Primary Election |
| August 22, 2017 | County canvass period begins |
| August 29, 2017 | County canvass period ends |
| August 31, 2017 | Lt. Governor canvasses Special Primary Election & certifies Special General Election ballot |

### *Rationale for Lt. Governor's May 19 Order*

The Lt. Governor states that providing a special election process and timeframe that

coincided with the already scheduled municipal elections addressed the state's interests in

efficient administrative processes, minimizing voter confusion by combining ballots, increasing

voter turnout and participation, and saving taxpayers approximately $1.6 to $2 million.[63]

The Lt. Governor was also concerned about advance mailing of ballots to military

personnel and overseas citizens. Pursuant to Utah Code § 20A-16-403, and 52 U.S.C.

§ 20302(a)(8), the Lt. Governor and county and municipal clerks are required to deliver to

military personnel and overseas citizens the primary election ballot 45 days prior to any federal

election. For the August 15, 2017, special primary election, that day was June 30, 2017, under

Utah law, and July 1, 2017, under federal law.[64]

The Lt. Governor determined that he had about six weeks, from May 19 to June 30, 2017,

to provide a declaration of candidacy period, signature collection period, signature review

period, political party conventions period, unaffiliated declaration of candidacy period and

provide sufficient time for election officials to develop, test, and qualify the special primary

ballots prior to June 30, 2017. These steps in a regular general election take place over the course

of four months.

The Special Election involves seven counties and fifty-four municipalities.[65] Because

Representative Chaffetz did not announce his resignation until May 18, 2017, and because the

Lt. Governor set the deadline for party candidates to submit their declarations of candidacy on

May 26, 2017, the UUP had less time to complete the steps necessary for Registered Political

Party status for the upcoming Special Election compared to the 2018 general election.[66]

---

[63] Found by the court; suggested by Disputed Facts and Issues ¶ 13; Thomas Dep. at 90:20–91:16 (calculating projected costs from historical average cost of $2.25 per voter for similar elections multiplied by 355,000 active registered voters in the Third Congressional District, with about 420,000 active and inactive registered voters).

[64] Stipulated Facts ¶ 32.

[65] *Id.* ¶ 33.

[66] *Id.* ¶ 34.

**The UUP Seeks to Organize and Participate in the Special Election.**

A month before Representative Chaffetz's announcement, in April 2017, the UUP was forming.[67] UUP had attracted some registered Democrat, registered Republican, and unaffiliated voters.[68] At that time, the next general Congressional election was at least 18 months away. The period for forming a new political party was open with several months left before the petition deadline of November 30, 2017.[69]

UUP's timetable changed when its founders learned that Representative Chaffetz's seat was opening earlier than expected. On May 25, 2017, UUP held a press conference announcing their candidate for the Special Election.[70] UUP's initial filing provided to the Lt. Governor on May 25, 2017, expressly stated: "The party will hold a convention in June to adopt a constitution and bylaws and elect officers for the party."[71] The UUP submitted approximately 2,100 signatures to the Lt. Governor on May 25, 2017. The party submitted an additional approximately 600 signatures prior to 5:00 p.m. on May 26, 2017.[72] When Mr. Bennett and other representatives of the UUP submitted their signatures to the Lt. Governor's office on May 25, an election official said that the Election Office would do the best they can to quickly review their documents and petition signatures.[73] The Election Office determined that additional resources were not necessary to review the UUP petition signatures, believing that it could take the entire

---

[67] *Id.* ¶¶ 1–2.

[68] Verified Complaint, ¶¶ 4–6.

[69] Utah Code § 20A-8-103.

[70] Stipulated Facts ¶ 53.

[71] *Id.* ¶ 35.

[72] *Id.* ¶ 36.

[73] *Id.* ¶ 37.

30-day statutory review period.[74] The Election Office opted to complete its review using existing internal resources.[75] The Election Office did not complete its review and certification of the UUP's party petition signatures submitted on May 26, 2017, until June 26, 2017.[76]

On May 26, 2017, the UUP sent its proposed bylaws and constitution to the Lt. Governor's office and chose to be designated as a Qualified Political Party.[77]

On June 17, 2017, the UUP held an organizing convention at which the party adopted its constitution and bylaws, elected officers, and nominated Mr. Bennett in accordance with its bylaws as the UUP's unopposed candidate in the Special Election for the Third Congressional District seat.[78] No other person has attempted to file as a UUP candidate for the Third Congressional District seat. Prior to 12:00 p.m. on June 19, 2017, the UUP submitted a certification to the Lt. Governor's office certifying Jim Bennett as the UUP's nominee in the Special Election for Representative Chaffetz's seat. UUP also stated that "[c]ertification is requested promptly and certification for candidates to file for the special election is requested pending certification of the party."[79]

On June 26, 2017, after the expiration of the full 30-day period for review of a new party's petition,[80] the Lt. Governor certified that the UUP had submitted enough signatures to become a Registered Political Party and that the party's name and emblem are distinguishable

---

[74] Thomas Dep. at 44-45, 48.

[75] *Id.*

[76] Stipulated Facts ¶ 45.

[77] *Id.* ¶ 38.

[78] *Id.* ¶¶ 3, 43.

[79] *Id.* ¶ 41; Utah Code § 20A-8-103(3)(i).

[80] Utah Code § 20A-8-103(6).

from other parties.[81] After that certification, UUP was then authorized to organize the prospective Registered Political Party.

On June 27, 2017, the Lt. Governor determined that the UUP need not hold another organizing convention in order to become a Registered Political Party.[82] On June 28, 2017, the UUP submitted to the Lt. Governor the names of party officers elected at the party's organizing convention and provided additional documentation requested by the Lt. Governor to complete the process of becoming a Registered Political Party.[83]

On July 13, 2017, the Lt. Governor certified the UUP as a Registered Political Party[84] and requested that the UUP provide him with the "Party's procedures for remote voting or designating an alternate delegate if a delegate is not present at a political party's convention" in order to assist him in determining whether the UUP has met the statutory requirements to be a Qualified Political Party ("QPP") under Utah Law.[85]

On Monday, July 17, the governing body of the UUP met and adopted a policy on remote voting that permits party members to vote remotely at satellite locations linked to the party's convention by video conferencing technology. On the same day, the chair of the UUP communicated the remote voting policy to the Lt. Governor's office by electronic mail.[86]

On Thursday, July 27, the Lt. Governor's office informed the chair of the UUP by telephone that the Lt. Governor's office had determined that the UUP's remote-voting policy

---

[81] Stipulated Facts ¶ 45.

[82] *Id.* ¶ 46.

[83] *Id.* ¶ 47.

[84] Supplemental Fact ¶1, Defendant's Responses to Plaintiffs' Additional Facts and Supplemental Facts, docket no. 35, filed July 13, 2017.

[85] Supplemental Stipulated Facts ¶ 1, docket no. 45, filed August 1, 2017; Stipulated Facts ¶ 2.

[86] Supplemental Stipulated Facts ¶¶ 2-3.

does not meet the statutory requirements for QPP status because it does not permit a delegate to participate in convention unless the delegate can be physically present at a specified location.[87]

On Monday, July 31, the UUP submitted to the Lt. Governor's office a proposed procedure for designating an alternate delegate in the event that a delegate is not able to attend the party's convention in person. The Lt. Governor and his staff reviewed the proposed procedure and determined that, if adopted, the proposed procedure would satisfy the requirement to be a QPP found in Utah Code § 20A-9-101(12)(a).[88]

Later on July 31, the governing body of the UUP then met and adopted the procedure that had been reviewed by the Lt. Governor's office. On August 1, the chair of the UUP informed the Lt. Governor's office by electronic mail that it had adopted the procedure. On August 1, 2017, the Lt. Governor made a final determination that the UUP has met the statutory requirements for QPP status.[89]

### Actions Taken Furthering Jim Bennett's Candidacy

Jim Bennett, a founding member of the UUP, is the UUP candidate for United States Representative in the Third Congressional District.[90] On the afternoon of May 26, 2017, Mr. Bennett went to the Lt. Governor's office to submit his declaration of candidacy.[91] Although the UUP had submitted its party petition signatures to the Lt. Governor's office, along with the party's proposed constitution and bylaws, prior to the 5:00 p.m. deadline, the Lt. Governor's

---

[87] *Id.* ¶ 4.

[88] *Id.* ¶¶ 5-6.

[89] *Id.* ¶¶ 7- 9.

[90] *Id.* ¶ 3.

[91] *Id.* ¶ 39.

office did not accept Mr. Bennett's declaration of candidacy for the UUP's nomination because the UUP was not yet a Registered Political Party in the State of Utah.[92]

Under the May 19 Order, the last day to file as an unaffiliated candidate was June 12, 2017, at noon. Mr. Bennett did not file as an unaffiliated candidate. The last day to file as a write-in candidate for the Special Election is September 8, 2017.

### *Summary of UUP and Bennett Actions*

In this table, the actions UUP took to become a Registered Political Party and Qualified Political Party (shown in red) are overlaid with the Lt. Governor's Special Election schedule, through certification of the general election ballot:

| Date | Event |
|---|---|
| May 19, 2017 (1:00 p.m.) | Declaration of candidacy and intent to gather signature period begins for all candidates |
| May 25, 2017 | UUP's initial petition with 2100 signatures provided to the Lt. Governor |
| May 26, 2017 | UUP submits an additional approximately 600 signatures |
| May 26, 2017 | UUP submits its proposed bylaws and constitution and chose to be designated as a qualified political party |
| May 26, 2017 | Jim Bennett submits his declaration of candidacy to the Lt. Governor |
| May 26, 2017 (5:00 p.m.) | Declaration of candidacy and intent to gather signature period ends for partisan candidates |
| May 27, 2017 | First day a party may hold a nominating convention |
| June 12, 2017 (12:00 p.m.) | Deadline for partisan signature gathering candidates to submit petition signatures for existing and prospective new parties. |
| June 12, 2017 (12:00 p.m.) | Declaration of candidacy and signature submission period ends for unaffiliated candidates |
| June 16, 2017 | Lt. Governor certifies qualified signature gathering candidates |
| May 26, 2017 | UUP submits its proposed bylaws and constitution to the Lt. Governor and chose to be designated as a qualified political party |
| June 17, 2017 | UUP holds its convention and nominates Jim Bennett as its candidate |
| June 19, 2017, before 12:00 p.m. | UUP certified Jim Bennett as the UUP's nominee in the congressional special election to the Lt. Governor's office. |
| June 19, 2017 (12:00 p.m.) | Last day for political parties to certify candidates nominated at convention to the Lt. Governor |

---

[92] *Id.* ¶ 44.

| June 19, 2017 (12:00 p.m.) | Lt. Governor issues a preliminary Special Primary Election ballot certification and delivers it to county clerks |
|---|---|
| June 26, 2017 | Lt. Governor certified that the UUP had submitted enough signatures to become a Registered Political Party and that the party's name and emblem are distinguishable from other parties |
| June 27, 2017 | Lt. Governor determined that the UUP need not hold another organizing convention to become a Registered Political Party |
| June 28, 2017 | UUP submitted to the Lt. Governor the names of party officers elected at the party's organizing convention and provided additional documentation requested by the Lt. Governor to complete the process of becoming a Registered Political Party. |
| June 30, 2017 | Vacancy in Office of Representative for Utah's Third Congressional District. |
| June 30, 2017 | Lt. Governor issues the Special Primary Election ballot certification and delivers it to county clerks |
| June 30, 2017 | Ballots are sent to military & overseas voters |
| July 3, 2017 | Last day for candidates to submit Primary Election profile to vote.utah.gov |
| July 13, 2017 | Lt. Governor certified the United Utah Party as a Registered Political Party requested UUP provide additional information concerning whether the it has met the statutory requirements to be a Qualified Political Party |
| July 17, 2017 | Voter registration deadline (via mail) |
| July 25, 2017 | Mail ballots are sent to voters |
| August 1, 2017 | Lt. Governor determines UUP has QPP status. |
| August 1, 2017 | In-person early voting begi90ns |
| August 8, 2017 | Voter registration deadline (via online & in-person) |
| August 10, 2017 | Absentee ballot request deadline |
| August 11, 2017 | In-person early voting ends |
| August 15, 2017 | Special & Municipal Primary Election |
| August 22, 2017 | County canvass period begins |
| August 29, 2017 | County canvass period ends |
| August 31, 2017 | Lt. Governor canvasses Special Primary Election & certifies Special General Election ballot |

**Lt. Governor Procedures – Special Primary Election to Special General Election**

The Lt. Governor issued a preliminary certification of the primary ballots on June 19 to the county clerks in order to allow time to prepare, print, and distribute the primary ballots by June 30, 2017.[93] On June 30, 2017, the Lt. Governor issued the final primary ballot certification

---

[93] *Id.* ¶ 54.

and the county clerks delivered primary ballots to voters that same day.[94] After the special primary election results are canvassed, the Lt. Governor will certify the candidates for the special general election ballots on or before August 31. On June 20, 2017, counsel for the Lt. Governor stated that Utah will not include the nominee of the UUP on the special general election ballot even if the party becomes a Registered Political Party before that date.[95] Pursuant to Utah Code § 20A-16-403, and 52 U.S. Code § 20302(a)(8), the Lt. Governor, county and municipal clerks are required to deliver to military personnel and overseas citizens the special general election ballot, 45 days prior to any federal election. For the November 7, 2017 election, that day is September 22, 2017, under Utah law, and September 23, 2017, under federal law.[96]

**Only the Lt. Governor's Procedures Exclude New Parties from the Special Election.**

Utah's party-registration statues and the Lt. Governor's May 19 Order made it impossible for a new political party to become registered prior to the May 26, 2017, candidate-filing deadline.[97] Nothing in Utah law prohibited the Lt. Governor from including in his May 19 Order a way for new political parties to participate in this Special Election.[98] As a practical matter, Utah's party registration statutes, the May 19 Order, and the Lt. Governor's timeframes for certifying a Registered Political Party in the context of a regular election cycle made it impossible for a new political party to have its nominee appear on the ballot in the Special Election unless the party had submitted its registration petition several months before Representative Chaffetz announced his intention to resign.[99]

---

[94] *Id.* ¶ 60.

[95] *Id.* ¶ 61; Letter from T. Roberts to C. Hayman, dated June 20, 2017, docket no. 19-4, filed July 7, 2017.

[96] Stipulated Facts ¶ 62.

[97] Found by the court; suggested by Disputed Facts and Issues ¶ 8.

[98] Found by the court; suggested by Disputed Facts and Issues ¶ 11.

[99] Found by the court; suggested by Disputed Facts and Issues ¶ 12.

**The Election Office Review of UUP's Petition Was Unnecessarily Delayed.**

The single longest delay in UUP registration was the Election Office review of the UUP petitions, from May 26 to June 26, 2017. This delay was entirely within the control of the Election Office. That period will be examined in detail.

When the Election Office reviews petition signatures for political parties or candidate petitions, it begins by verifying that the person who circulated the petition meets the statutory requirements necessary to be a circulator—*i.e.*, that the circulator is a Utah resident over 18 years of age.[100] The Election Office then reviews the individual petition signatures and the accompanying address, birthdate, and signature to ensure that information matches the information the State has on file.[101] For candidate petitions, the Election Office also reviews the petition signatures to ensure that the voter did not sign another petition for the same candidate.[102] Utah's voter registration database ("VISTA") usually contains all of the information necessary for the Election Office to review petition signatures.[103] If a signature has been collected by a careful circulator, and the name, address, and birth date included on the petition is the same as the information contained in VISTA, it takes approximately 60 to 90 seconds for the Election Office to review a signature.[104]

During this Special Election, two party candidates submitted candidate petition signatures: Tanner Ainge and John Curtis.[105] Mr. Ainge submitted his candidate petition

---

[100] Thomas Dep. at 21-22, 25.

[101] *Id.* at 20–22.

[102] *Id.* at 21.

[103] *Id.* at 24–26.

[104] *Id.* at 32–34.

[105] *Id.* at 34.

signatures on Tuesday, June 6, 2017, or Wednesday, June 7, 2017.[106] The Election Office reviewed those petitions and certified 7,000 signatures within approximately one week.[107] Mr. Curtis submitted his candidate petition signatures on June 12, 2017. The Election Office reviewed those petitions and certified 7,000 within 3 to 4 days.[108]

In preparation for reviewing the candidate petitions of Mr. Ainge and Mr. Curtis, the Election Office hired temporary employees and procured rental space and computer screens for those workers.[109]

The Lt. Governor said he was aware on May 22, 2017, that the UUP intended to become a political party and run a candidate in the Special Election.[110] The Lt. Governor's Office has no information that the signatures the UUP submitted were in bad form or took an unusually long amount of time to verify.[111] The Lt. Governor has identified no defects in the UUP's process of organizing the party and, barring any technical computer issues with the state system and the public-based voter registration websites, intended to and did issue a certification to the UUP on July 13, 2017, confirming that it is a Registered Political Party in the State of Utah.[112] From start to finish, the process for the Lt. Governor to review the UUP's party petitions and organizational documents spanned from May 25, 2017, to July 13, 2017—*i.e.*, seven weeks.[113] The UUP's registration application could have been completed in less than seven weeks if the Lt. Governor

---

[106] *Id.* at 37.

[107] *Id.*

[108] *Id.*

[109] *Id.* at 35–36.

[110] *Id*. at 53–55, 104.

[111] *Id*. at 52.

[112] *Id.* at 63–64.

[113] *Id.* at 70–71.

had taken different steps, such as using the temporary workers the Lt. Governor's office had hired to verify the UUP's 2,000 signatures.[114] The review of 2,000 signatures could have been completed in less than 30% of the time required to review 7,000 signatures each for candidates Mr. Ainge (one week) and Mr. Curtis (3-4 days). 30% of the longer one-week period is less than two days.

### Elimination of Election Office Delays Would Have Allowed Full Registration of the UUP Before the Special Primary Election.

The longest single period in UUP registration as a party was the 30-day review of petitions in the Lt. Governor's Office from May 26 to June 26, 2017. The second longest period was the document review from June 28 to July 13, 2017. Another long period was the time required for the UUP to show compliance for QPP status, from July 13 to August 1, 2017. Reducing the first period from 30 days to four; the second period from 15 days to two; and the third period from 15 days to five business days (due to UUP's inadequate submissions) shows the UUP registration process could have been completed as follows, enabling UUP to be recognized before the UUP convention and certification of the primary election ballot:

| Date | Event |
|---|---|
| May 19, 2017 (1:00 p.m.) | Declaration of candidacy and intent to gather signature period begins for all candidates |
| May 25, 2017 | UUP's initial petition with 2100 signatures provided to the Lt. Governor |
| May 26, 2017 | UUP submits an additional approximately 600 signatures |
| May 26, 2017 | UUP submits its proposed bylaws and constitution and chose to be designated as a qualified political party |
| May 26, 2017 | Jim Bennett submits his declaration of candidacy to the Lt. Governor |
| May 26, 2017 (5:00 p.m.) | Declaration of candidacy and intent to gather signature period ends for partisan candidates |
| May 27, 2017 | First day a party may hold a nominating convention |

---

[114] *Id.* at 71–73.

| Date | Event |
|------|-------|
| June 12, 2017 (12:00 p.m.) | Deadline for partisan signature gathering candidates to submit petition signatures for existing and prospective new parties. |
| June 12, 2017 (12:00 p.m.) | Declaration of candidacy and signature submission period ends for unaffiliated candidates |
| June 16, 2017 | Lt. Governor certifies qualified signature gathering candidates |
| May 26, 2017 | UUP submits its proposed bylaws and constitution to the Lt. Governor and chose to be designated as a qualified political party |
| June 2, 2017 | Lt. Governor could have certified that the UUP had submitted enough signatures to become a Registered Political Party and that the party's name and emblem are distinguishable from other parties |
| June 5, 2017 | Lt. Governor could have determined that the UUP need not hold another organizing convention to become a Registered Political Party |
| June 6, 2017 | UUP could have submitted to the Lt. Governor the names of party officers elected at the party's organizing convention and could have provided additional documentation requested by the Lt. Governor to complete the process of becoming a Registered Political Party. |
| June 8, 2017 | Lt. Governor could have certified the United Utah Party as a Registered Political Party and could have requested UUP provide additional information concerning whether the it met the statutory requirements to be a Qualified Political Party |
| June 15, 2017 | Lt. Governor determines UUP has QPP status. |
| June 17, 2017 | UUP holds its nominating convention and nominates Jim Bennett as its candidate |
| June 19, 2017, before 12:00 p.m. | UUP certified Jim Bennett as the UUP's nominee in the congressional special election to the Lt. Governor's office. |
| June 19, 2017 (12:00 p.m.) | Last day for political parties to certify candidates nominated at convention to the Lt. Governor |
| June 19, 2017 (12:00 p.m.) | Lt. Governor issues a preliminary Special Primary Election ballot certification and delivers it to county clerks |
| June 30, 2017 | Vacancy in Office of Representative for Utah's Third Congressional District. |
| June 30, 2017 | Lt. Governor issues the Special Primary Election ballot certification and delivers it to county clerks |

**The Lt. Governor Did Not Consider Participation of New Parties in the Special Election.**

Every deadline in the May 19 Order would not exist but for the May 19 Order.[115]
Although the May 19 Order compresses the statutory election calendar as compared to the
regular election calendar, the May 19 Order makes no accommodations for or adjustments to the
political party statutory process for becoming a Registered Political Party.[116] At the time the Lt.
Governor issued the May 19 Order, "there just wasn't any real discussion related to any potential
because I—we just weren't—it wasn't an issue that had come up, other than in talking about
scenarios that—and timeliness and other issues."[117] The Lt. Governor's Office admits it never
made a determination that the Lt. Governor could not make adjustments in the May 19 Order to
the political party statutory process for becoming a Registered Political Party.[118]

**The State Faces No Significant Burdens in Including the UUP and Its Candidate
in the Special General Election.**

Adding the UUP as an additional party and its candidate to the already scheduled special
general election likely would not result in any cost increase to the State, and the Lt. Governor's
Office is not aware of any voter confusion that has arisen from any of the other congressional
special elections around the country this year.[119] No one other than Mr. Bennett attempted to file
a declaration of candidacy seeking to be on the ballot in the Special Election for a political party
that is not registered.[120] The Lt. Governor's Office has no reason to believe that anyone other
than Mr. Bennett wanted to run for the UUP nomination for the Third Congressional District.[121]

---

[115] *Id.* at 80–81.

[116] *Id.* at 74, 82–84.

[117] *Id.* at 86–87.

[118] *Id.* at 84.

[119] *Id.* at 91–94.

[120] *Id.*

[121] *Id.* at 103–04.

The Lt. Governor's Office has not received any indication from the Green Party that it intends to try to run a candidate in this Special Election.[122]

## PROCEDURAL STANDARD

To be granted a motion for preliminary injunction, the movant must demonstrate that four factors weigh in favor of the injunction:

(1)      the likelihood of success on the merits;
(2)      the likelihood that the movant will suffer irreparable harm in the absence of preliminary relief;
(3)      the balance of equities[123] tips in the movant's favor; and
(4)      the injunction is in the public interest.[124]

Because a preliminary injunction is an extraordinary remedy, the "right to relief must be clear and unequivocal."[125]

Additionally, three types of preliminary injunctions are disfavored: (1) preliminary injunctions altering the status quo, (2) mandatory preliminary injunctions (those requiring the nonmovant to take action), and (3) preliminary injunctions granting the moving party all the relief it could recover at the conclusion of a full trial on the merits.[126] Plaintiffs seek a disfavored mandatory preliminary injunction because it would (1) alter the status quo for the Special Election Procedures, (2) require the Lt. Governor to include the UUP in the Special Election,[127]

---

[122] *Id.* at 100–101.

[123] The Tenth Circuit has sometimes framed this factor as the "balance of harms" rather than the "balance of equities." *See, e.g. Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009) (setting forth one of the elements of preliminary injunction as "the threatened injury to the moving party outweighs the harm to the opposing party resulting from the injunction"). Here, as must generally be the case, what is least harmful on balance is also most equitable on balance.

[124] *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1208 (10th Cir. 2009).

[125] *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

[126] *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), *aff'd on other grounds*, 546 U.S. 418 (2006).

[127] Motion at 2, docket no. 5. Plaintiffs frame their request for relief as "enjoin[ing] the [Lt. Governor] from refusing to include the United Utah Party's nominee, Jim Bennett, on the ballot in the special election." *Id.* To stop a party from refusing to do something is the same as requiring the party to take action.

and (3) afford Plaintiffs all the relief sought.[128] This is typical of an election case, in which a public official has taken action or a statute defines a procedure, which can only be corrected by affirmative relief granted in a short time frame. A disfavored preliminary injunction may only be granted when supported by strong showings of the likelihood of success on the merits and the favorable balance of harms.[129]

As the parties have acknowledged,[130] the Motion hinges on the outcome of the first element — likelihood of success on the merits. If Plaintiffs (1) are likely to succeed on their claim that the UUP's exclusion from the Special Election violates Plaintiffs' constitutional rights, it follows that (2) Plaintiffs will suffer irreparable harm in the absence of preliminary relief with respect to the upcoming Special Election, (3) the balance of equities tips in Plaintiffs' favor, and (4) a preliminary injunction is in the public interest.[131] Conversely, if Plaintiffs were not likely to succeed on their constitutional claims, the other elements would weigh just as firmly against preliminary relief.

## DISCUSSION

### A Flexible Legal Standard Applies to Constitutional Challenges to Election Laws.

Constitutional analysis begins by determining the level of judicial scrutiny that applies to the government restriction at issue. The Supreme Court explained in *Burdick v. Takushi* that constitutional challenges to state election laws are scrutinized under a uniquely flexible standard justified by the nature of election laws.[132] Without question, "voting is of the most fundamental

---

[128] Verified Complaint at 12–13 (Prayer for Relief).

[129] *Ashcroft*, 389 F.3d at 976.

[130] Transcript at 95:17–96:10.

[131] *RoDa Drilling,* 552 F.3d at 1208.

[132] 504 U.S. 428, 434 (1992) (upholding Hawaii election law's ban on write-in voting).

significance under our constitutional structure."[133] Even though voting is a fundamental right, the right to vote in any manner and associate for any political purpose is not absolute.[134] The individual states are responsible to establish procedures and regulations for holding elections.[135] Elections must be structured and regulated to bring order and fairness to the democratic process.[136] "Each provision of [a state's comprehensive election code], whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends."[137] To subject every voting regulation to strict scrutiny would paralyze states from operating elections equitably and efficiently.[138] "Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any 'litmus-paper test' that will separate valid from invalid."[139]

The Supreme Court in *Anderson v. Celebrezze* implemented a two-step analysis for constitutional challenges to state election laws. A court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that [plaintiff] seeks to vindicate."[140] The court next identifies and evaluates "the precise interests put forward by the State as justifications for the burden imposed by its rule."[141] In this

---

[133] *Id.* at 433 (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).

[134] *Id.* (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986)).

[135] *Id.* (citing U.S. Constitution, Art. I, § 4, cl. 1.).

[136] *Id.*

[137] *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (rejecting Ohio's early deadline for declaration of candidacy for President of the United States).

[138] *Burdick*, 504 U.S. at 433.

[139] *Anderson*, 460 U.S. at 789.

[140] *Id.*

[141] *Id.*

second part of the analysis, the government's interests are not only weighed against the plaintiff's rights; the court "also must consider the extent to which those interests make it necessary to burden the plaintiff's rights."[142] In other words, the relative balance of the rights and burdens is examined, and there must be a connection between the government's interests and the particular restriction imposed on the plaintiff.

### The Special Election Procedures Severely Burden Plaintiffs' Constitutional Rights.

The *Anderson/Burdick* test starts by assessing the "character and magnitude of the asserted injury."[143] The character of the injury asserted in this case is a violation of the First and Fourteenth Amendment rights to affiliate with political parties in the Special Election.[144] The magnitude of the asserted injury is complete—that is, the Special Election Procedures not only limit but completely bar the UUP's participation in the Special Election as a new party.

### *The Character of the Asserted Injury: The Special Election Procedures Violate Plaintiffs' First and Fourteenth Amendments Rights.*

The relief sought by the Motion concerns the UUP's access to the ballot, which impacts not only the rights of the UUP and Mr. Bennett, its candidate, but also the rights of voters in the Third Congressional District of Utah, including the other named Plaintiffs. The Supreme Court has held that "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters."[145] Courts recognize that restrictions on ballot access interfere specifically with candidates' and political parties' "right to associate for political purposes" and with "the rights of

---

[142] *Id.*

[143] *Id.*

[144] Verified Complaint ¶¶ 1 and 61.

[145] *Bullock v. Carter*, 405 U.S. 134, 143 (1972) (rejecting the Texas filing fee for primary elections).

qualified voters to cast their votes for the candidates of their choice." [146] For several decades, the Supreme Court "has recognized the constitutional right of citizens to create and develop new political parties." [147] "The right derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences." [148] The Utah Elections Code recognizes the values of candidacy and voter expression, instructing that one part of the code shall "be construed liberally so as to ensure full opportunity for persons to become candidates and for voters to express their choice." [149]

Plaintiffs correctly assert that the Lt. Governor's Special Election Procedures did not provide for new party participation in the Special Election. [150] Despite the UUP's diligent efforts, it has not been able to declare its chosen candidate, Mr. Bennett, for the Special Election. [151] Under the Lt. Governor's plan, Mr. Bennett's options for potential candidacy are limited to running as an independent candidate or as a write-in candidate, neither of which accurately reflects his affiliation with the UUP. [152] While the timeline for established parties to hold primaries and participate in the special general election was outlined in the May 19 Order, the Lt. Governor provided no path to the ballot for new political parties. [153]

---

[146] *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

[147] *Norman v. Reed*, 502 U.S. 279, 288 (1992).

[148] *Id*.

[149] Utah Code § 20A-9-401.

[150] Motion at 8–9.

[151] Stipulated Facts ¶ 44.

[152] Letter from T. Roberts to C. Hayman, dated June 20, 2017; Stipulated Facts, Exhibit 4, docket no. 19-4.

[153] May 19 Order, Exhibit 2 toStipulated Facts, , docket no. 19-2.

In *Anderson*, the Supreme Court clearly spoke against unequal treatment of political parties. "A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment."[154] The *Anderson* court held that equal treatment of candidates in an election is not necessarily achieved by imposing identical procedures on candidates without accounting for differences in their candidacies. "Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike."[155] This case presents such a situation.

The UUP, as a new party, unquestionably differs from the established Republican and Democratic Parties. The Republican Party has been particularly dominant in Utah's Third Congressional District elections. The Lt. Governor, Governor Herbert, and resigned Representative Chaffetz are all Republicans. In a state that elected Republican candidates for federal office across the board in the 2016 elections, the Third Congressional District stands out for electing Representative Chaffetz at 73.5 percent, a higher percentage than any other race in the state.[156] These facts suggest careful examination of the one-party control of this special election process, from resignation to the Governor's writ of election and proclamation, through the Lt. Governor's Special Election Procedures.

The UUP serves an important role as an alternative to the established political parties. As the Supreme Court has observed, "political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in

---

[154] *Anderson*, 460 U.S. at 793 (1983).

[155] *Id.* at 780 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)). While *Anderson* did not reach Equal Protection arguments, the Supreme Court noted that other courts had done so, in favor of *Anderson*. *Id.* at 780, n. 7.

[156] Certification of the State Board of Canvassers, dated November 28, 2016, available at: https://elections.utah.gov/Media/Default/2016%20Election/2016%20General%20Election%20-%20Statewide%20Canvass%203.pdf (last visited August 1, 2017).

time made their way into the political mainstream."[157] Indeed, the Utah Republican Party has been involved in dissension over election procedures, even to the point of internecine litigation in this court.[158] Such circumstances lay fertile ground for newly emerging parties to participate in the Utah's political process.

The Lt. Governor contends that Mr. Bennett could be an effective alternative as an independent or write-in candidate.[159] These options fall short of protecting Plaintiffs' right to association in the Special Election.[160] It "is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."[161] In *Bullock v. Carter*, the Supreme Court rejected the argument that instead of paying a burdensome filing fee to participate in a primary election for local office in Texas, a prospective Democratic Party candidate could forego the primary and apply for the general election ballot via voter petition.[162] The Supreme Court held that "we can hardly accept as reasonable an alternative that requires candidates and voters to abandon their party affiliations in order to avoid the burdens of [a voting regulation]."[163] This is no less true for a new political party. Plaintiffs have a protectable constitutional right to associate as a party under the UUP banner.

---

[157] *Anderson*, 460 U.S. at 794.

[158] *Utah Republican Party v. Herbert et al*, 2:16-cv-00038-DN; *Utah Republican Party v. Herbert et al*, 2:14-cv-00876-DN.

[159] Opposition at vii.

[160] *McLain v. Meier*, 637 F.2d 1159, 1165 (8th Cir. 1980) (A "candidate who wishes to be a party candidate should not be compelled to adopt independent status in order to participate in the electoral process.").

[161] *Anderson*, 460 U.S. at 787 (quoting *NAACP v. Alabama*, 357 U.S. 449, 460 (1958)).

[162] 405 U.S. at 146–47 (rejecting Texas filing fee for primary elections).

[163] *Id.*

***The Magnitude of the Asserted Injury: The Special Election Procedures Severely Burden Plaintiffs' Rights.***

The Special Election Procedures create a complete bar to new party participation in the Special Election. The May 19 Order compresses the statutory election calendar as compared to the regular election calendar, but makes no allowance for a newly emerging political party.[164] At the time the Lt. Governor issued the May 19 Order, "there just wasn't any real discussion related to any potential [new political party] because . . . it wasn't an issue that had come up, other than in talking about scenarios that—and timeliness and other issues."[165] The Lt. Governor's Office admits it never determined that the Lt. Governor couldn't make adjustments in the May 19 Order to the process for formation of a new party in the context of a congressional special election.[166] Nevertheless, the Election Office declined Mr. Bennett's declaration of candidacy for the UUP's nomination on the May 26, 2017 deadline because the UUP was not yet a Registered Political Party.[167]

Excluding the UUP from the Special Election altogether imposes a severe burden on the right to associate in a political party described above. The Supreme Court explained the importance of new party ballot access in *Williams v. Rhodes*:

> The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot.[168]

---

[164] Thomas Dep. at 74, 82–84.

[165] *Id.* at 86–87.

[166] *Id.* at 84.

[167] Stipulated Facts, ¶¶ 39–40.

[168] *Williams v. Rhodes*, 393 U.S. 23, 31 (1968).

The rights of each of the Plaintiffs is heavily burdened by the Special Election Procedures. The UUP is excluded from the Special Election. Mr. Bennett is forced to choose between running without the affiliation of his party and not running at all. And the voters are deprived of an option in the election that best reflects their political ideals.

In summary, under the first step of the *Anderson/Burdick* analysis, the character and magnitude of the infringement on Plaintiffs' rights is significant.

### The Interests Asserted by the Lt. Governor Do Not Justify or Necessitate a Complete Bar to New Political Party Participation in the Special Election.

The second step in the *Anderson/Burdick* analysis is to evaluate the State's interests in implementing the Special Election Procedures.[169] The court must consider whether the State's interests justify imposing such a burden on Plaintiffs' rights, as well as "the extent to which those interests make it necessary to burden the plaintiff's rights."[170] In other words, the State's interests must be *proportionate* to the burden the election procedures impose on Plaintiffs, and the specific State interests must *necessitate* imposing the particular burden caused by the election procedures.

### *The State Interests Identified by the Lt. Governor Are Insufficient.*

The Special Election Procedures reflect an effort by the Lt. Governor to follow the typical process for elections provided in the Election Code as closely as possible assuming the typical practice of forming a political party *before* the party declares a candidate. The Lt. Governor also seeks to combine the Special Election with the existing municipal elections scheduled for November 7, 2017, throughout the Third Congressional District. The Lt. Governor contends that this design serves a number of State interests:

---

[169] *Anderson*, 460 U.S. at 789.

[170] *Id.*

- alleviating administrative burdens on the State and counties;

- saving the State the added election costs of a separate election;

- reducing the time of the vacancy in Congress;

- minimizing voter confusion, deception, and even frustration of the democratic process at the general election;

- increasing voter participation;

- promoting the stability of the political system by avoiding splintered parties and unrestrained factionalism; and

- preventing ballot overload with frivolous candidacies by requiring a preliminary showing of a significant modicum of support.[171]

These State interests are not sufficient justifications for the severe burden imposed by the Special Election Procedures. The State presumably could not forecast the need for the Special Election. The Lt. Governor was expected to fill Representative Chaffetz's vacancy in compliance with the Election Code, and to do so as quickly, efficiently, and cost-effectively as possible. None of these goals, however, permit the Lt. Governor to prevent a class of voters from association, assembly, and voting for a newly formed political party in the Special Election.

**Administrative Burdens**

Reducing administrative burdens is a worthwhile objective, but not a sufficient state interest to outweigh Plaintiffs' First and Fourteenth Amendment rights. In *Idaho Republican Party v. Ysursa*, the defendant argued that changes to election procedures would create added administrative burdens and costs.[172] The district court agreed but nonetheless concluded that "there is no support for an argument that avoiding these burdens and costs are a compelling state

---

[171] Opposition at 15–16.

[172] 765 F.Supp.2d 1266, 1276 (D. Idaho 2011).

interest."[173] The same holds true here. Although adding another political party to the ballot creates more work for the State, that does not justify excluding UUP from the Special Election.

**Costs**

The Lt. Governor argues that he was compelled to use the existing election dates of August 15 and November 7 because additional costs would have been incurred if those dates were not used. However, the cost of using different election dates does not outweigh the burden of complete exclusion of a newly formed political party.

Courts have repeatedly rejected the argument that cost is a sufficient state interest in election cases.[174] The Third Circuit, relying on Supreme Court precedent, explained that "defraying the costs of elections is not "of compelling importance."[175] Similarly, Justice Stevens, in a concurring decision in *Illinois Board of Elections,* recognized a "valid interest" in limiting access to the ballot where placing additional names on a ballot "adds to the cost of conducting elections," but found the interest insufficient to outweigh the burden of Illinois's high signature requirements for new parties.[176] Election costs do not justify the burden of an absolute bar to ballot access for candidate Jim Bennett of the new UUP. However, incurring the expense of a separate election is not the Lt. Governor's only option, as will be discussed later.

**Time**

The Lt. Governor prioritized joining the Special Election with municipal elections already scheduled for August 15 and November 7, 2017. The condensed schedule in the May 19 Order—which did not allow time for the UUP to organize, register, qualify, and participate in the

---

[173] *Id.* at 1276.

[174] *Belitskus v. Pizzingrilli*, 343 F.3d 632, 646–47 (3d Cir. 2003).

[175] *Id.* (citing *Bullock* at 148).

[176] *Ill. Bd. of Elections*, 440 U.S. at 191.

Special Election before the candidate declaration deadline—was caused by the short time between Representative Chaffetz's resignation and the November 2017 municipal general elections.

The UUP could not reasonably predict that Chaffetz would resign and cannot be expected to do so.[177] The Supreme Court has declined to recognize a right to "instantaneous" access to the ballot or even a late decision by a candidate to seek inclusion on a ballot.[178] But that circumstance is not present here. Rather, the UUP had *no opportunity* to participate in the Special Election because it was not already a Registered or Qualified Political Party when the Special Election was announced.

> The Supreme Court recognizes that election schemes that require unnecessarily early action by candidates place a disproportionate burden on newly emerging parties and candidates: Since the principal policies of the major parties change to some extent from year to year, and since the identity of the likely major party nominees may not be known until shortly before the election, this disaffected 'group' will rarely if ever be a cohesive or identifiable group until a few months before the election.[179]

Impossibly early deadlines cannot be a valid state interest.

**Voter Considerations**

The Lt. Governor argues that adding a candidate to the ballot with a UUP designation could result in voter confusion, deception, and even frustration of the democratic process at the general election. Little risk of that exists here. UUP declared its intent to join the race almost immediately after Representative Chaffetz announced its resignation. UUP was uniquely diligent

---

[177] *Breck v. Stapleton*, No. 1:17-CV-36, 2017 WL 1319742, Slip Op. at 10-11 (D. Mont. April 8, 2017) (rejecting Montana's argument that "putative candidates should start collecting signatures based on the mere possibility of an election"); *Green Party of Arkansas v. Priest*, 159 F. Supp. 2d 1140, 1144 n.2 (E.D. Ark. 2001) (rejecting Arkansas' argument that the Green Party could have become a recognized political party in the prior year even though the special election at issue was "unknown and unforeseen" at that time).

[178] *Burdick*, 504 U.S. at 437 (1992) (citing *Storer v. Brown*, 415 U.S. 724, 736 (1974)).

[179] *Williams*, 393 U.S. at 33.

and public in working to access the ballot as a party. A demonstrated constituency of voters is interested in an alternative to the Republican, Democratic, independent, and write-in candidates. The additional option at the polls would benefit more than harm voters.

Even if a separate election were held, the Lt. Governor has not shown, beyond his own assumption, that voter turnout would suffer. It is equally easy to speculate that a stand-alone special election to elect a congressional candidate could draw voters disinterested in municipal elections.

The Lt. Governor's voter considerations are not a sufficient interest to justify barring participation of new parties in the Special Election.

### Political Stability and Ballot Overload

The Lt. Governor argues that the State interest in promoting the stability of the political system by avoiding splintered parties and unrestrained factionalism justifies barring the UUP, its designated candidate, and interested voters from participating in the Special Election. The Lt. Governor also asserts an interest in preventing ballot overload with frivolous candidacies by requiring a preliminary showing of a significant modicum of support.

These interests are not impaired by the UUP's participation in the Special Election. The UUP has demonstrated with its petition that it has the support required by the Election Code. And by organizing as a political party, UUP is *countering* factionalism and giving voters a consolidated voice distinct from the established political parties.

### The Lt. Governor Could Have Accommodated Formation of a New Political Party Before the Special Primary Election.

The failure of the Special Election Procedures to accommodate new political parties is entirely unnecessary because Utah law allows the Lt. Governor complete control over

congressional special elections,[180] subject only to constitutional considerations. The statutes do not constrain imaginative design of a complete process. This flexibility is wise, given the unusual circumstances that are inherent in congressional special elections.[181]

As the UUP suggested at argument, the Lt. Governor could have designed an entirely customized process[182] like those used in Georgia or Montana[183] or could have opted to allow formation of new political parties *concurrent* with candidate declarations. Candidates of prospective political parties would be at risk of not having ballot access with party identification if their designated party failed to form, but this is no reason to completely prohibit new parties from arising in response to a new political circumstance. This risk is certainly less than the burden of complete exclusion and is a reasonable risk for a candidate willing to link fate to a prospective party.[184]

The steps for formation of a new political party in Utah are not complex:

- The prospective new party presents declaration of intent to form new political party.

- The prospective new party submits the information required by Utah Code § 20A-8-103(2)(c).

- The prospective new party submits petition signatures.

- The Lt. Governor makes the determinations required by Utah Code § 20A-8-103(6) & (7) regarding required number of voters' signatures, name and emblem of prospective new party.

- The prospective new party files the names of the party's officers or governing board (Utah Code § 20A-8-106(1)) and constitution and bylaws (Utah Code § 20A-8-101(b)).

---

[180] Utah Code § 20A-1-102(28); Stipulated Facts ¶ 7.

[181] *Supra*, at 5.

[182] Transcript, 18-27, referring to documents filed as docket no. 39-1, attached to Defendant's Response to Plaintiff's Alternative Election Calendar (Options A, B and C), docket no. 39, filed July 17, 2017.

[183] *Id.* at 92–94.

[184] To ameliorate that risk, the schedule could have permitted a concurrent conditional unaffiliated application or have provided that a candidate of a failed prospective party would pass to the ballot as unaffiliated. Nothing in the Election Code bars this in a congressional special election.

- The Lt. Governor certifies the new political party.

These steps could have been outlined concurrent with the early stages of candidacy, allowing prospective parties and prospective candidates to qualify at the same time, and still use the municipal primary and general election dates.

This schedule overlays the process of formation of a new political party (italics) with the Lt. Governor's Special Election Procedures:

| Date | Event |
| --- | --- |
| *May 19, 2017 (12:00 p.m.)* | *Deadline to present declaration of intent to form new political party* |
| May 19, 2017 (1:00 p.m.) | Declaration of candidacy and intent to gather signature period begins for all candidates |
| *May 22, 2017 (5:00 p.m.)* | *Deadline for prospective new parties seeking to participate in the special election to submit the information required by Utah Code § 20A-8-103(2)(c)* |
| *May 25, 2017 (5:00 p.m.)* | *Deadline for prospective new parties seeking to participate in the special election to submit petition signatures* |
| May 26, 2017 (5:00 p.m.) | Declaration of candidacy and intent to gather signature period ends for partisan candidates |
| May 27, 2017 | First day a party *or prospective new party* may hold a nominating convention |
| *June 2, 2017* | *Lt. Governor makes determinations required by Utah Code § 20A-8-103(6) & (7) regarding required number of voters, name and emblem of prospective new parties* |
| June 12, 2017 (12:00 p.m.) | Deadline for partisan signature gathering candidates to submit petition signatures for existing and prospective new parties. |
| June 12, 2017 (12:00 p.m.) | Declaration of candidacy and signature submission period ends for unaffiliated candidates |
| *June 12, 2017 (12:00 p.m.)* | *Deadline for prospective new parties to file the names of the party's officers or governing board (Utah Code § 20A-8-106(1) and constitution and bylaws Utah Code § 20A-8-101(b)* |
| June 16, 2017 | Lt. Governor certifies qualified signature gathering candidates |
| *June 16, 2017* | *Lt. Governor certifies new political parties* |
| June 19, 2017 (12:00 p.m.) | Last day for political parties to certify candidates nominated at convention to the Lt. Governor |
| June 19, 2017 (12:00 p.m.) | Lt. Governor issues a preliminary Special Primary Election ballot certification and delivers it to county clerks |

By concurrently allowing prospective parties and candidates to qualify, the Lt. Governor's schedule using the already set municipal primary and general elections can be preserved.

This schedule, at this date, would have resulted in certification of new parties by before the deadline to certify candidates from party conventions, giving certainty as of that date, allowing full participation in primary elections. The interests argued by the Lt. Governor are also satisfied by this schedule and are not contradicted by concurrently allowing prospective parties and candidates to qualify.

**Administrative Burdens**

As discussed above, administrative burdens are of limited constitutional value. While the burden of allowing concurrent party and candidate qualification are greater than the office administrative burdens if new parties are prohibited, the concurrent burdens are not shown to be impossible. And the Lt. Governor's office has demonstrated that it can handle these concurrent burdens because it has actually done so.

**Costs**

Similarly, additional reasonable costs are not usually given constitutional dignity. But the costs of party formation are inevitable if a party will form. So, the only question is whether concurrent costs of party and candidate qualification are too great for the State to bear. Again, the record demonstrates the Lt. Governor's office has borne these concurrent costs.

**Time**

The Lt. Governor's desire to join the Special Election with municipal elections already scheduled for August 15 and November 7, 2017, is satisfied by a concurrent schedule.

### Voter Considerations

By allowing concurrent party and candidate qualification on this accelerated schedule, there would be no voter confusion, deception, or frustration of the democratic process at the conventions, primary Special Election or general Special Election. The only confusion could be in the period of concurrent uncertainty before a party convention, when a candidate declares for a party yet to be formed. But that potential confusion could be minimized by clear statements of conditions and is confined to the first month of a nearly six-month Special Election Procedure.

### Political Stability and Ballot Overload

The concurrent process does not present significant risks to political stability or ballot clarity. As the facts have developed, only one new party has emerged with the strength and rapidity to achieve ballot access.

### *The Facts Demonstrate the UUP and its Candidate Are Ready to Participate in the Special Election.*

The actual performance of the UUP and the Lt. Governor's Office in the recent months has allowed the UUP to form well in advance of the special primary election. This demonstrates the viability of alternative procedures because the Lt. Governor has actually accommodated party formation well before the deadline to certify the Special General Election ballot.

And the UUP could have been certified even earlier, in time to participate in the Special Primary Election if that had been necessary. *The three greatest factors preventing certification of the UUP prior to the certification of the special primary election ballot were within the exclusive control of the Election Office*. The Election Office was not *required* to take 30 days to review the UUP petition. But it did, even though the work could have been completed in two days. No justification has been offered for the 15 days the Election Office used to review the UUP organizational documents and there is no minimum statutory time requirement for that process.

Finally, review of the UUP documents submitted July 17th did not require until July 27th, when the Lt. Governor's response was given to the UUP. Had those times been shortened, the UUP could have been registered before the convention and ready to appear on the Primary Special Election ballot if more than one UUP candidate had declared.

But the special primary election deadline is artificial on the facts presented, because only one candidate declared as a member of the UUP. A primary election is not needed for UUP in this circumstance. The May 19 Order itself makes a special primary election conditional: "If a special primary election is needed, it shall be held on the same day as the municipal primary election, August 15, 2017."[185] Because Jim Bennett is the unopposed nominee of the UUP, Utah law would not require the UUP to participate in a special primary election. Without the need for a primary election, UUP is ready to participate in the special general election.

***State Interests Do Not Justify Exclusion of the UUP from the Special Election.***

In summary, the Lt. Governor's proffered interests do not justify complete exclusion the UUUP and its candidate from the Special Election. And those interests would not have prevented concurrent party and candidate qualification. Most importantly, the State's interests are satisfied by the factual development to date because the UUP and Mr. Bennett are fully prepared to participate in the Special Election. Under the *Anderson/Burdick* test, the Special Election Procedures burden Plaintiffs' First and Fourteenth Amendment rights without sufficient justification. Therefore, the Special Election Procedures violate Plaintiffs' rights to the extent they exclude the presence of UUP and Mr. Bennett on the Special Election ballot.

---

[185] Stipulated Facts ¶ 30.

**Plaintiffs Will Suffer Irreparable Harm in the Absence of Preliminary Relief.**

Because Plaintiffs are likely to prevail on the merits of their claims, the remaining preliminary injunction factors are not far from reach. In First Amendment cases, "the likelihood of success on the merits will often be the determinative factor."[186] The record supports such a result here.

Plaintiffs will suffer irreparable harm in the absence of preliminary relief. The Supreme Court has held that "[t]he loss of First Amendment Freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[187] This particular Special Election, which is now scheduled for November 7, 2017, will only be held once. Without relief, the UUP, its candidate Mr. Bennett, and their supporters will be unalterably excluded from the Special Election—a result that money damages could not redress. This factor weighs strongly in favor of the injunction.

**The Balance of Equities Is Strongly in Plaintiffs' Favor.**

The relative balance of the burden on Plaintiffs against the insufficient interests of the State shows Plaintiffs have equities on their side. The severe nature of the harm by complete exclusion from a significant election also shows the equities favor Plaintiffs. The diligence of the UUP and Mr. Bennett weigh heavily in Plaintiffs' favor. Although party formation was omitted from the Special Election Procedures, they made every reasonable attempt. Though they were rebuffed in their early attempts to form a party and

---

[186] *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014) (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir.2012), cert. denied, ––– U.S. –––, 133 S.Ct. 651, 184 L.Ed.2d 459 (2012)).

[187] *Elrod v. Burns*, 427 U.S. 347 373 (1976) (plurality opinion); *Hobby Lobby*, 723 F.3d at 1145 (same).

designate a candidate,[188] the Plaintiffs have demonstrated compliance with reasonable expectations. This factor strongly weighs in favor of granting the injunction in favor of Plaintiffs.

### The Injunction Is in the Public Interest.

The injunction serves the public interest. This factor of the test for preliminary injunctions looks beyond the private balance of equities to the broader impact of the injunction on the public. The Tenth Circuit has held that "it is always in the public interest to prevent the violation of a party's constitutional rights."[189] Beyond the theoretical benefit to the public interest of enforcing the First and Fourteenth Amendments, the injunction serves to provide another option to voters in the Special Election. Failure to issue an injunction would deny voters an important choice. This factor weighs heavily in favor of granting the injunction.

The preliminary injunction alters the status quo, requires the Lt. Governor to take action, and grants Plaintiffs the most significant relief they seek in their complaint, though declaratory judgment, nominal damages, attorney's fees, and costs are not adjudicated. In spite of these factors disfavoring this injunction, Plaintiffs have made a strong showing of the likelihood of success on the merits and the equities are strongly in their favor.

### No Bond Is Required.

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security *in an amount that the court considers proper* to pay the costs and damages sustained by any party found to have been

---

[188] During this litigation, the Lt. Governor's Office has exhibited very professional cooperation in the UUP certification process.

[189] *Hobby Lobby*, 723 F.3d at 1145 (10th Cir. 2013) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir. 2012)).

wrongfully enjoined or restrained."[190] Although the Lt. Governor has not requested a bond, and Plaintiffs have not argued against the bond requirement, the bond requirement must be addressed.[191]

Under the circumstances, no bond is required from Plaintiffs. Despite the mandatory nature of the language in the Rule, trial courts have "wide discretion under Rule 65(c) in determining whether to require security."[192] This preliminary injunction enforces fundamental constitutional rights against the government. Waiving the security requirement best accomplishes the purposes of Rule 65(c).[193]

### ORDER AND PRELIMINARY INJUNCTION

THEREFORE, IT IS HEREBY ORDERED that the Motion for Temporary Restraining Order and Preliminary Injunction[194] is GRANTED and a Preliminary Injunction is GRANTED.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Lt. Governor Spencer Cox is enjoined, directed, and ordered to place Jim Bennett, as the designated candidate of the United Utah Party, a Qualified Political Party, on the special general election ballot for the election set November 7, 2017, to fill the office of Representative of the Third Congressional District for the State of Utah in the United States House of Representatives.

---

[190] Fed. R. Civ. P. 65(c) (emphasis added).

[191] *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) ("[U]nlike the case in which a bond is denied as unnecessary after full consideration, when a trial court fails to contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable.").

[192] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009).

[193] *Id. See also Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1335–36 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.").

[194] Docket no. 5, filed June 21, 2017.

Dated August 2, 2017.

BY THE COURT:

_____
David Nuffer
United States District Judge